

# IN THE COURT OF CRIMINAL APPEALS
# OF TEXAS

## NO. AP-77,063

### JAMES CALVERT, Appellant

### v.

### THE STATE OF TEXAS

### ON DIRECT APPEAL FROM CAUSE NO. 241-1467-12
### IN THE 241ST DISTRICT COURT
### SMITH COUNTY

**NEWELL, J.,** *delivered the unanimous opinion of the Court.*

### OPINION

In October 2015, a jury convicted Appellant of murder in the course of committing

or attempting to commit burglary or kidnapping.[1]  Based upon the jury's answers to the

special issues set forth in Texas Code of Criminal Procedure Article 37.071, Sections 2(b)

and 2(e), the trial judge sentenced Appellant to death.[2]  Direct appeal to this Court is

---

[1] TEX. PENAL CODE § 19.03(a)(2).

[2] TEX. CODE CRIM. PROC. art. 37.071, § 2(g).  Unless otherwise indicated, all references to
Articles refer to the Code of Criminal Procedure.

automatic.[3]  After reviewing Appellant's twenty-nine points of error, we find them to be without merit.  Consequently, we affirm the trial court's judgment and sentence of death.

## STATEMENT OF FACTS

While visiting Croatia, Appellant met the victim, Jelena.  She accompanied him on his return to Tyler, and they married in 2004.  Jelena became increasingly fearful of Appellant over the course of their marriage.

Appellant and Jelena's first child, E.C., was born in 2006.  Their second child, L.C., was born in 2008.  Appellant and Jelena separated in 2009 and divorced in 2010.  Jelena obtained a restraining order that barred Appellant from going to her new home.  According to their divorce decree, Jelena had primary possession of the children.  She could not move with the children more than 125 miles from the Smith County Courthouse.  Appellant had visitation rights on alternate weekends and Thursdays. The order specified that Jelena and Appellant would exchange the children at Jason's Deli.

In January 2012, Jelena married Arvind Sriraman.  Jelena wanted to move with the children to Houston, where Sriraman had taken an engineering job, but Appellant refused to agree to modify the terms of the child custody order.  He was also uncooperative during mediation.  Eventually, Jelena and Sriraman took the matter to trial.  On October 19, 2012, a jury determined that the custody order should be modified so that Jelena and the children could move up to 500 miles away from the Smith County Courthouse.

---

[3] TEX. CODE CRIM. PROC. art. 37.071, § 2(h).

About twelve days later, on October 31st, Jelena was packing to move to Houston. L.C., age four, was home with her. E.C., age seven, was at school. Although Appellant did not have visitation that day, Jelena had agreed that Appellant could take the children to dinner and then trick-or-treating.

Shortly before the scheduled visit, Appellant told Jelena that they needed to exchange the children at her house instead of the deli. Jelena did not know it but Appellant had been avoiding service of a motion by Deidre Adams, his first wife. Adams and Appellant had a child together, J.C., and Adams had filed a motion to enforce court-ordered child support. Appellant suspected that Adams was planning to serve him with that motion at the deli. Jelena would not agree to exchange the children at her house. Appellant angrily canceled the visit. Jelena was upset about this incident, which she relayed to multiple friends.

Less than three hours later, Appellant broke into Jelena's house and, in front of L.C., shot her multiple times. Appellant took L.C. and fled to Louisiana. That evening, following a high-speed chase in West Monroe, Louisiana, police officers arrested Appellant and discovered L.C. physically unharmed in the back seat of Appellant's car.

Appellant was indicted for capital murder. Counsel (Jeffery Haas and Jason Cassel) were appointed to represent him. However, in February 2014, Appellant requested and was granted the right to represent himself. He represented himself through approximately fifty pretrial hearings, voir dire, and roughly three weeks of the jury trial. Appellant's attorneys, in standby status, were present and available to assist him. On September 15, 2015, during

the guilt phase, the trial court revoked Appellant's pro se status and reinstated counsel to represent him.

At trial, Shonda Emmert testified that she was in the parking lot across the street from Jelena's house around noon on the day of the offense. She heard, "[B]ang, bang, bang," which she initially thought was a nail gun "going off." About a minute later she saw a man walking out of the house, carrying a small child wrapped in a blue blanket. He went to a car parked down the street, put the child in the back seat of the car, and drove away.

Emmert drove to the house to see if things were okay. Another woman, Robin Dickerson, pulled up at the same time, ran into the carport, and screamed at Emmert to call 911. Emmert walked toward the house to get a better look at the house number. She saw a body in the carport; the door between the kitchen and carport was "splintered" and looked like it had been kicked in. When the prosecutor showed Emmert photographs of L.C., Appellant, and Appellant's car, she stated that the photos were consistent with the appearance of the child, the man, and the car she saw on the day of the offense.

Dickerson testified that she worked at the same church as Jelena. On the day of the offense, around noon, she was in a parking lot near Jelena's house when she heard four or five shots. She looked toward Jelena's house and saw a man carrying a child from the carport to a car parked on the street. The man got into the car and left. Dickerson believed that the child she saw was L.C. and the man, Appellant. Dickerson drove up, walked into the

carport and saw Jelena lying in the doorway, dead. When Emmert drove up, Dickerson told her, "Call 911. He shot her."

Tyler Police Detective Craig Shine, the lead detective in this case, responded to the 911 call. He testified that it was apparent from the number and locations of Jelena's gunshot wounds that the shooter knew her and wanted her dead. Based on his observations and interviews at the crime scene, Shine obtained a capital murder warrant for Appellant. The Tyler Police Department broadcasted a BOLO ("be on the lookout") Alert and an Amber Alert.

Texas Ranger Brent Davis testified that he went to the crime scene and saw numerous cartridge casings on the kitchen floor. All of the casings were from a .40-caliber semi-automatic pistol and were marked ".40 S&W." From the location of the casings, it appeared that the rounds were fired at Jelena from inside the house. Davis observed bullet strikes on the door, the door frame, the car, and the concrete floor of the carport. It appeared that the door between the kitchen and the carport had been kicked in; the strike plate and pieces of wood from the door frame were on the floor. The door was standing open. Tyler police officers advised Davis that L.C. was missing and that they believed he had been kidnapped. It appeared to Davis that Jelena had been trying to leave the house to escape from the shooter when she was shot multiple times.

Dr. Elizabeth Ventura, a medical examiner at the Southwestern Institute of Forensic Sciences, conducted the autopsy. She testified that Jelena was intentionally killed.

Specifically, Jelena sustained six gunshot wounds, five of which damaged vital organs in her head and torso. The number, direction, and location of the gunshot wounds indicated that Jelena was changing her position in relation to the gun when she was shot. The fact that she had sustained several fatal shots while moving around was evidence of an intentional killing in which the shooter wanted her dead. Ventura said that it was likely, but not certain, that the fatal shot to Jelena's head was the last shot.

Howard Ryan, a forensic investigation consultant and crime scene reconstructionist, testified about the bloodstain evidence at the crime scene. He noted that a contact transfer stain on the carport door indicated that Jelena was shot in the back while she was upright, and then she slid down the door. After she was seated and leaning against the door, she was shot through the abdomen. Another shot through her arm and side caused her to fall onto the door mat in the carport. Finally, Jelena sustained a shot to the back of the head while her head was face down and several inches off the carport floor. A spent shell casing in the carport indicated that the shooter was likely standing over her when he fired that shot. Ryan averred that this pattern indicated that the shooter was proficient, in control, and "not frantic" while he was shooting.

Tim McLemee, an expert in forensic digital data and media, discussed a data report showing the WiFi connections that Appellant's iPad had made on the day of the offense, starting at 1:32 p.m. and ending at 9:46 p.m. These connections started in Tyler, Texas, and ended near West Monroe in Ruston, Louisiana. Appellant's iPad had connected to WiFi

networks in several McDonald's restaurants along the route. Most of the searches on the iPad were for news stories about the instant offense and Amber Alerts.[4]

West Monroe Police Officer Raymond Spoon testified that he had volunteered to "take a call" before his shift started on the evening of the day of the offense. As a result, he was not in the police station when officers were briefed on the alerts from Tyler, Texas, and was unaware of those alerts when he first encountered Appellant.

Spoon was parked on the grassy median of the highway, "working drug interdiction," when Appellant's vehicle passed him at 11:05 p.m. Spoon began following the vehicle after he saw "some indicators" that it might be transporting drugs.[5] Upon observing a traffic violation, Spoon activated his lights and attempted to stop the vehicle. Initially, Appellant pulled over and stopped, but as Spoon exited his patrol car, Appellant drove away. Appellant thereafter passed three parking lot entrances where he could have pulled in and stopped safely. He drove slowly and then stopped a second time. After Spoon exited the patrol car and ordered Appellant out of his vehicle, Appellant drove away again. Concerned that this pattern of stopping and starting was consistent with "baiting" and ambushing a police officer,

---

[4] FBI Special Agent Mark Sedwick testified that the historical call detail records from Appellant's phone provided no cell tower information after 10:18 a.m., which meant that his phone was turned off, out of the coverage area, or in airplane mode.

[5] Spoon testified that the indicators included: the vehicle was traveling in the far right lane; the driver's hands were at "10:00 and 2:00" on the steering wheel; the driver looked straight ahead and never looked toward Spoon; and the vehicle appeared to have a single occupant who was driving on the interstate highway a little after 11:00 p.m. on Halloween.

Spoon called for assistance. Officer Justin Cummings, Sergeant Matthew Downhour, and Corporal Marie Knight testified that they responded to Spoon's call for assistance.

Initially, Appellant led a "slow-rolling chase," but he picked up speed as other patrol cars joined the pursuit. He ran red lights and almost caused several collisions. Appellant eventually drove into a dead-end street in a residential area, made a U-turn, drove across a front yard, and was finally forced to stop when his car was blocked in by police vehicles. As officers were approaching Appellant's vehicle with their guns drawn, Cummings heard Appellant say, "Just don't shoot my child." Appellant would not open his car door. Officers broke the window to reach him. Cummings removed a gun from between Appellant's legs and threw it away from the car. Appellant fought with officers after they pulled him from the car. During the struggle, Appellant said, "You don't know what I've done."

Appellant resisted arrest and continued to be uncooperative when officers placed him into a patrol car. Downhour stated that Appellant was wearing a concealed waistband designed to hold a gun and magazines. It contained an empty magazine fitting the Sig Sauer pistol that was on the back-seat floor. Although there was a different license plate on Appellant's vehicle than that in the BOLO Alert and Amber Alert, Knight identified Appellant and the child as the subjects of those alerts.

Detective Shine testified that after the West Monroe Police Department notified him that they had arrested Appellant, he drove from Tyler to West Monroe and interviewed Appellant. During that interview, Appellant identified himself as the driver and owner of the

impounded vehicle and admitted to having a Sig Sauer pistol that he "always" kept in the glove compartment and the weapon that officers had removed from his lap. Appellant told Shine that if his son L.C. had not been in the car with him, he "would have shot those idiots"—meaning the West Monroe police officers—when they pointed their guns at him.

In the audiovisual recording of Appellant's statement to police, Appellant acknowledged that he had taken about $200 in cash from his mother before he left her house on the morning of the offense. He clearly described his activities shortly before Jelena's murder, including having breakfast at a Whataburger and picking up a copy of Adams's motion for enforcement of child support at the courthouse. However, he stated that he did not remember anything after that until he was driving away from Tyler. Appellant suggested that he might have been fixing a client's computer during that time, but he could not identify the client.[6] He avoided describing the murder or specifying where or how he picked up L.C. But he admitted that he "must have" taken L.C. from Jelena and that he "might" have had Jelena's phone in his car.

Appellant repeatedly stated that he did not remember—or that he did not know—if he and Jelena had agreed that he would have the children that day or if Jelena had wanted him to go to her house to pick them up. When an investigator asked him if it made him mad when Jelena told him not to pick up the children from her house, he responded that he "didn't see the logic in it." When asked where he went after he picked up L.C., Appellant told

---

[6] The record shows that, at the time of the offense, Appellant worked as a freelance computer consultant.

investigators that he did not recall driving toward any particular destination, but he remembered "having a good day with [L.C.]." Appellant stated that he took L.C. to a Halloween festival at a church or school somewhere between Tyler and West Monroe.

Appellant described Jelena, Adams (his first wife), and Debbie Campbell (his sister) as unintelligent, vindictive, and dishonest. He acknowledged that Jelena had told him that she was afraid of him. When investigators informed him that there were witnesses to the offense, he remarked that Jelena's neighbors would not recognize him.

When asked if he knew why he was in the police station, Appellant responded by asking if he was being charged with speeding. He stated that he had evaded arrest because he did not like getting speeding tickets. Detectives told him that he was being held on a capital murder warrant, and he challenged them to show it to him. When they did, he emphasized that the warrant was from Texas and stated that he needed to know what the Louisiana charges were.

After speaking with Appellant, Shine viewed Appellant's vehicle in the impound lot. A West Monroe officer told Shine that Appellant had boasted following his arrest that "they were looking for the wrong license plate." Looking through the windows, Shine saw two firearms and two cell phones, one of which matched the description of Jelena's phone.

Tyler Police Department Detective Craig Williams testified that he processed Appellant's vehicle after it was returned to Tyler. He found Jelena's cell phone on the back seat and its black-and-pink case in the driver's door pocket. He also identified a Springfield

XD handgun recovered from the driver's floorboard, where West Monroe police officers had placed it after they arrested Appellant.[7] It had an attached magazine of twelve rounds and one round in the chamber. All rounds recovered from that gun were Winchester .40 caliber Smith & Wesson, the "same caliber and same brand of the casings that were at the crime scene." Additionally, Williams identified license plates found under the front passenger floor mat as the current plates for Appellant's vehicle. The license plates that were on the vehicle when it was stopped were expired. Williams testified that the vehicle's trunk contained numerous loaded rifles, several handguns, and a large stock of ammunition. Appellant had approximately 200 rounds, ready to fire, in the rifles.

Williams also reviewed photographs of items taken from the car. He identified: a knife; a Don Hume holster; an Apple phone in a gray-and-white case; a Sig Sauer .380 pistol with a loaded magazine and a chambered round; two additional loaded magazines; a McDonald's receipt from Arcadia, Louisiana, printed at 9:07 p.m. on the date of the offense; an iPad; a computer bag containing copies of a modified order for possession and access to J.C., the 2010 agreed final decree of divorce between Appellant and Jelena, a box of "Winchester .40-caliber Smith & Wesson bullets" (which was missing ten bullets), 9-millimeter ammunition that would fit a Kel-Tec firearm, such as the Kel-Tec 9-millimeter

---

[7] This firearm was the weapon that Cummings had thrown out of the car. Wade Thomas, a forensic scientist with the Texas Department of Public Safety lab in Tyler, conducted a toolmark analysis on the Springfield XD to determine whether it was the weapon used in the offense. By comparing recovered projectiles with test-fired projectiles, Thomas determined that the recovered projectiles were fired by the Springfield XD.

pistol found in the vehicle's trunk, three shotgun rounds, and a box containing three Hornaday Critical Defense .380-caliber cartridges; Appellant's wallet; a blue-and-black holster designed to be concealed under clothing; a SKS magazine loaded with five rounds; "[o]ne case of Federal Premium Personal Defense .380 Auto, 90-grain Hydra-Shok, with 17 live rounds inside"; "[o]ne box of Remington 12-gauge buckshot 00BK"; a receipt for buckshot from Gander Mountain in Tyler, printed at 10:38 a.m. on the date of the offense; a Whataburger receipt printed at 10:05 a.m. on the date of the offense; and an envelope with a copy of Adams's motion for enforcement of child support order and order to appear in the interest of J.C., file-marked October 26 (five days prior to the offense).

## SUFFICIENCY OF THE EVIDENCE

Appellant does not challenge the sufficiency of the evidence to prove that he intentionally killed Jelena. Rather, he argues that the evidence was insufficient to prove that he did so in the course of committing or attempting to commit the offense of kidnapping (point of error twenty-one) or in the course of committing or attempting to commit burglary (point of error twenty-two). Appellant asserts that there was "evidence to defeat" the underlying offense of burglary—L.C.'s statement that "there was a knock at the door" before Appellant entered the house and killed Jelena.

In assessing the legal sufficiency of the evidence to support a conviction, we consider all of the record evidence, whether admissible or inadmissible, in the light most favorable to

the verdict.[8]  We determine whether, based on that evidence and reasonable inferences therefrom, any rational trier of fact could have found the defendant guilty of the essential elements of the offense beyond a reasonable doubt.[9]

Here, the jury returned a general verdict finding Appellant "guilty of the offense of capital murder as charged in the indictment."  We will uphold the verdict of guilt if the evidence was sufficient on either the kidnapping or the burglary theory.[10]

A person commits capital murder when he intentionally causes the death of an individual in the course of committing or attempting to commit burglary.[11]  A person commits burglary if, without the effective consent of the owner, he enters a habitation with the intent to commit a felony, theft, or assault; or if, without the effective consent of the owner, he enters a habitation and commits or attempts to commit a felony, theft, or an assault.[12]  "An unlawful entry into a habitation with the intent to commit murder will satisfy the burglary element of a capital murder charge."[13]

---

[8] *Powell v. State,* 194 S.W.3d 503, 507 (Tex. Crim. App. 2006).

[9] *Musacchio v. United States,* 136 S. Ct. 709, 715 (2016) (citing *Jackson v. Virginia,* 443 U.S. 307, 319 (1979)).

[10] *See Sorto v. State,* 173 S.W.3d 469, 472 (Tex. Crim. App. 2005).

[11] *See* TEX. PENAL CODE § 19.03(a)(2); *Whitaker v. State,* 977 S.W.2d 595, 598 (Tex. Crim. App. 1998).

[12] TEX. PENAL CODE § 30.02(a)(1), (3).

[13] *Balderas v. State,* 517 S.W.3d 756, 766 (Tex. Crim. App. 2016) (quoting *Whitaker,* 977 S.W.2d at 598-99).

When Appellant informed Jelena that he wanted to exchange the children at her house, she expressly refused, telling him that they would exchange the children in the deli parking lot as originally planned. Appellant then canceled the exchange. During and after these discussions, Jelena communicated to Sriraman and to her friends that she was afraid of Appellant and did not want him in her house.

Moreover, several witnesses at the crime scene observed that the door frame was splintered and the strike plate was on the floor, indicating a forced entry. Evidence that Jelena did not want Appellant in her home and that the door had been forced open sufficiently established that Appellant entered Jelena's home without her effective consent. Thus, the first requirement of burglary is satisfied.

The evidence also established that Appellant entered Jelena's home with the intent to commit the felony of murder. Appellant aimed his gun at Jelena and shot her repeatedly as she attempted to escape, and he shot her again after she was sitting and then lying on the floor. Appellant's use of a firearm, as well as the number and locations of Jelena's gunshot wounds, demonstrated his intent to murder Jelena.[14] A rational jury could have determined from this evidence that Appellant entered Jelena's house without her effective consent, intending to commit a felony, and intentionally murdered Jelena. Accordingly, the evidence was sufficient to prove that Appellant was guilty of capital murder. Because we find the

---

[14] *See, e.g., Ex parte Thompson,* 179 S.W.3d 549, 555 (Tex. Crim. App. 2005) (finding that evidence of the Appellant's intent to kill was overwhelming when, among other things, he intentionally shot the victim in the abdomen and then intentionally shot him three more times as he lay on the ground).

evidence sufficient to prove the offense of burglary of a habitation, we need not consider whether the State proved the underlying felony of kidnapping.[15] Points of error twenty-one and twenty-two are overruled.

## SHOCK CUFF ACTIVATION

Appellant wore a shock cuff on his ankle, which deputies activated outside the jury's presence. In point of error one, Appellant alleges that the trial judge violated his rights to substantive and procedural due process by allowing him to be subjected to an electric shock during trial for conduct that did not warrant such treatment, particularly when the judge had far less drastic alternatives. Appellant asserts that he did not pose a security threat while representing himself but instead was shocked for being disrespectful. Appellant notes that his counsel later moved for a mistrial on the ground that he "highly suspect[ed]" that the jury—which had just been excused for the day—heard Appellant scream.[16] Appellant argues that activating the shock cuff constituted "egregious official conduct" or conduct that "shocks the conscience," in violation of the Fourteenth Amendment guarantee of substantive due process. He contends that this conduct was structural error requiring reversal.[17] We

---

[15] *See* TEX. PENAL CODE § 19.03(a)(2); *see also Vega v. State,* 267 S.W.3d 912, 913 (Tex. Crim. App. 2008) ("If the hypothetically correct jury charge for the case would authorize the jury to convict on alternative theories of liability, then the appellate court must deem the evidence sufficient if it is sufficient under any of the theories of liability.").

[16] After this incident, the trial judge re-appointed standby counsel, who represented Appellant for the rest of the trial.

[17] Appellant also claims that the shock cuff's activation violated the Eighth Amendment of the United States Constitution, as well as Article I, Sections 13 and 19 of the Texas Constitution. "Eighth Amendment scrutiny is appropriate only after the State has complied with the constitutional

agree with Appellant that, under the circumstances here, activation of the shock cuff violated

due process because there was no immediate security concern. We disagree with Appellant,

however, that the constitutional error in this case was structural or harmful, because the

activation was not in front of the jury and it only momentarily incapacitated Appellant.

Appellant requested before trial that he be allowed to wear a shock belt instead of a

leg brace in proceedings before the jury. He argued that a shock belt would be less

noticeable than a leg brace; therefore, it would not "lower" his presumption of innocence.

For reasons not explained in the record, Appellant wore both a shock cuff on his ankle and

a leg brace during the trial. Deputies activated the shock cuff two times. The first shock

came nearly a year before a jury was picked. The second shock came during trial, just after

the jury had left the courtroom for the day.

While Appellant complains only of the second incident, a brief summary of the first

is relevant to our harm analysis. The first occurred after a pretrial hearing on October 9,

2014, when Appellant refused to be handcuffed for transport to the jail. He grabbed the

counsel table with both hands and stiffened his arms. Unable to move Appellant's arms,

transport officers activated the shock cuff for one second. Appellant yelled and immediately

---

guarantees traditionally associated with criminal prosecutions. . . . Where the State seeks to impose punishment without such an adjudication, the pertinent constitutional guarantee is the Due Process Clause of the Fourteenth Amendment." *Ingraham v. Wright*, 430 U.S. 651, 671 n.40 (1977). Further, Appellant has not briefed this or any other of his Texas constitutional claims separately from his federal constitutional claims. Therefore, we will address only his federal constitutional claims. *See Welch v. State,* 93 S.W.3d 50, 52 & n.5 (Tex. Crim. App. 2002).

broke his hold on the table. However, he continued resisting and fighting while they handcuffed him. It took four officers to restrain and handcuff him.

When Appellant returned to the jail after this incident, the officers who accompanied him expressed their intent to take him to the medical clinic to make sure that he was alright after being shocked. But Appellant stated, "I'm okay," and, "I don't think I need to." As they walked across the parking lot toward the jail, officers asked Appellant several times if he needed to go to the clinic. He repeatedly stated that he did not. When they reached Appellant's cell, Appellant cooperated as officers uncuffed him and unloaded his paperwork.

The second incident, the one at issue here, took place after the close of testimony on September 15, 2015, during the guilt phase. After the jury had been excused for the day, the trial judge conducted a hearing concerning Appellant's cross-examination of Detective Shine. The judge asked Appellant, "Where were you going with that[?]" Without standing up, Appellant responded:

> [APPELLANT]: Your Honor, I understand Detective Shine doesn't remember everything that's before him. Obviously that would be next to impossible.
>
> THE COURT: Next to impossible to what?
>
> [APPELLANT]: For him to be able to --
>
> THE COURT: Stand up when you talk to the Court. All they need you to do is stand up when you talk to the Court. That's what lawyers do. They stand up.
>
> Mr. Haas, he's --
>
> CAPTAIN CARAWAY: Stand up.

SERGEANT SHOEMAKER: I told you to stand up.

CAPTAIN CARAWAY: Stand up.

*(Shock bracelet activated on defendant.)*

[APPELLANT]: I'm sure the Court very much enjoyed that.

At that point, the judge terminated Appellant's pro se status, explaining:

> [F]or all the reasons this Court's gone over, all the admonishments I've given you. . . . I have warned you and warned you. . . . [Y]our right to represent yourself is not just terminated on that type [of] disrespect for this Court, it's terminated on everything I've put up with from you right up through the last set of admonishments I've given you. . . . [Y]our right to represent yourself, based on all your conduct, all the admonishments I've given you, right up to right now, your right to represent yourself is terminated.
>
> * * *
>
> I should have done this a lot earlier, but I kept giving you chance after chance after chance.

The judge re-appointed defense counsel to represent Appellant.

The next morning, September 16th, the trial judge continued the case until September 28th in order to give defense counsel time to prepare for trial. When the judge informed the jury of the new schedule and explained that defense counsel would be representing Appellant when the trial resumed, Appellant interjected, "And the jury should know that was not voluntary." The judge told him to be quiet and sit down, but Appellant interrupted him two more times to reiterate that he did not agree to defense counsels' representation.

When the trial resumed twelve days later, defense counsel moved for a mistrial outside the jury's presence on the ground that he "highly suspect[ed]" that the jury heard "the

screams that [Appellant] let out after he was zapped." In response to this motion, the judge clarified that, when deputies activated the shock cuff, the jury was out of the courtroom and the door was "shut behind them." He acknowledged that he did not know "how far up the hall the jury went," but he added that there was no evidence in the record that any juror heard anything "regarding any response of [Appellant] to being shocked." The judge also stated that, even if a juror had heard something, there was no evidence that the juror would have had "any earthly idea who it was coming from." Additionally, he concluded, "if they did hear anything," there was no evidence that it would affect their ability "to fairly and impartially carry out their duty as jurors in the case." The judge denied the motion for mistrial.

We note that deputies had not shocked Appellant on previous occasions when he had been significantly more combative and disrespectful than he was when they shocked him for failing to stand on September 15th. Further, Appellant's failure to stand did not pose an immediate threat to courtroom security. The trial judge's admonishment to Appellant immediately after the shock made no mention of a threat to security but instead expressed exasperation over Appellant's continuing failure to follow the deputies' and the judge's instructions as well as his defiant and disrespectful attitude toward the judge.[18]

We agree with Appellant that activating the shock cuff as a means to get Appellant to stand up when addressing the trial court violates due process. As the El Paso Court of

---

[18] *Cf. Morris v. State*, 554 S.W.3d 98, 118 (Tex. App.—El Paso 2018, pet. ref'd).

Appeals recently put it, immediate security concerns or flight risk can justify the activation of a stun belt; decorum concerns cannot.[19] Use of a stun belt "as a method to enforce decorum or as a punishment for a defendant's obstreperous conduct, is constitutionally prohibited and falls outside the wide discretionary penumbra for courtroom management set by [*Illinois v. Allen*, 397 U.S. 337, 346 (1970)]."[20]

However, contrary to Appellant's contention, the error was not structural. Structural errors are a very limited class of errors that affect the framework within which the trial proceeds such as the total deprivation of counsel, the lack of an impartial trial judge, the violation of the right to self-representation at trial, the violation of the right to a public trial, or the giving of a constitutionally deficient reasonable-doubt instruction.[21] Like the El Paso Court of Appeals, we cannot conclude that the error here, which again, occurred outside the presence of the jury, falls within that category. But the error in improperly activating the

---

[19] *Id.* Unlike in *Morris,* the trial judge in this case did not instruct deputies to shock the defendant; rather, the deputies activated the shock cuff on their own volition after appellant disobeyed their instructions. *Cf.* 554 S.W.3d at 104-05. But the trial court made clear on the record that the deputies had the freedom to activate it as means to enforce decorum. At one point the trial court reminded Appellant that "the deputy has got a shock device in their hand . . . . [T]hey will use whatever means they have to control you." Shortly thereafter, when Appellant had responded to a State's objection before standing up, [the deputy] said, "If you're going to speak to the Court, stand up. Last chance." The trial court added, "Stand up, Mr. Calvert. It won't work out good if you don't stand up, believe me." Nothing in the record suggests the trial judge did not condone the shock as a means to enforce the stand up/sit down rules. Quite the opposite.

[20] *Id.*

[21] *United States v. Marcus*, 560 U.S. 258, 263 (2010).

shock cuff was of constitutional dimension.[22]  Accordingly, we will apply the harm standard for constitutional error: this Court must reverse unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment.[23]

There are two primary ways in which a shock cuff's activation may adversely affect the fairness of a trial.  The first way is the negative effect on jurors' impartiality and the presumption of innocence—implicating the Fifth Amendment.[24]  The second is the negative effect on the defendant's ability to confer with counsel and otherwise participate in his defense—implicating the Sixth Amendment.[25]  Neither applies here.

There is no evidence that the shock cuff's activation had a negative effect on the jurors' impartiality or the presumption of innocence.  The jurors were not present.[26]  Absent

---

[22] *See Morris,* 554 S.W.3d at 124; *Deck v. Missouri*, 544 U.S. 622, 629, 630, 635  (2005) ("[A]bsent a trial court determination, in the exercise of its discretion," that their use is "justified by a state interest specific to a particular trial," the use of visible physical restraints during the guilt phase of a criminal trial violates due process because it "undermines the presumption of innocence and the related fairness of the factfinding process.").

[23] *See* TEX. R. APP. P. 44.2.

[24] *See, e.g., Chavez v. Cockrell,* 310 F.3d 805, 807, 809 (5th Cir. 2002); *Morris*, 554 S.W.3d at 112.

[25] *See, e.g., United States v. Durham,* 287 F.3d 1297, 1306 (11th Cir. 2002) ("[A] stun belt imposes a substantial burden on the ability of a defendant to participate in his own defense and confer with his attorney during a trial."); *Morris,* 554 S.W.3d at 112.

[26] *Cf. Hollaway v. State,* 6 P.3d 987, 994 (Nev. 2000), *overruled on other grounds by Lisle v. State*, 351 P.3d 725 (Nev. 2015) (finding reversible error when defendant's shock belt was accidentally activated during prosecutor's final closing argument asking "how deep, deep into this man's being does this violence run").  The "accidental" activation in *Hollaway* is no anomaly; purposeful activations are comparatively rare.

evidence in the record that jurors heard Appellant scream, we will not speculate that they did.[27]

Further, the record contains no evidence that the shock cuff's activation affected Appellant's ability to confer with counsel and participate in his defense. Conversely, in *State v. Belcher*, there was evidence that after the activation of the defendant's shock belt, the defendant "was not able to confer with his counsel in deciding how to exercise his peremptory strikes."[28] And in *Morris v. State*, there was evidence that the activation caused the defendant's absence from most of the trial proceedings because he was afraid to be in the courtroom.[29]

Unlike Belcher and Morris, Appellant was no more than momentarily incapacitated by the activations of the shock belt. And the record of this case does not indicate that

---

[27] *See Word v. State,* 206 S.W.3d 646, 651-52 (Tex. Crim. App. 2006) ("It is usually the appealing party's burden to present a record showing properly preserved, reversible error."); *Weaver v. State*, 894 So. 2d 178, 196 (Fla. 2004) (holding that accidental activation of stun belt did not prejudice defendant where the activation occurred outside the presence of the jury); *State v. Wachholtz*, 952 P.2d 396, 399 (Idaho Ct. App. 1998) (affirming denial of motion for mistrial based on the accidental discharge of stun belt that occurred while potential jurors were assembled before voir dire, where the defendant had offered no evidence that potential jurors actually heard the defendant scream after the belt's discharge); *Harrison v. Yarborough*, No. 103CV05005-AWI-SMSHC, 2006 WL 735986, at *1 (E.D. Cal. Mar. 22, 2006), *aff'd sub nom. Harrison v. Yarbourogh*, 211 F. App'x 653 (9th Cir. 2006) (holding that there was no prejudice where, "although the stun-belt was activated while the jury was deliberating and Petitioner screamed, Petitioner ha[d] adduced no evidence that the jurors heard or attributed the scream to Petitioner, or were in any way influenced by the activation").

[28] *State v. Belcher,* 183 S.W.3d 443, 449 (Tex. App.—Houston [14th Dist.] 2005, no pet.) (finding reversible error).

[29] *Morris,* 554 S.W.3d at 117-21, 124-26 (finding reversible error).

Appellant was anxious or distracted by the possibility of another shock.[30]  After the first, pretrial activation, Appellant continued to resist and fight the transport guards, and then repeatedly refused offers for medical treatment, stating that he was "okay."  Thereafter, he very actively and consistently participated in his defense.  And after the second, midtrial activation, coming nearly a year later, Appellant continued arguing with the judge.  Before the jury, Appellant interrupted the judge several times to express his disagreement with the reinstatement of defense counsel.  In addition, the trial judge continued the proceedings for twelve days to give defense counsel time to get up to speed.

On this record, we conclude that the shock cuff's activation outside the jury's presence did not affect the jurors' impartiality, nor Appellant's presumption of innocence, nor Appellant's ability to be present at trial and participate in his own defense.  We are confident beyond a reasonable doubt that the error did not contribute to the conviction or punishment.[31] Point of error one is overruled.

## DENIAL OF MISTRIAL

In point of error two, Appellant makes two arguments in support of his assertion that the trial judge erred by refusing to grant a mistrial following the shock cuff's activation. First, he argues that this incident biased the jury against him. We rejected Appellant's first argument in our discussion of point of error one. Second, he contends that it was

---

[30] *See Durham,* 278 F.3d at 1306.

[31] *See* TEX. R. APP. P. 44.2(a).

unreasonable to force defense counsel to assume responsibility for a trial in which so much had transpired because there was no way for counsel to develop and implement an effective trial strategy. Appellant asserts that "there effectively was nothing counsel could do." He argues that, if the judge felt compelled so late in the trial to require Appellant to proceed with counsel, then the judge was also compelled to grant a new trial in which counsel could perform effectively. Appellant's second argument is not preserved because defense counsel did not timely move for a mistrial on this basis.[32] Point of error two is overruled.

CONFLICT OF INTEREST

In point of error three, Appellant argues that the trial judge erred by re-appointing his standby counsel, Jeffrey Haas and Jason Cassel, to represent him as defense counsel when the judge revoked his pro se status because Appellant and defense counsel "clearly" had a conflict of interest. Specifically, Appellant contends that because he had accused counsel of "unethical conduct, ineffective assistance, and other wrongdoing," it was unreasonable for the trial judge to conclude that counsel could zealously represent him.[33] He argues that counsel had a disqualifying conflict of interest as a matter of law because he had filed "grievances with the State Bar on Mr. Haas."

---

[32] *See* TEX. R. APP. P. 33.1; *Griggs v. State,* 213 S.W.3d 923, 927 (Tex. Crim. App. 2007).

[33] After the trial court denied Haas's first motion to withdraw, defense counsel did not move to withdraw again. *See* our discussion of points of error five through seven, below.

The Sixth Amendment guarantees the right to reasonably effective assistance of counsel, which includes the right to "conflict-free" representation.[34] In the case of a conflict of interest, trial counsel renders ineffective assistance if the defendant can demonstrate that (1) counsel was burdened by an actual conflict of interest; and (2) the conflict actually affected the adequacy of counsel's representation.[35] The mere possibility of a conflict, without more, will not justify reversal.[36]

Regarding the first prong, "an 'actual conflict of interest' exists if counsel is required to make a choice between advancing his client's interest in a fair trial or advancing other interests (perhaps counsel's own) to the detriment of his client's interest."[37] "The appellant bears the burden of proof by a preponderance of the evidence on a claim of conflict-of-interest ineffective assistance. . . ."[38] Therefore, if a defendant fails to present any

---

[34] *See Strickland v. Washington,* 466 U.S. 668, 692 (1984); *Cuyler v. Sullivan,* 446 U.S. 335, 348-50 (1980).

[35] *Cuyler,* 446 U.S. at 349-50.

[36] *Id.* at 350; *see also Pollan v. State,* 612 S.W.2d 594, 596 (Tex. Crim. App. 1981) (panel op.).

[37] *Acosta v. State*, 233 S.W.3d 349, 355 (Tex. Crim. App. 2007) (quoting *Monreal v. State,* 947 S.W.2d 559, 564 (Tex. Crim. App. 1997)).

[38] *Odelugo v. State,* 443 S.W.3d 131, 136 (Tex. Crim. App. 2014).

evidence regarding the issue, or if the evidence relevant to the issue "is in perfect equipoise," his "claim will fail."[39]

Regarding the second prong, a defendant's allegation alone that counsel has not been zealous in his representation does not establish an actual conflict of interest.[40] Nor does a defendant's refusal to cooperate with counsel and desire to no longer be represented by his appointed counsel.[41] Further, a criminal defendant's filing of a grievance or other legal proceeding against his court-appointed counsel does not necessarily give rise to a conflict of interest.[42]

Here, when the trial judge initially allowed Appellant to proceed pro se, the judge also directed standby counsel to continue investigating and preparing a defense so that they would be ready to represent Appellant if necessary. Appellant filed pleadings complaining about standby counsel's investigation and repeatedly threatened to sue or file grievances against counsel for alleged misconduct. For example, in "Defendant's Motion for Court to Change the Selection of Assignment of 'Standby Counsel,'" Appellant argued that he was entitled to new standby counsel for the following reasons: "bad communication and lack of zealous

---

[39] *Id.* at 136-37.

[40] *Cf. Acosta,* 233 S.W.3d at 355.

[41] *See Viges v. State,* 508 S.W.2d 76, 76-77 (Tex. Crim. App. 1974).

[42] *See Dunn v. State,* 819 S.W.2d 510, 519 (Tex. Crim. App. 1991) (rejecting a defendant's conflict of interest claim that relied on his malpractice action against his attorneys); *Perry v. State,* 464 S.W.2d 660, 664 (Tex. Crim. App. 1971) (holding that a defendant's civil rights action against his attorney did not establish an actual conflict of interest).

drive"; counsel "hampered" Appellant's defense and failed to assist him in "furthering" his defense; unspecified "[o]bjections, problems, questionable actions are all well documented within *ex parte* proceedings to which Defendant cannot disclose herein yet give rise to challenge the Court in its <u>motives</u> to a level giving Defendant . . . good cause for alarm if true. (See Ex parte filings, etc.)"; counsel "betrayed" him by disclosing privileged information to the State, which was "legally unethical"; and counsel's testimony at a hearing on Appellant's motion to recuse the trial judge was "surprisingly" unfavorable.

At the hearing on this motion, Appellant accused the trial judge of ordering counsel to reveal privileged information to the State. Standby counsel Cassel denied any intent to provide privileged information to the State. He explained the process he intended to use to copy information from a computer that was in evidence so that he could give that information to Appellant. Appellant argued that simply copying the data would alter it, so even if counsel acted in good faith, "the relationship has been destroyed between me and Mr. Cassel." The judge denied Appellant's request for different standby counsel. Cassel stated that he would not copy the hard drive if Appellant did not want him to. Appellant confirmed that he did not want Cassel to copy it. He added that most of his "work product" was on USB drives, and he did not want counsel to copy those drives, either.

This process of a complaint, a hearing, and a resolution repeated itself several times. Appellant's complaints may have been "very personal" but there is no indication in the record that counsel took them as such. Instead, counsel followed the trial court's repeated

instructions to continue preparing a parallel defense in the event that they were reinstated to represent Appellant, as they eventually were. Appellant does not identify any instance in which counsel was required to make a choice between advancing their own interests or advancing Appellant's interests.[43] Instead, he argues that counsel was conflicted as a matter of law because of the grievance that he had filed. Appellant cites *Garner v. State*[44] for the proposition that the existence of a grievance constitutes a conflict of interest as a matter of law. But that is not what *Garner* says. In that case, as here, the nature of the grievance was unclear from the record. The court held that Garner "ha[d] on appeal shown the mere possibility of a conflict of interest. That mere possibility, without more, [wa]s not sufficient to impugn a criminal conviction."[45] The same is true here.

Appellant at most has shown only the "mere possibility of a conflict of interest." Appellant attached to one of his pleadings a letter from the State Bar, dated January 29, 2014, responding to a grievance Appellant filed against Mr. Haas. That letter stated that the grievance committee had determined that the information alleged "d[id] not demonstrate professional misconduct or an attorney disability;" thus, the committee classified the grievance as an inquiry and dismissed it. This dismissal came at least twenty-one months before Mr. Haas was placed back in as counsel.

---

[43] *See Acosta,* 233 S.W.3d at 355.

[44] 864 S.W.2d 92 (Tex. App.—Houston [1st Dist] pet. ref'd).

[45] *Id*. at 99.

Further, our own review of the record has not uncovered any instance in which counsel advanced their own interests over Appellant's. Appellant consulted standby counsel on several occasions. Standby counsel provided Appellant with the legal materials he requested. After Appellant complained that he could not find investigators and experts who were willing to work with a pro se defendant, standby counsel located investigators and experts for him. Counsel took discovery materials to the jail for Appellant's review, but Appellant often refused to meet with counsel. As the State notes, Haas and Cassel were present for the multiple pretrial hearings and the trial, they were familiar with the thousands of pages of discovery, and they had no objections to stepping back in.

Because Appellant has not met his burden to prove, by a preponderance of the evidence, that counsel made a choice between advancing Appellant's interest in a fair trial and advancing other interests to Appellant's detriment, he has not proved a constitutional conflict of interest. The trial judge did not err by reinstating standby counsel, Haas and Cassel, to represent him as defense counsel. Point of error three is overruled.

## THE *FARETTA* RULE

In point of error four, Appellant argues that this Court should limit the *Faretta* rule by holding that a defendant in a case in which the State is seeking the death penalty cannot waive his constitutional right to counsel. In *Faretta v. California*, the Supreme Court held that the Sixth Amendment guarantees a defendant in a state criminal trial the right to

represent himself at trial.[46]   We have previously held that the Sixth and Fourteenth Amendments guarantee that a person brought to trial, even in a capital murder case in which the State seeks the death penalty, may dispense with counsel and make his own defense.[47] We decline to revisit the matter in this case.  Point of error four is overruled.

PRO SE REPRESENTATION

In intertwined points of error (five through eight), Appellant asserts that the trial court erred in permitting him to represent himself.  Appellant's arguments rest upon a four-prong attack.  First, Appellant should not have been allowed to proceed pro se because he was not competent to represent himself.  Second, Appellant could not have knowingly and voluntarily waived his right to counsel because of his mental health issues.  Third, the trial judge should have conducted an adversarial hearing with independent counsel to ensure that Appellant was competent to waive counsel and represent himself despite his mental heath issues.  And fourth, Appellant did not voluntarily waive his right to counsel because his waiver was equivocal. After addressing the relevant facts, we will discuss each of these points of error on the merits.

*Relevant Facts*

---

[46] *Faretta v. California,* 422 U.S. 806, 818-20 (1975).

[47] *See, e.g., Moore v. State,* 999 S.W.2d 385, 396 (Tex. Crim. App. 1999) (citing *Faretta,* 422 U.S. at 818-20).

Haas was appointed to represent Appellant in November 2012. About two months later, he filed a motion to withdraw. At the hearing on this motion, Haas described Appellant's interest in pursuing an insanity defense and their strategic disagreement over whether to file a motion for change of venue. Haas informed the court that, based solely on that disagreement, Appellant told him, "[W]e're not able to communicate. I want you to withdraw." Appellant told the judge, "I just feel he's going to sell me out, and he's already decided on what my fate is going to be." Appellant added that he felt "so strongly against this that I'd rather represent myself pro se than continue on with Mr. Haas."

The judge stated that he had "heard nothing in this hearing . . . to cause the Court to discharge Mr. Haas as [Appellant's] lead attorney." The trial judge denied the motion to withdraw. Appellant stated that he would represent himself pro se if the judge did not appoint a different attorney. The judge advised Appellant that representing himself in a capital murder case "would be the absolute worst-case scenario looking at what you can be facing." After the hearing, Haas remained as lead counsel.

A year later, Haas advised the judge that Appellant wished to proceed pro se. At a hearing, Appellant confirmed this. The judge explained to Appellant that he would appoint a mental health expert to conduct an examination and determine whether Appellant had the ability to knowingly, intelligently, and competently waive his right to counsel. Appellant repeatedly objected to the appointment of a mental health expert, arguing, "[T]here's been no submission of any inquiry or anything to raise an inquiry of competency," and, "There's

nothing in the Code of Criminal Procedure that provides any power to the Court . . . to assign me to have a competency hearing[.]"

The trial judge acknowledged that no statute mandated a competency evaluation, and that there was "no evidence in this case whatsoever . . . that you are not competent to stand trial." However, it was "of great concern to the Court at every step that the Court takes every precaution it can . . . before the Court approves the waiver."

The trial judge appointed Dr. Mitchell Dunn to evaluate Appellant's competency to waive his right to counsel. Dr. Dunn reviewed Appellant's mental health records, including: a 1999 psychological examination; psychiatric treatment beginning in 2009; and an admission to a psychiatric unit in 2011. He reported that Appellant had been diagnosed with, and prescribed psychotropic medications and ongoing therapy for, several "disorders." Specifically, Appellant had been diagnosed with obsessive-compulsive disorder; "Major Depressive Disorder, Recurrent, in Partial Remission"; and "Personality Disorder Not Otherwise Specified, with Antisocial and Obsessive-Compulsive Features."

Additionally, Dr. Dunn interviewed Appellant for two hours and forty-five minutes. He opined "to a reasonable degree of psychiatric certainty that [Appellant] is competent to waive his right to counsel and to represent himself in a case where he's indicted for capital murder and the State is seeking the death penalty." After discussing with Appellant the advantages and disadvantages of self-representation, Dr. Dunn concluded that Appellant was "capable of knowingly and intelligently waiving the traditional benefits associated with a

right to counsel" and Appellant could "describe in a reasoned manner the potential benefits for him in pursuing such a course as well as the potential risks." Dr. Dunn reported that Appellant stated that he wanted to represent himself to "have more flexibility of doing what [he wants] to do." Appellant had acknowledged that he "wants to control the situation, [and] is frustrated when he can't [control it]."

During a pretrial hearing regarding Appellant's request to proceed pro se, both Appellant and defense counsel agreed with this assessment. The judge asked Appellant if he still wanted to represent himself. Appellant responded that he did not "wish to necessarily represent [himself] as a matter of free choice." He expressed his dissatisfaction with defense counsel's performance—specifically, counsel's failure to investigate, obtain materials that Appellant had requested, and take other actions.[48] He stated that he wanted effective counsel but did not feel he had effective counsel. He asserted that, because the trial judge had denied his motion to substitute counsel, his "only recourse" was to represent himself.

The judge reiterated that he had no indication that defense counsel had been ineffective or that there were valid grounds for counsel's withdrawal. The judge stated that, if he allowed Appellant to represent himself, he would appoint defense counsel as standby counsel. When Appellant asked the judge to direct him to case law describing the

---

[48] More specifically, Appellant complained that counsel did not: request a reduced bail; provide him the grand jury transcript, and in fact denied its existence; "perform[] process" on the defense's investigator and mitigation expert; talk with Appellant's family law attorneys; obtain certified copies of the family court proceedings; and contact the State about discovery materials that Appellant believed should have already been provided.

responsibilities of standby counsel, the judge admonished him that he would have to do his own legal research if he represented himself.

The trial judge asked Appellant and counsel whether, in light of counsel's response to Appellant's specific complaints, "an effort could be made to see if any of these matters could be resolved" so that Appellant could pursue "some other course" besides representing himself. But Appellant maintained that he did not want to work with defense counsel and that he "would even have to object that he be appointed as standby counsel when we get to that point, if we do." He contended that counsel would be biased and "not zealous" in assisting him.

The judge reviewed the indictment and elicited Appellant's acknowledgment that he understood the charges against him. The judge explained that the State had the burden of proof and that the trial would proceed to a sentencing phase if Appellant were found guilty. In response to the judge's admonishments and questioning, Appellant showed his understanding and familiarity with the sentencing process (including the special issues); pretrial motions (including grounds for suppression); the jury selection process (including challenges for cause and peremptory strikes and the disadvantages he would face during the process); the definition of mitigating evidence; the types of experts that could testify at the sentencing phase regarding future dangerousness and mitigation; the direct appeal process; the writ process (including waiving any claim of ineffective assistance of counsel by representing himself); his responsibility for drafting jury charges and objecting to the State's

proposed charge; and the high degree of "trial ability," qualifications, and experience generally required by counties for an attorney to defend a capital case; and the process of laying a proper predicate for a witness.

Appellant affirmed that he had represented himself in a child custody dispute and that he had graduated from Texas A&M University with a degree in computer science. He agreed with Dr. Dunn's statements that he was aware of the benefits and risks associated with pro se representation and that he was "capable of knowingly and intelligently waiving the traditional benefits associated with the right to counsel."

The judge reviewed the process of cross-examining expert witnesses, advising Appellant that defense counsel knew how to do it. The judge repeatedly emphasized that Appellant would have to make proper objections in order to keep out inadmissible testimony and that the judge would hold Appellant to the same rules of evidence as he would hold an attorney. The judge admonished him that, if he did not properly object to testimony, he would waive the objections.

The judge noted that Appellant would be personally responsible for finding experts and other witnesses and having them available to testify. He asked Appellant how, being incarcerated, he would locate and contact the witnesses he needed. Appellant responded that he had "people on the outside that can help me," and that he could write letters and make "limited telephone calls" from jail. The judge emphasized the disadvantages that Appellant

would face as an incarcerated pro se defendant, as opposed to defense counsel who could "do all that." Appellant reiterated that he understood.

Additionally, the judge stressed his view that Appellant was "making a tremendous mistake" by invoking his right to self-representation when he had "almost no experience in the questioning of these type witnesses or cross-examination of witnesses called by the State or understanding how to object to evidence." Appellant stated that he understood "the Court's opinion."

The judge then asked Appellant if he was requesting self-representation "competently, voluntarily, knowingly, and intelligently." Appellant affirmed that he was. The judge asked him if he was making the request "for waiver of counsel clearly, unconditionally, and unequivocally." Appellant responded, "I have a problem with that last part. I want to represent myself, and I do not want counsel. Per our conversation that we've had previously, the 'and do not want counsel' is not exactly true. I'd ask that that be removed." The judge stated that Appellant did not have a right to court-appointed counsel of choice and that he could not allow Appellant to represent himself unless his waiver was free and unconditional.

After conferring with defense counsel, Appellant stated that he did not know if he "agreed with that," but he "guess[ed] it was okay." He added that the written waiver language was "oversimplified" because he wanted to represent himself and he did not want the counsel that he had. The judge repeated that Appellant's qualified statement was not a valid waiver.

After additional consultation, defense counsel clarified to the judge that Appellant had been qualifying his statement because he wanted to make sure that executing the waiver of his right to counsel would not waive his prior objections to counsel. Appellant affirmed that this was his concern. The judge confirmed that Appellant's objections were on the record and that Appellant's waiver of counsel would not waive any ruling that was on the record. He reiterated that he could not consider a waiver of counsel unless it was "unconditional and unequivocal." Defense counsel expressed the view that the trial judge's assurances concerning its prior rulings had resolved the matter, and Appellant concurred. When the trial judge again asked Appellant if he voluntarily abandoned his right to counsel, Appellant agreed, without qualification, that he did. The judge again reviewed the hazards of self-representation and advised Appellant that he was making a mistake, but Appellant persisted in his desire to represent himself.

Appellant then executed a written waiver of counsel.[49] The trial judge approved the waiver and appointed defense counsel as standby counsel. The judge informed Appellant that standby counsel would be ready to take over if Appellant changed his mind about wanting to represent himself. The judge also warned Appellant that if he made "a mess of the case trying to represent yourself" or did "damage to the case," and counsel "step[ped]

---

[49] *See* TEX. CODE CRIM. PROC. art. 1.051(f) ("A defendant may voluntarily and intelligently waive in writing the right to counsel. . . .").

back in," counsel would have to "work with what they've got left."[50] Appellant stated that he understood. Based on Dr. Dunn's report, the judge's own communications with Appellant, and defense counsel's representations, the trial judge concluded that Appellant was competent to waive his right to counsel and represent himself and that he knowingly, intelligently, and voluntarily chose to do so. Trial on the merits was scheduled to begin eighteen months later.

The day before trial, Appellant filed "Defendant Pro Se's Motion to Allow the Defendant to Revoke His Waiver of Counsel Contingent Upon That Re-Appointment of Counsel Would Neither be Jeffrey Haas Nor Jason Cassel (Both Being Current Appointed 'Standby' Counsel) Under Art. 1.051(h)." In this motion, he asserted that the "Court is fully aware of all continued complaints against 'now standby counsel' in open and other settings, pleadings, etc. . . . Defendant does not have the time to re-list them all and simply moves the Court to take judicial notice of the record." He concluded that, if the judge would not appoint new counsel, then he wanted to remain pro se (which he described as "the lesser of two evil[s]").

Appellant also filed "Defendant['s] pro se Objections to Court's Lack of Admonishments Concerning Restrictions that are Placed on Defendant Upon Entering of a Waiver of Counsel." He asserted that the trial judge had not admonished him concerning

---

[50] *See* TEX. CODE CRIM. PROC. art. 1.051(h) ("A defendant may withdraw a waiver of the right to counsel at any time but is not entitled to repeat a proceeding previously held or waived solely on the grounds of the subsequent appointment or retention of counsel. . . .").

"[t]he problems with ineffective 'standby' counsel, essentially working for the Court and supporting the State, as well as a highly biased court, and an extremely unethical District Attorney's Office." He complained that he had been forced to dedicate time and resources to filing motions and objecting to alleged prosecutorial misconduct and that the judge had not admonished him that he would have to do so. He also complained that the judge had not admonished him that he would not have specific "rights" in jail, many of which concerned his subjective expectations of privacy and his ability to contact witnesses and review discovery. He further averred that he was "ill-prepared" for trial.

About a week later, after the trial had begun, the trial judge heard these pleadings and denied them.[51] Appellant re-asserted his motion for the appointment of new counsel, along with "all my motions that I filed since the 24th," at a September 8, 2015 hearing. The judge repeated his denial.[52]

_____

[51] At first, the trial judge stated that these motions and objections, filed the day before the trial on the merits was scheduled to begin, were untimely and therefore he would not rule on them.

[52] On September 24, 2015, defense counsel moved for an informal inquiry into Appellant's competency to stand trial. The jury trial was on hold because, after revoking Appellant's pro se status, the judge gave counsel twelve days, from September 16th to 28th, to prepare for trial. The trial judge held a hearing on this motion on September 30th—two days after the jury trial resumed. Although that hearing did not address Appellant's competency to waive counsel and represent himself, we will summarize it because it is relevant to claims five through seven. Defense counsel pointed to a number of poor decisions that Appellant had made while representing himself as evidence that he did not have a rational understanding of the proceedings. The prosecutor responded that Appellant's poor decisions were not evidence that he lacked a rational understanding but instead were a consequence of his lack of legal training. The defense submitted an affidavit from attorney Kenneth Murray questioning Appellant's competence. The prosecutor observed that Murray had tried to negotiate a plea offer for Appellant, which indicated that Murray had believed at one time

(continued...)

*Applicable Law*

The Sixth Amendment guarantees that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense."[53] That right includes the well-established reciprocal right to self-representation.[54] But in order to proceed pro se, a defendant must knowingly and voluntarily waive his right to counsel.[55] The competency standard for waiving counsel is no higher than the standard for competency to stand trial.[56] To knowingly and voluntarily waive the right to counsel, a defendant need not have the skill and experience of a lawyer.[57] But the defendant must "be made aware of the

---

[52] (...continued)

that Appellant had a rational understanding of the proceedings against him and was competent to enter a plea. The prosecutor called Drs. Michael Arambula and Edward Gripon. Arambula opined that Appellant had a sufficient present ability to consult with his attorneys and a rational as well as factual understanding of the proceedings. Arambula had watched Appellant during the trial and observed that his mistakes while representing himself were not caused by mental illness but instead resulted from a lack of legal training. Appellant's inappropriate behaviors were due to his personality problems. Arambula noted that Murray's affidavit did not use the term "irrational" in the way that a medical expert would. Arambula did not observe any conduct at trial consistent with irrational thinking due to mental illness. He also observed that Appellant effectively consulted with standby counsel when he wanted their help. Gripon agreed with Arambula. He added that Murray's statement—that Appellant's mental and emotional deficiencies negatively affected his perceptions—did not allege facts indicating incompetence. The judge concluded that Appellant was competent to stand trial.

[53] U.S. CONST. amend. VI; *see also Williams v. State*, 252 S.W.3d 353, 355 (Tex. Crim. App. 2008).

[54] *Williams*, 252 S.W.3d at 356.

[55] *Chadwick v. State*, 309 S.W.3d 558, 561 (Tex. Crim. App. 2010); *Faretta*, 422 U.S. at 835.

[56] *Chadwick*, 309 S.W.3d at 560 (citing *Godinez v. Moran*, 509 U.S. 389, 399 (1993)).

[57] *Faretta*, 422 U.S. at 835.

dangers and disadvantages of self-representation, so that the record will establish that 'he knows what he is doing and his choice is made with eyes open.'"[58] Therefore, the focus is not on whether the defendant is competent to represent himself at trial.[59] Instead, the focus is on whether he is competent *to choose* to represent himself.[60]

But, even where the defendant is competent to choose to represent himself, the right to self-representation is not absolute. In *Indiana v. Edwards*, the Supreme Court acknowledged another limitation on the right to self-representation.[61] In that case, the defendant sought to represent himself at trial.[62] The trial court denied the request based on his lengthy record of psychiatric reports and schizophrenia diagnosis.[63] The Supreme Court granted certiorari to consider whether the Constitution permits states to deny a defendant his right to self-representation "on the ground that the defendant lacks the mental capacity to conduct his trial defense unless represented."[64] The Court held that the Constitution permits

---

[58] *Id.* (quoting *Adams v. U.S. ex rel McCann*, 317 U.S. 269 (1942)).

[59] *Dunn*, 819 S.W.2d at 523.

[60] *Id.*

[61] *Indiana v. Edwards*, 554 U.S. 164 (2008).

[62] *Id.* at 169.

[63] *Id.*

[64] *Id.* at 174.

states to do so. The Court discussed *Godinez v. Moran*,[65] where it had held that the competency standard for pleading guilty or waiving the right to counsel is not higher than the competency standard for standing trial. The Court distinguished *Godinez* from the instant case in part because *Godinez* "involved a State that sought to *permit* a gray-area defendant to represent himself," but the case before it involved a State that "*den*[*ied*] a gray-area defendant the right to represent himself."[66]

*First Prong: Competency to Represent Himself*

In point of error eight, Appellant asserts that the trial judge erred as a matter of law by finding that, despite Appellant's mental health issues, he was competent to represent himself. In support of his argument, he points to his pre-trial conduct and Dr. Dunn's psychological-evaluation report. Appellant asserts that, in light of that evidence, the trial judge erred under *Edwards* in permitting him to proceed pro se. But Appellant's reliance on *Edwards* is misplaced.

The case here does not raise an *Edwards* issue. The trial court here permitted Appellant to proceed pro se (up until that right was revoked for other reasons); it did not deny him the right to represent himself. The language in *Edwards* is permissive rather than mandatory: *Edwards* does not require a trial court to restrict the defendant's right if the

---

[65] *Godinez*, 509 U.S. at 398-99.

[66] *Edwards*, 554 U.S. at 173.

defendant is incompetent to represent himself—it merely permits the restriction.[67] Therefore, the issue is not whether Appellant was competent to represent himself. Instead, the issue is whether he was competent *to choose* to represent himself. Point of error eight is overruled.

*Second Prong: Competency to Choose to Represent Himself*

In point of error five, Appellant argues that he was incompetent to knowingly and voluntarily waive his right to counsel. In support of his argument, he again points to his pre-trial conduct and Dr. Dunn's psychological-evaluation report. Appellant alleges that Dr. Dunn diagnosed him with a number of mental health problems and that he could not knowingly and voluntarily waive his right to counsel because he had a record of "known psychiatric issues." He contends that he was denied a fair trial because he was allowed to represent himself under these circumstances.

"To raise the issue of competency by means of the defendant's past mental health history, there generally must be evidence of recent severe mental illness or bizarre acts by the defendant or of [intellectual disability]."[68] In *Dunn v. State* (a case unrelated to Dr. Dunn who examined Appellant), the defendant challenged on appeal his competency to waive his

---

[67] *See Fletcher v. State*, 474 S.W.3d 389, 400 (Tex. App.—Houston [14th Dist.] 2015, pet. ref'd) ("*Edwards* decided whether the trial court improperly compelled a defendant diagnosed with severe mental illness to proceed with counsel. Appellant asks us to hold that *Edwards* means not solely that a trial court *may* insist on representation for defendants who are incapable of conducting trial proceedings due to severe mental illness, but also that a trial court *must* do so. We disagree that *Edwards* so holds."); *United States v. Berry*, 565 F.3d 385, 391 (7th Cir. 2009) (Under *Edwards*, the "Constitution *may* have allowed the trial judge to block [the defendant's] request to go [at] it alone, but it certainly didn't require it.").

[68] *Moore,* 999 S.W.2d at 395.

right to counsel.[69] Prior to trial, a doctor psychologically evaluated the defendant. The doctor's report described the defendant's antisocial personality disorder but also concluded that the defendant was competent to stand trial. We held that the defendant "did not present nor was there any evidence in the record from any source" that the defendant was incompetent to exercise his right to self-representation.[70]

Like the record in *Dunn*, the record in this case contains no evidence that Appellant was incompetent to exercise his right to self-representation. Dr. Dunn observed that Appellant's prior records included diagnoses of several "disorders." But Dr. Dunn ultimately concluded that Appellant was competent to waive his right to counsel. Further, when discussing whether Appellant would proceed pro se, both Appellant and the trial judge acknowledged that there was no evidence raising an issue of incompetency. There is no evidence of recent "severe mental illness or bizarre acts by [Appellant] or of moderate retardation."[71] The trial judge did not abuse his discretion in finding that Appellant was competent to knowingly and intelligently waive his right to counsel based on Dr. Dunn's report.

Likewise, Appellant's disruptive conduct and numerous and lengthy pretrial motions provide no evidence that he was incompetent to waive counsel. Appellant avers that his

---

[69] *Dunn*, 819 S.W.2d at 520.

[70] *Id.* at 521–22.

[71] *Moore,* 999 S.W.2d at 395.

inappropriate conduct was "fully consistent with" his obsessive-compulsive personality disorder. He contends that, "long before trial ever started," the trial judge should have found him incompetent, terminated his right to represent himself, and reinstated defense counsel. He states that, as soon as he was allowed to proceed pro se, he "quickly filed" over 100 motions, "many of which were virtually incomprehensible, obsessed with detail, and repetitive." He notes that he was rigid in his behaviors and unable to adapt to external rules. He acknowledges that he behaved disrespectfully toward the judge and opposing counsel when he became frustrated. Appellant points out that his conduct while representing himself pre-trial was so bad that the prosecutors presented it during the punishment phase as evidence of his future dangerousness. But Appellant's disruptive conduct as a pro se defendant is not necessarily evidence of incompetence.

For example, in *Moore v. State*, the defendant argued on appeal that his repeated outbursts during trial were evidence of incompetence.[72] To illustrate, when one of the lawyers asked a witness about the defendant's booking photo, the defendant blurted out: "Does Jesus Christ have long hair and a beard? You've seen pictures of Him. What makes the difference between Jesus Christ and Charles Manson?"[73] We held that, while the outbursts "were inappropriate violations of court decorum, they do not constitute evidence of his inability to

---

[72] *Moore,* 999 S.W.2d at 394-95.

[73] *Id.* at 394.

communicate with counsel."[74] "If such actions were probative of incompetence, one could effectively avoid criminal justice through immature behavior."[75]

Here, although some of Appellant's motions are confusing and peculiar, most are topical and logically related to the proceedings. They reflect that Appellant had familiarized himself with many potentially relevant laws. He relied on his own understanding of the laws he believed to be relevant, and he was extremely careful not to waive any potential errors. Further, Appellant points to no case law, and we have found none, supporting his position that disruptive behavior resulting from a personality disorder renders a defendant incompetent to choose to represent himself. In fact, our cases suggest the contrary.[76] The trial judge did not abuse his discretion when he initially determined that Appellant was competent to choose to represent himself, and at no point during the pretrial proceedings did his conduct require the judge to revisit this determination.

Further, when a defendant exercises his right to self-representation at trial, an appellate court's analysis generally focuses on whether the defendant was aware of the dangers and disadvantages of self-representation.[77] Appellant does not challenge on appeal the trial judge's admonishments. And our review of the record shows that the

---

[74] *Id.* at 395.

[75] *Id.*

[76] *See, e.g., Moore*, 999 S.W.2d at 395; *Dunn,* 819 S.W.2d at 521-22.

[77] *Johnson v. State*, 760 S.W.2d 277, 278 (Tex. Crim. App. 1988).

admonishments were sufficient. The judge thoroughly reviewed the trial process with Appellant, and Appellant repeatedly indicated that he understood it. Given the option to proceed with unwanted counsel or to represent himself—and after being thoroughly and repeatedly admonished as to the dangers and disadvantages of proceeding pro se—Appellant persistently asserted his right to self-representation. There is "nothing unfair in putting an accused to this choice, so long as the trial court is satisfied he is competent to make it, and that he does so informedly and with eyes open."[78] Point of error five is overruled.

*Third Prong: Lack of Adversarial Hearing and Independent Counsel – Competence*

In point of error six, Appellant complains that the trial judge erred when he did not conduct an adversarial hearing with independent counsel to ensure that Appellant was competent to waive counsel and represent himself despite his documented mental health problems. He complains that his hearing was "entirely non-adversarial," and the result was "disastrous."

Appellant cites no authority for his assertion that the trial judge erred by failing to conduct an adversarial proceeding with independent counsel. Therefore, this point of error is inadequately briefed.[79] In any event, after making a preliminary inquiry, the trial judge found no evidence that Appellant was incompetent to waive counsel. And, as discussed

---

[78] *See Burgess v. State,* 816 S.W.2d 424, 429 (Tex. Crim. App. 1991).

[79] *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record.").

above, Appellant need not be competent to represent himself, only to choose to represent himself.[80] The judge's determination is supported by the record, which contains no evidence of severe mental illness and includes Dr. Dunn's report concluding that Appellant was competent to stand trial. The trial judge is "best able" to make that determination.[81] Point of error six is overruled.

*Fourth Prong: Waiver of Counsel – Voluntariness*

In point of error seven, Appellant asserts that the trial judge erred in finding a voluntary waiver of counsel because the judge did not adequately address his complaints about court-appointed counsel or consider alternatives to pro se representation. Appellant contends that he made it clear he did not want to waive counsel, and therefore the trial judge should not have found a waiver. He avers that his qualified waiver of the right to counsel was not intelligent, free, and voluntary, and that the trial judge committed structural error by allowing him to proceed pro se. He argues that such error is not subject to a harm analysis, and therefore, he is entitled to a new trial.

A defendant is not entitled to appointed counsel of his choice.[82] A defendant who is displeased with appointed counsel must either show adequate cause for a change of appointed counsel, accept the assigned attorney, or effectively waive the right to counsel and

---

[80] *See Dunn*, 819 S.W.2d at 523

[81] *See Edwards,* 554 U.S. at 177.

[82] *See Dunn,* 819 S.W.2d at 520.

represent himself.[83] Here, as discussed above, Appellant never showed adequate cause for a change of counsel. Thus, when Appellant did not want to accept appointed counsel, his remaining option was to waive the right to counsel and represent himself. Contrary to Appellant's assertion, the trial judge's refusal to appoint new counsel did not render his waiver involuntary. The trial judge thoroughly admonished Appellant of the hazards of self-representation. The judge refused to accept Appellant's waiver unless it was "unconditional and unequivocal." Appellant ultimately agreed that his waiver was without qualification. Likewise, Appellant's motion to revoke his pro se status did not render his waiver involuntary. "A defendant may not use his right to counsel to manipulate the court or to delay his trial."[84] Appellant began representing himself in February 2014. He filed his contingent motion to revoke his pro se status the day before trial in August 2015. Yet long before August 2015 Appellant knew the factual bases that he asserted in support of his need for counsel—specifically, the lack of privacy in jail and his difficulties in addressing alleged misconduct, reviewing discovery, and contacting witnesses.

Appellant knowingly and voluntarily waived his right to counsel; his waiver was unequivocal. Point of error seven is overruled.

## COMMENTS ON PRO SE STATUS

---

[83] *Thomas v. State,* 550 S.W.2d 64, 68 (Tex. Crim. App. 1977); *Cain v. State,* 976 S.W.2d 228, 235 (Tex. App.—San Antonio 1998, no pet.).

[84] *See Culverhouse v. State,* 755 S.W.2d 856, 861 (Tex. Crim. App. 1988).

In points of error nine and nineteen, Appellant complains that both the State and the trial judge made inappropriate comments regarding his pro se performance and undermined his efforts to represent himself. This, he asserts, violated his right to proceed pro se under the Sixth Amendment as well as his fundamental right to a fair trial under the Fifth Amendment.

Appellant raises six challenges: (1) the prosecutor disparaged Appellant's conduct as a pro se litigant and took advantage of his pro se status; (2) the trial judge made negative expressions before the jury concerning Appellant's pro se performance; (3) the trial judge routinely and erroneously overruled Appellant's objections; (4) the State "used" Appellant's frustrated reactions to these erroneous rulings as evidence against him; (5) sheriff's deputies had inappropriate and prejudicial interactions with Appellant in the jury's presence; and (6) the cumulative effect of the errors resulted in a deprivation of his right to counsel including the right to proceed pro se. We will address each of these complaints in turn.

*(1) Disparaging Appellant's Pro Se Status*

Appellant complains of five specific instances in which, he asserts, the prosecutor disparaged his conduct as a pro se litigant. Appellant made no objections to the first three.[85]

---

[85] The first three complained-of instances are the prosecutor's statements that: Appellant "makes these ridiculous-looking faces"; Appellant "doesn't care what the Court says or what the rules are"; and, "In [Appellant's] zero years of trying cases in the courtroom – and I'm just trying to say – we object to his incessant objection."

Therefore, he forfeited error as to those.[86]  Regarding the two instances as to which he preserved error, Appellant alleges the following:

(a) The prosecutor engaged in a running, derogatory commentary when she questioned Detective Shine about Appellant's attitude during his videotaped interview with Shine and another investigator; and

(b) The prosecutor presented, at the punishment phase, evidence of a pretrial incident in which Appellant had been accused of stealing exhibits, and then published an audiovisual recording of Appellant's bad behavior during the officers' search for those exhibits.

We address each of these in turn.

### (a) Running, Derogatory Commentary

At trial, the prosecutor played the audiovisual recording of Appellant's interview following his arrest.  The prosecutor then elicited Shine's opinion testimony concerning Appellant's attitude during the interview—leading with, at times, the prosecutor's own commentary or Shine's previous statements.  Shine agreed with the prosecutor that Appellant treated the interview as a "big game," was sometimes sarcastic and mocking, was callous, was a smart-aleck and had a "cold-blooded heart."  At one point during Shine's testimony, the prosecutor stated:  "[Jelena's] laying in a refrigerator unit at [the medical examiner's

---

[86] *See* TEX. R. APP. P. 33.1(a); *see Coble v. State,* 330 S.W.3d 253, 282 (Tex. Crim. App. 2010).

office] in Dallas . . . and [Appellant's] talking to you about ripping the grate down to prove what a bad system—."[87]

Appellant complains here that his objections to those statements were improperly overruled.[88] Appellant's trial objections that comport with his claims on appeal were based on Rules 403, 404(b), and 701. His objections to "inappropriate comment by the prosecution" and "misrepresentation of the evidence" also comport with his claims on appeal.[89] Therefore, we will consider the statements in regards to those objections.

Under Rule 701 of the Texas Rules of Evidence, a lay witness can testify in the form of an opinion if the opinion is (a) rationally based on the witness's perceptions, and (b) helpful to the clear understanding of the testimony or the determination of a fact in issue. Even if a lay opinion meets both requirements under Rule 701, a trial court has discretion under Rule 403 of the Texas Rules of Evidence to exclude the testimony if its probative value

---

[87] Deputies carried Appellant into the interview room, with his arms and legs secured to a restraint chair. Appellant and investigators discussed that he was secured in that manner because he had removed a metal grate from his jail cell wall, and then he brandished it at a deputy who attempted to enter his cell. Appellant told investigators that he pulled the grate off the wall because he "was showing it was a weakness in their security system. . . . Their security system sucks."

[88] Appellant also complains that the prosecutor elicited Shine's testimony that, during the interview, Appellant indicated that treating his bruised leg was more important than talking about Jelena's death. Appellant also complains about Shine's testimony that, at the time of the interview, Shine believed Appellant had killed Jelena. Appellant did not object at trial to this testimony. *See* TEX. R. APP. P. 33.1; *see also Yazdchi v. State,* 428 S.W.3d 831, 844 (Tex. Crim. App. 2014) ("For a party to preserve a complaint for appellate review, the complaining party must make a specific objection and obtain a ruling on the objection.").

[89] *See* TEX. R. EVID. 403, 404(b), and 701.

is substantially outweighed by a danger of unfair prejudice or misleads the jury. "The probative force of evidence refers to how strongly it serves to make the existence of a fact of consequence more or less probable."[90] Relevant evidence is presumed to be more probative than prejudicial.[91] Evidence is unfairly prejudicial if it has the capacity to lure the fact-finder into declaring guilt on a ground other than proof specific to the offense charged.[92] Further, the judge has substantial discretion in balancing probative value and unfair prejudice.[93] We will uphold the judge's ruling as long as it is within the zone of reasonable disagreement.[94]

First, Shine's testimony was admissible. Here, the jury saw the recording of the interview before hearing Shine's commentary about it. Appellant sat with his back to the camera during most of the interview. Shine, who spoke with Appellant face-to-face, personally viewed his facial expressions and demeanor during the interview. Therefore, Shine's Rule 701 opinion testimony was probative of Appellant's attitude during the interview; it was rationally based on Shine's perception and helpful to clearly determining

---

[90] *Gonzalez v. State,* 544 S.W.3d 363, 372 (Tex. Crim. App. 2018).

[91] *Santellan v. State,* 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).

[92] *Manning v. State,* 114 S.W.3d 922, 928 (Tex. Crim. App. 2003).

[93] *Powell v. State,* 189 S.W.3d 285, 288 (Tex. Crim. App. 2006).

[94] *Manning,* 114 S.W.3d at 343-44.

a fact in issue.[95]  And the evidence was not unfairly prejudicial given that the interview itself was in front of the jury; the jury itself was able to observe Appellant's inflections and demeanor. Thus, the trial judge acted within his discretion when he concluded that this Rule 701 testimony was admissible under Rule 403.[96]

Second, the prosecutor's comment about Jelena "laying [sic] in a refrigerator unit" was a reasonable inference from the evidence.  The prosecutor made this statement just after Shine testified that Jelena's body was in the medical examiner's cooler while Shine was questioning Appellant in Louisiana.  Further, the evidence established that Jelena's body had been transported to the medical examiner's office and placed in a cooler not long after 4:43 p.m. on October 31, 2012, and it was removed for examination at 7:00 a.m. on November 1.

Appellant removed the grate from his jail cell wall some time after his arrest around 11:00 p.m. on October 31st, but prior to discussing his removal of the grate with investigators when the interview began around 3:00 a.m. on November 1st.  Appellant talked about removing the grate at the beginning of this interview, while he was still secured in the

---

[95] *See, e.g., Garcia v. State,* 126 S.W.3d 921, 925 (Tex. Crim. App. 2004) (concluding that officers' testimony describing the appellant as "cocky," "very calm, very matter-of-fact," "very nonchalant, very laid back and calm," and at times "arrogan[t]," was evidence of his lack of conscience or remorse); *Motilla v. State,* 78 S.W.3d 352, 359 (Tex. Crim. App. 2002) (stating that an appellant's reluctance to answer questions in his recorded statement to investigators demonstrated a lack of remorse, and the jury could have regarded his attitude of defiance and apathy as evidence of his intent to kill).

[96] We also note that similar testimony had already been admitted without a Rule 701 objection. *See Coble*, 330 S.W.3d at 282 (stating that erroneously admitted evidence will not result in reversal when the same evidence was received elsewhere without objection).

restraint chair. The trial judge did not abuse his discretion by overruling Appellant's objection to "misrepresentation of the evidence."

To the extent that Appellant objected to the rest of the prosecutor's comments during examination, we need not determine whether the judge erred by overruling these objections because the prosecutor's comments were harmless. As an initial matter, they were not evidence; the prosecutor's parroting of Shine's own words while framing questions, for instance, was gratuitous but innocuous.[97] And the jury was instructed that the lawyers' statements were not evidence.[98] Further, jurors had viewed the recording of the interview and could judge for themselves whether the prosecutor's and Shine's characterizations were

---

[97] *See, e.g., Madden v. State,* 242 S.W.3d 504, 515 (Tex. Crim. App. 2007) ("[Q]uestions on cross-examination cannot, by themselves, raise a disputed fact issue.").

[98] Specifically, the jury charge stated:

Remember that any statements, objections, or arguments made by the lawyers are not evidence. The function of the lawyers is to point out those things that are most significant or most helpful to their side of the case, and in so doing to call your attention to certain facts or inferences that might otherwise escape your notice. In the final analysis, however, it is your own recollection and interpretation of the evidence that controls the case. What the lawyers say is not binding upon you.

accurate.[99]  We have fair assurance that error, if any, did not affect the result because the evidence of Appellant's guilt was overwhelming.[100]

(b) Evidence Involving Stolen Exhibits

We next turn to Appellant's complaint about the prosecutor putting on evidence that he stole exhibits from the courtroom.  Following a pretrial hearing, the court coordinator raised the subject of the missing exhibits.  Appellant acknowledged that, a day before the hearing, he had received a request to look for those exhibits.  He told the judge that he did not have them but said he would look again.  He asked the judge to give him until the following Tuesday to produce them because his papers were in disarray.  He stated that it would be hard for him to find them, but he was "sure they'll turn up if I have them; if not, then it's not my responsibility."

Pointing out that Appellant often shredded papers in his cell, the prosecutor requested that the trial judge order the sheriff's office to search the cell before Appellant "shred[ded] [the exhibits]."  Accordingly, the judge ordered the sheriff to take action that same day.

---

[99] *Cf. Fairow v. State,* 943 S.W.2d 895, 899 (Tex. Crim. App. 1997) ("[W]hile a witness cannot possess personal knowledge of another's mental state, he may possess personal knowledge of facts from which an opinion regarding mental state may be drawn.  The jury is then free to give as much or as little weight to the opinion as it sees fit."); *see, e.g, Jackson v. State,* 822 S.W.2d 18, 30 (Tex. Crim. App. 1990) (stating that an officer who witnessed a defendant giving a statement to another officer could testify to his opinion that the defendant gave the statement voluntarily because such testimony was a "mere shorthand rendering of the facts" demonstrating the defendant's mental attitude or emotional state).

[100] *Motilla,* 78 S.W.3d at 357 ("'[T]he presence of overwhelming evidence supporting the finding in question can be a factor in the evaluation of harmless error.'") (quoting *Wesbrook v. State*, 29 S.W.3d 103, 119 (Tex. Crim. App. 2000)).

Specifically, the sheriff's deputies would give Appellant another opportunity to search his cell for the exhibits, but if he still did not produce them, then the deputies would search for them.

The recording of the deputies' search for these exhibits captured Appellant's uncooperative conduct and refusal to search for the exhibits.[101] The deputies carried Appellant's papers to a room with tables and chairs. Appellant was present throughout the search. He repeatedly refused the deputies' offers to let him go through his paperwork himself, even as he complained that they were violating his rights by looking at his work product, getting his materials out of order, and wrinkling his papers.[102]

Lieutenant John Shoemaker located the missing exhibits on top and inside of a book that had been placed inside an envelope. When Shoemaker informed Appellant that they were taking the envelope, Appellant asserted that they had no authority to do that and could not take his personal property. While the deputies were carrying Appellant's papers back to his cell, he displayed further disruptive conduct.[103]

---

[101] Appellant argued and wrestled with deputies, saying, "I can't allow you to take my work product." He accused them of conducting an illegal search and told them that they were "essentially letting me free now" because an appellate court would conclude that the search was illegal.

[102] He also repeatedly accused Deputy Sheffield of "resequencing [his] paperwork" and commented, "I understand it's after your bed time."

[103] Specifically, Appellant demanded, "I want all that back in my cell the way you got it." Although he had not looked through his papers, he complained that items were missing. As deputies unloaded his papers into his cell, he complained that someone had gone through his clothes while he was gone. He was upset that deputies were placing his papers on the floor (even though they had

(continued...)

At a pretrial hearing four days later, the court reporter identified the recovered exhibits. The trial judge denied Appellant's motion to suppress them as the fruits of an illegal search. Over Appellant's objection, the trial judge admitted the audiovisual recording of the search.

The trial judge noted the orderly way in which these exhibits had been placed inside the book and envelope, with the lists on top of the book and the photos between the pages. The judge observed that this placement showed that the person who handled them was "very aware that these were exhibits." He stated that Appellant would have known that these materials were exhibits when he took them; he refused opportunities to search for them; and the deputies who searched for them properly followed the judge's order. The judge concluded, "[T]he Court finds [Appellant] knowingly took these photographs and these two documents, put them in the brown envelope, and took them back to [his] cell." The judge held Appellant in contempt for his "deliberate actions in secreting these exhibits." The judge imposed the maximum sentence of six months and warned Appellant that he was very close to rescinding his pro se status.

Appellant now avers that, if he had been treated like an attorney and given a chance to look for the missing exhibits, this incident would not have occurred and he would not have displayed poor conduct. However, the record reflects that Appellant refused at least two

---

[103] (...continued)
been on the floor before the search began), and he accused them of stepping on the papers and wadding them up. He stated that he would tell the judge what they had done to his paperwork.

opportunities to look for the exhibits. To the extent that Appellant complains that the judge should have given him more time to search, the record shows that he did not make use of the time he had, and that the trial judge reasonably ordered a search that provided Appellant with an opportunity to produce the exhibits while minimizing his opportunity to destroy them. Further, Appellant's disruptive and disrespectful conduct during the search was relevant punishment-phase evidence demonstrating that he could not or would not control himself even when he knew that his conduct was being recorded.[104] We reject Appellant's complaint about the prosecutor's use of this evidence during the punishment phase.

*(2) The Judge's Negative Comments on Appellant's Pro Se Performance*

Appellant argues that, before the jury, the trial judge expressed his unfavorable views of Appellant's pro se performance.[105] A criminal defendant has a due process right to proceed before an impartial court.[106] But a court's efforts at courtroom administration are not a valid basis for finding judicial bias, even if they include "expressions of impatience,

---

[104] *See* TEX. CODE CRIM. PROC. art. 37.071, § 2(a)(1).

[105] The record shows that Appellant did not object to any of the judge's statements that he now complains about. However, when a judge comments improperly on the weight of the evidence or conveys to the jury his opinion of the case, this error is not forfeited on appeal by a party's inaction at trial. *See Proenza v. State,* 541 S.W.3d 786, 798-99 (Tex. Crim. App. 2017).

[106] *See Brumit v. State*, 206 S.W. 3d 639, 645 (Tex. Crim. App. 2006) ("Due process requires a neutral and detached hearing body or officer."); *see also Tumey v. Ohio,* 273 U.S. 510, 523, 535 (1927).

dissatisfaction, annoyance, and even anger."[107]  Further, "opinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible."[108]

To constitute reversible error, a trial judge's comment must be reasonably calculated to benefit the State or prejudice the defendant's rights.[109]  We will reverse the judgment and remand the case for a new trial "when the court has misdirected the jury about the law or has committed some other material error likely to injure the defendant's rights."[110]

Appellant complains about the trial judge's statement: "I don't want to use the word 'waste,' but I don't want to take up any more of the jury's time on this."  He asserts that this comment expressed the trial judge's opinion on Appellant's cross-examination of L.C.'s therapist, Judith Lester.

The record shows that, after Appellant's cross-examination of Lester, the parties and the judge began discussing, in the jury's presence, whether Lester would be finally excused

---

[107] *Liteky v. United States,* 510 U.S. 540, 555-56 (1994).

[108] *Id.* at 555.

[109] *Becknell v. State,* 720 S.W.2d 526, 531 (Tex. Crim. App. 1986).

[110] Tex. R. App. P. 21.3(a)(b).

or subject to recall. Lester explained that she had rearranged her clinical practice schedule in order to travel from Ohio to testify. The trial judge then stated:

> Okay. All right. Well, you're here now. Let me take it -- I don't want to use the word "waste," but I don't want to take up any more of the jury's time on this, because I'll take it up outside their presence without them sitting here listening to it, since it's a matter between the Court and defendant and State.

This record does not support Appellant's position that the judge's comment conveyed displeasure with his performance as a pro se defendant. In context, it is apparent that the judge used the term "waste" in reference to taking up the jury's time with the discussion of Lester's schedule. The judge made the comment in the course of managing trial logistics and scheduling. The comment did not bear on the presumption of innocence or vitiate the impartiality of the jury.[111]

Appellant next contends that, as the judge excused the jury, the judge implied that Appellant was responsible for the slow pace of the trial. Specifically, the judge advised the jury that he had hearings the following morning ("a succession of hearings in the morning, or what you might call -- it wouldn't surprise you -- a lengthy hearing in the morning") with multiple witnesses. Because those hearings were on the Friday before Labor Day, the judge told the jury to return the following Tuesday. The judge then stated:

---

[111] *See id.*; *see also, e.g., Sensley v. Albritton,* 385 F.3d 591, 599 (5th Cir. 2004) (noting that an appellate court reviewing a decision under 28 U.S.C. § 455(a), which requires the disqualification of a federal judge "in any proceeding in which his impartiality might reasonably be questioned," must inquire into how all of the facts "would appear to a 'well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person'") (quoting *United States v. Jordan,* 49 F.3d 152, 156 (5th Cir. 1995)).

That way I don't run the chance just wasting your time sitting in the jury room because we have multiple witnesses to hear in the morning outside your presence. And basically what you've seen so far, you probably understand why I'm anticipating it will take a while.

In context, the judge's comment to the jury about "what you've seen so far" referred to the jury having already spent time waiting in the jury room during hearings that took "a while." Further, the judge's use of the word "waste," in context, referred to the jurors potentially wasting their time by waiting in the jury room while the judge held the hearings. This record does not support Appellant's characterization of the judge's statement as an unfavorable comment on his pro se representation.

*(3) Overruling Appellant's Objections*

Appellant complains that the trial judge routinely overruled his objections, even when they were well-founded. He first complains of an instance in which the prosecutor asked Officer Cummings to describe how he had spent the day of the offense—that specific Halloween—with his own daughter. Appellant avers that the trial judge overruled his objection without giving him an opportunity to make a record of the ground, stating, "Listen to me. Listen to me. Your objection to that question is overruled. That's the Court's ruling." Cummings then testified that he spent part of that Halloween evening with his daughter, "the first Halloween my child was walking"; his ex-wife had brought her to the police station for trick-or-treating. The prosecutor stated, "And after that, you apprehended this defendant. It's significant because you put your life on the line after being with your

little girl." Cummings agreed. The prosecutor added, "I guess you saw little [L.C.] . . . . That kind of hits home with you when you have a little girl like you did." Cummings answered, "It does."

This evidence was not relevant and therefore was inadmissible.[112] But the error was harmless. By the time the prosecutor questioned Cummings about Halloween, Appellant himself had elicited Cummings's emotional response to Appellant endangering L.C.[113] The error in admitting Cummings's testimony about how he spent Halloween with his daughter was harmless.[114]

Appellant next complains about an exchange in which the prosecutor asked Detective Williams, "If you had to guess who that wallet belonged to, who would it be?" The record shows that before the prosecutor asked this question, Williams identified the wallet as the one that he had found on the floor of Appellant's car, and he established the chain of custody. The prosecutor then asked Williams, "[W]hose wallet was that?" Williams responded, "It contains a Texas driver's license belonging to [Appellant]." The prosecutor then offered the

---

[112] TEX. R. EVID. 402 ("Irrelevant evidence is not admissible.").

[113] On cross-examination, Appellant asked Cummings, "You have pretty strong feelings about this case, don't you?" Cummings asked him what he meant. Appellant stated, "Well, you testified to the way it affected you, the way you felt about the person you identified as [L.C.] and so forth, correct?" Cummings replied, "I do feel strongly about how you endangered your child, yes."

[114] See, e.g., Gardner v. State, 306 S.W.3d 274, 293 (Tex. Crim. App. 2009) ("[A]ny possible error in the admission of State's Ex. 36 was harmless because appellant affirmatively stated 'No objection' when a sample cut from that robe was introduced into evidence as a comparison sample to the red fibers found in the white truck appellant had borrowed from his brother-in-law.").

wallet and its contents into evidence "for all purposes." The trial judge admitted the wallet over Appellant's objections.

The prosecutor then asked Williams if anyone in the courtroom "fit the photograph" on the driver's license found in the wallet, and Williams pointed to Appellant. Williams testified that the wallet also contained a Texas A&M alumni card with Appellant's name, as well as a voting card with Appellant's name and address. The prosecutor then asked, "If you had to guess who this wallet belonged to, who would it be?" Appellant objected based on speculation, which the trial judge overruled. Williams testified, "I wouldn't have to guess. I know exactly who it belongs to."

The prosecutor's phrasing, "If you had to guess who this wallet belonged to," may have been somewhat flippant, but it did not invite speculation. "Speculation is the mere theorizing or guessing about the possible meaning of the facts and evidence presented."[115] The prosecutor was not asking Williams to theorize or guess about facts or evidence outside his personal knowledge.[116] Therefore, the trial judge did not err in overruling Appellant's objection. In addition, Appellant avers that, in three other instances, the trial judge overruled his proper objections. He provides record cites without elaboration. He also refers generally to "numerous other, similar examples" of the prosecutor taking unfair advantage

---

[115] *Gross v. State*, 380 S.W.3d 181, 188 (Tex. Crim. App. 2012),

[116] *See Fairow*, 943 S.W.2d at 902 ("Personal knowledge is required because testimony without personal knowledge is pure speculation and conjecture.").

of his pro se status and the trial judge overruling his proper objections. We decline to make Appellant's arguments for him regarding the "numerous other examples" or to search the record for additional instances of potential error.[117]

*(4) Use of Appellant's Courtroom Conduct as Evidence Against Him*

Appellant also complains that the State improperly "used" his negative reactions to the trial judge overruling his objections as punishment-phase evidence against him. However, Appellant's reactions during the proceedings could properly be considered as punishment-phase evidence because they demonstrated his inability or unwillingness to control his temper and conform his conduct to the rules of the court.[118]

*(5) Deputies' Interactions with Appellant*

Appellant complains about the sheriff's deputies' interactions with him in the jury's presence. Specifically, Appellant asserts that, because he failed at times to "stand" or "sit" promptly while trying to make objections, he was often physically pushed down by

---

[117] *See* TEX. R. APP. P. 38.1(i) ("The brief must contain a clear and concise argument for the contentions made, with appropriate citations to authorities and to the record."); *see also, e.g., Wyatt v. State,* 23 S.W.3d 18, 23 n.5 (Tex. Crim. App. 2000) ("[The] appellant points us to nothing in the record, makes no argument, and cites no authority to support this proposition. We will not make appellant's arguments for him and hold the allegation to be inadequately briefed.").

[118] *See, e.g., Coble,* 330 S.W.3d at 267 (citing evidence of the appellant's courtroom conduct of turning around to stare at a witness and repeatedly giving her a "weird evil grin" as evidence of his future dangerousness); *Martinez v. State,* 327 S.W.3d 727, 736-37 (Tex. Crim. App. 2010) (finding that evidence that the appellant threatened a witness as she walked past him in the courtroom was admissible under Rules 401 and 403).

courtroom deputies, in front of the jury, and then ultimately (and wrongfully as discussed above) subjected to the electric shock outside the jury's presence.

But, as we stated above, a court's efforts at courtroom administration are not a valid basis for finding judicial bias, even if they include "expressions of impatience, dissatisfaction, annoyance, and even anger."[119] And the record reflects that Appellant's conduct caused any "friction" that was apparent to the jury. He ignored the judge's instructions and repeatedly interrupted witnesses' testimony even after the judge had ruled it was admissible. For example, while cross-examining his sister Debbie Campbell, Appellant asked her whether she, personally, had ever seen him physically abuse his ex-wives. She responded that she had not, although she had seen the after-effects of the abuse. On redirect examination, the prosecutor asked Campbell about an incident in which Appellant had physically abused Adams. When Appellant objected to hearsay, the prosecutor argued that Appellant's cross-examination had opened the door to the State's questions about Appellant's abuse of his ex-wives. The trial judge agreed and overruled Appellant's objection.

The judge then informed Appellant that he did not have to keep objecting in order to preserve error. However, every time Campbell began to answer a question, Appellant objected again, repeating the same grounds each time. He further interrupted Campbell's testimony to object on additional grounds. The judge instructed Appellant that once the

---

[119] *Liteky,* 510 U.S. at 555-56.

judge ruled, Appellant needed to let Campbell answer the question. But Appellant continued objecting, and this exchange between Appellant and the trial judge repeated itself multiple times, with the trial judge instructing Appellant to "[h]ave a seat."

Appellant then objected to "this person, [Officer] Sheffield, touching me right now." The judge overruled this objection and Appellant again objected. The judge then held a recess to discuss the matter outside the jury's presence. The judge then stated:

> [Appellant], I'm warning you again that Officer Sheffield is following the Court's instructions that once I rule, you know you are supposed to sit down. . . .[S]it down when the Court rules, and [the jury] won't see anything but you sitting down after I rule. You're forcing this by continuing on. And I'm instructing you again, when I rule, that's it.

Once the jury returned, Appellant, after another objection, finally allowed Campbell to complete her answer to the prosecutor's question.

This part of the trial record documents just one of many instances in which Appellant's own defiant and disruptive behavior precipitated the deputies' conduct. Appellant's complaint is without merit.

*(6) Cumulative Effect*

Appellant argues that the cumulative effect of these alleged errors resulted in a deprivation of his right to counsel, including the right to proceed pro se. He states that, because impairments of the right to counsel and other errors involving the fundamental fairness and integrity of the trial itself are "structural," he is entitled to a new trial.

We reject Appellant's characterization of these alleged errors, most of which concern evidentiary rulings, as violations of his right to proceed pro se or any other constitutional right. Many errors concerning the erroneous admission of the State's evidence or the erroneous exclusion of a defendant's evidence are non-constitutional.[120]

We also reject Appellant's characterization of these alleged errors as "structural." Structural errors "affect the 'framework within which the trial proceeds.'"[121] Only "a very limited class" of errors is structural,[122] which does not include the erroneous admission of evidence  We reiterate that a pro se defendant is bound by the same rules and requirements and is subject to the same risks and pitfalls as a professional attorney.[123] Here, the trial judge admonished Appellant at length regarding these issues. Having found no structural error, and having determined that any other error was harmless, we conclude that the cumulative effect is likewise harmless. Points of error nine and nineteen are overruled.

## REVOCATION OF PRO SE STATUS

In point of error ten, Appellant asserts that, to the extent he had a constitutional right to proceed pro se, the trial judge terminated his right for inadequate reasons. Appellant contends that his remark to the judge, "I'm sure the Court very much enjoyed that"—after

---

[120] *Easley v. State,* 424 S.W.3d 535, 540 (Tex. Crim. App. 2014).

[121] *Marcus,* 560 U.S. at 263 (quoting *Johnson v. United States*, 520 U.S. 461, 468 (1997)).

[122] *Lake v. State,* 532 S.W.3d 408, 413 (Tex. Crim. App. 2017) (quoting *United States v. Davila*, 569 U.S. 597, 611 (2013)).

[123] *Williams*, 252 S.W.3d at 356; *Johnson*, 760 S.W.2d at 279.

being subjected to "a severe electric shock"—did not justify revoking his right to self-representation. He urges this Court to reverse his conviction and death sentence based on the denial of his right to self-representation.

Generally, a defendant should be allowed to proceed pro se if the defendant clearly, unequivocally, unconditionally, and timely asserts his right to self-representation; knowingly and intelligently maintains his desire to proceed pro se after being warned of the consequences; and does not assert this right in order to disrupt or delay the proceedings.[124]

However, "[t]he right of self-representation is not a license to abuse the dignity of the courtroom" or to disregard relevant rules of procedural and substantive law.[125] "[T]rial judges confronted with disruptive, contumacious, stubbornly defiant defendants must be given sufficient discretion to meet the circumstances of each case."[126] "[T]he trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct."[127]

Here, in explaining his decision to revoke Appellant's pro se status, the trial judge pointed to Appellant's statement, "I'm sure the Court very much enjoyed that," as well as all of his prior disruptive conduct. Although the judge pointed to all of Appellant's prior

---

[124] *See, e.g., Hubbard v. State,* 739 S.W.2d 341, 343-15 (Tex. Crim. App. 1987); *Blankenship v. State,* 673 S.W.2d 578, 584-85 (Tex. Crim. App. 1984).

[125] *Faretta,* 422 U.S. at 834n.46.

[126] *Illinois v. Allen,* 397 U.S. 337, 343 (1970).

[127] *Faretta,* 422 U.S. at 834 n.46 (citing *Allen,* 397 U.S. at 343).

disruptive conduct, we discuss Appellant's disruptive conduct only on the day that the judge revoked his pro se status. Suffice it to say that Appellant's conduct on that day was consistent with his conduct on previous days.

After Jelena's murder but prior to Appellant's arrest, officers searched Appellant's mother's house (where Appellant also lived) without a warrant. Appellant filed a pretrial motion to suppress any evidence seized from the house, and the prosecutor agreed not to present any such evidence. Yet, on the day the judge revoked Appellant's pro se status, and after previous failed attempts at questioning other investigators about the search of his mother's house, Appellant attempted to question Shine about the search. When Appellant first asked Shine whether investigators had entered Appellant's mother's house, the prosecutor objected. The trial judge sustained the objection. Appellant responded that the trial judge had denied his motion to suppress, but the judge reiterated that the prosecutor's objection was sustained.

Appellant stated that, "I think the jury needs to know the truth, your honor, as far as—." The judge interrupted him, stating that "the truth" was that the State had agreed to his motion to suppress the search of his mother's house. Appellant argued that the State had never agreed and that the trial judge had denied his motion. The prosecutor responded that the State had agreed to the motion.

The judge admonished Appellant that he was sustaining "any objection and anything related to anything taken out of your mother's house," and directed Appellant to ask another

question. But Appellant again asked Shine about the search, the prosecutor again objected, and the judge again sustained the objection. Yet Appellant persisted in his questioning. The trial judge again ordered Appellant not to raise the search of his mother's house before the jury. Appellant responded that his question had "nothing to do with [his] motion to suppress." At that point, the judge excused the jury.

Appellant again asserted that the State never agreed to his motion. The judge again admonished Appellant about arguing with him, stating:

> You're right in that category of a defendant that the Court can terminate your right to represent yourself. I don't really want to do that, but you're putting me in a position where I can't go on like this. We can't get this case finished in front of the jury with you conducting yourself in this manner. Do you understand the Court's ruling?

Appellant responded, "I would move the Court to recuse himself then." The judge stated that there was no basis for recusal, and "[e]verything taking place right now is [what] you [are] generating and causing." He added, "These deputies are not going to put up with you. You know the remedy they have got. And if you think somehow in your mind if they deploy that remedy there is going to be a mistrial, you can forget it."

The judge reiterated that Appellant must not mention his mother's house. The trial judge, Appellant, and the State again went back and forth about whether the State agreed to the motion to suppress. The judge warned Appellant that if he asked a witness about the search, the judge would terminate his right to represent himself. The judge stated, "If you rebel against that order, if you're defiant of that order, then I can't control the courtroom, and

I can't control the proceedings. And you won't be representing yourself anymore, and you [will] have caused it all."

When the jury returned, Appellant again brought up the search of his mother's house. The trial judge again excused the jury. The judge admonished Appellant about his defiant and rebellious conduct. He stated that he was "now convinced [he could] not get this case tried under the Rules of Evidence" with Appellant representing himself. Appellant responded that he had not gone into the motion to suppress. When the judge asked Appellant if he understood the judge's ruling, Appellant answered, "I just want the truth."

After the jury returned, the judge instructed Appellant to "continue with your cross under the rulings of the Court." Appellant immediately stated, "I object, Your Honor, because I'm not able to—." The judge interrupted him and told him that his objections were on the record and he needed to ask questions. Appellant responded, "These are separate objections, Your Honor. I object to not being able to effect a defense in front of the jury." The judge interjected that Appellant's objections were "all overruled" and again instructed Appellant to question the witness. Instead, Appellant continued his objection, stating, "[u]nder the Sixth Amendment."

After returning to his questions, Appellant repeatedly asked Shine questions that Shine did not know the answer to.[128] Appellant then began reading aloud from a property sheet that

---

[128] Specifically, Appellant repeatedly asked Shine questions about the arrest warrant that Shine did not know the answer to. Eventually, the prosecutor objected that the question had been

(continued...)

listed items taken from his vehicle, repeatedly asking Shine if he remembered the items on that list. The prosecutor objected that Appellant needed to show Shine the property sheet rather than read from it. Appellant then showed Shine the property sheet, but it did not refresh Shine's memory.

At that point, Appellant interrupted his own questioning to object that a deputy was a foot-and-a-half from him and was looking at his evidence. The judge responded that the deputy was not disturbing the evidence and directed Appellant to continue questioning Shine. But Appellant stated that the deputy was "a witness." The judge responded that the deputy was not a witness "in this part of the case," and again instructed Appellant to continue examining Shine.

Appellant, talking about the courtroom deputy, complained, "this person is still talking to me and disrupting me, so I would move the Court to admonish him as far as to back away—." The judge responded that if he admonished anyone, Appellant knew who it would be, and he instructed Appellant to "sit down and ask the next question." The prosecutor interjected to clarify what the deputy had said.[129] Appellant began, "Your Honor—," but the

---

[128] (...continued)
asked and answered. Appellant responded that he was now asking a different question, which was what time Shine had spoken with the officer who prepared the affidavit for the arrest warrant. Shine again answered that he did not know. Appellant then asked Shine what time he and the other investigators had arrived at the crime scene, and Shine stated that he did not know "exactly what time we arrived." Appellant further questioned Shine about other matters that Shine did not know about, leading to more objections by the State.

[129] "[J]ust for the record, . . . I can hear [the deputy] . . . , and all he said was, 'Stand up.
(continued...)

judge interrupted him, stating that there were "14 people sitting over here," and, "Let's show enough courtesy to ask the questions instead of arguing about these other matters. If you've got a question, ask it."

Appellant then continued to ask Shine about other items taken from the car. The prosecutor objected that this questioning was "repetitive." The judge sustained the objection. After questioning Shine about other things in the vehicle,[130] Appellant then began questioning Shine about his role in searching and securing the vehicle, and the prosecutor objected to the form of the question and relevance. The trial judge sustained the objection. Appellant objected "under a right to cross-examine the witness. Obviously, that's a Sixth Amendment right." The judge overruled the objection and told Appellant to "[h]ave a seat."

Appellant then turned his questioning to the topic of his interview. Appellant challenged Shine's authority and jurisdiction to interview him in West Monroe, Louisiana. The prosecutor objected that Appellant was misstating the law regarding jurisdiction. The judge sustained the objection. Appellant began, "Well, I didn't—," and the judge told him to stand up. Appellant again asked Shine why he did not wait until after extradition to conduct the interview.

---

[129] (...continued)
Stand up when you address the Court.' He's trying to make the defendant follow the Court's instructions. . . . It's the defendant's actions that are causing the deputies . . . to do what they do."

[130] Specifically, Appellant asked Shine what he thought about the shooting target that was found in the trunk of the car. Shine stated that he did not form any conclusions or opinions. Appellant asked Shine, "Now, none of the photographs of the trunk show the target, correct?" Shine responded that he did not recall.

Appellant then read some of his own exculpatory statements from the transcript of his interview and asked Shine to confirm that Appellant had said those things. The prosecutor objected, and the judge sustained the objection. Next, Appellant questioned Shine about Appellant's comment on the State's copy of the recorded interview: "Do you have a plea offer for me?" Appellant claimed that this comment was not on his copy of the recorded interview. The prosecutor objected that they previously had a hour-long recess where Appellant was asked to produce evidence supporting that allegation, but Appellant had not done so.[131] The judge sustained the objection.

Appellant then examined Shine about the process of making the recording. Appellant stated that he "need[ed] to see the file dates and—." The judge admonished him to stand up. Appellant then repeated: "I need to review the file dates and times of the video." The prosecutor objected to relevance, and the judge sustained the objection. Appellant then began, "Well, Your Honor, I'm just trying to show—and I understand that—." A sheriff's deputy interrupted to tell him, "If you're going to speak to the Court, stand up. Last chance." The judge stated, "Let's get it over with. Stand up, [Appellant]. It won't work out good if you don't stand up, believe me."

---

[131] Before this exchange, standby counsel had testified outside the jury's presence that he had heard Appellant's comment about a plea offer when he listened to Appellant's copy of the interview. And the prosecutor reminded the judge of the State's motion in limine to prevent Appellant from asking Shine if he had tampered with the recordings.

When Appellant continued examining Shine about the recording process, the prosecutor objected that Shine had not made the recording and so he was the wrong person to ask. The trial judge sustained the objection. Appellant then asserted that he could use his copy of the interview to show that the recording had been altered. The judge stated that he would take that up outside the jury's presence in order to determine relevance, and then Appellant would have another opportunity to present his evidence. The judge added, "You can shake your head, smile if you want to. Doesn't bother the Court. That's the Court's ruling. If you have any other questions for Detective Shine, ask them."

Appellant questioned Shine about the second vehicle search, in which Shine had found the current license plates for Appellant's car under the front passenger-side floor mat. Appellant directly accused Shine and other law enforcement officers of planting the license plates in Appellant's car. Shine categorically denied the accusation, noting that it was "totally baseless" and offensive. Appellant began to respond to Shine, but the judge cut him off and told him to ask his next question. Appellant then asserted through questioning that Shine and other officers had planted the rifles found in Appellant's trunk at the time of his arrest. Appellant seemed to imply that the officers could have obtained the rifles from his mother's house. The prosecutor objected, and the judge sustained the objection.

After asking repetitive questions about other evidence, Appellant asked Shine if he had personal knowledge of the contents of a laptop bag found in the car. Shine stated that he did not, but that he could testify about the recovered items if he had the property sheets.

Appellant told the judge that he could not find his copies of the property sheets and asserted that the State could provide them. The prosecutor refused. Lacking the property sheets, Appellant showed Shine photographs of the items in question and asked him if those items had been in the vehicle. The prosecutor successfully objected. Appellant again asked the prosecutor to hand the witness her copies of the property sheets so that the witness could refresh his memory. The prosecutor again declined.

Appellant then questioned Shine about the ammunition scattered throughout the vehicle. Appellant asked if Jelena was shot with "target ammunition," and continuously asked about the damage caused by different types of ammunition. The prosecutor objected, and the judge sustained the objection.

Turning to the police report, Appellant acknowledged that he had received a copy in discovery, but he asserted that he did not have it with him, so he took Shine's copy. Appellant began questioning Shine about details recorded in it. The prosecutor objected, and the judge sustained the objection. Appellant complained that he was unable to question Shine. The judge then recessed for the day and dismissed the jury. This is when the shock incident occurred.

Outside the presence of the jury, the judge asked Appellant where he was going with this line of questioning. Because Appellant refused to stand while addressing the judge, a deputy activated the shock cuff. After he was shocked, Appellant commented, "I'm sure the

Court very much enjoyed that." The judge then reinstated standby counsel to represent Appellant.

This record reflects that the trial judge had adequate cause to revoke Appellant's pro se status because he "deliberately engage[d] in serious and obstructionist misconduct."[132] Despite the trial judge's repeated rulings and admonitions, Appellant refused to abandon a line of questioning about a search that he had successfully moved to suppress. Twice, outside the jury's presence, the trial judge reiterated and explained his rulings excluding testimony about that search and warned Appellant that he was in danger of losing his pro se status. Further, when Appellant was given the opportunity to present evidence that the audiovisual recording of the interview had been altered, he failed to do so. Nevertheless, he attempted to inform the jury that the recording had been altered. It appears from the record that, when the judge stated that he would take that matter up outside the jury's presence, Appellant shook his head and smiled. Even after the trial judge ruled that asking Shine questions that other investigators had already answered was repetitive and "a waste of time," Appellant continued with those questions. With no good-faith basis, Appellant accused Shine and other investigators of planting evidence.

Appellant repeatedly refused to comply with relevant rules of procedural and substantive law. Based on Appellant's defiant and disruptive conduct, the judge revoked his pro se status. On this record, we conclude that the trial judge did not abuse his discretion by revoking Appellant's pro se status. Point of error ten is overruled.

_____

[132] *See Faretta,* 422 U.S. at 834 n.46.

CLOSING ARGUMENT – GUILT PHASE

In point of error eleven, Appellant contends that the prosecutor engaged in egregious misconduct during closing argument at the guilt phase in violation of due process. Further, he argues, given the magnitude, extent, and egregious nature of the misconduct, the errors are not harmless.

The principal purpose of closing argument is to facilitate the jury in properly analyzing the evidence presented at trial so that it may "arrive at a just and reasonable conclusion based on the evidence alone, and not on any fact not admitted in evidence."[133] There are four proper areas of jury argument: (1) summation of the evidence; (2) reasonable deduction from the evidence; (3) answer to argument of opposing counsel; and (4) plea for law enforcement.[134] "[C]ounsel is allowed wide latitude in drawing inferences from the evidence so long as the inferences drawn are reasonable, fair, legitimate, and offered in good faith."[135] To complain on appeal about an improper jury argument, a defendant must object at trial and pursue his objection to an adverse ruling.[136] He must object each time an

---

[133] *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. 1980) (panel op.) (quoting *Stearn v. State*, 487 S.W.2d 734, 736 (Tex. Crim. App. 1972)).

[134] *Milton v. State*, 572 S.W.3d 234, 239 (Tex. Crim. App. 2019).

[135] *Shannon v. State,* 942 S.W.2d 591, 597 (Tex. Crim. App. 1996).

[136] *Cockrell v. State,* 933 S.W.2d 73, 89 (Tex. Crim. App. 1996).

improper argument is made, or he waives his complaint, regardless of the egregiousness of the argument.[137]

Here, Appellant failed to preserve many of his complaints regarding the prosecutor's closing argument during the guilt/innocence phase because counsel failed to timely object or did not object each time the allegedly improper argument was made.[138] Therefore, we will not consider those complaints. He did, however, preserve some of his complaints.

Appellant states that the prosecutor violated his Sixth Amendment rights by commenting on his in-court behavior and making demeaning remarks regarding his self-representation. Appellant preserved error for two of these complained-of comments.

Appellant complains about the prosecutor's statement, "See him laughing and smirking and shaking his head." The trial judge overruled Appellant's timely objection that

---

[137] *See, e.g., id.*; *Fuentes v. State,* 991 S.W.2d 267, 273 (Tex. Crim. App. 1999).

[138] *See* TEX. R. APP. P. 33.1; *Cockrell,* 933 S.W.2d at 89; *Fuentes,* 991 S.W.2d at 273. Appellant complains that the prosecutor demonized him by calling him names such as "the evil that sits in this courtroom," a "monster," and a "selfish coward." He also contends that the prosecutor: improperly inflamed jurors with irrelevant emotional considerations and encouraged them to put themselves in Jelena's position and to speak for Jelena and her family; improperly injected herself personally into the case; intimated that her experience and expertise led her to conclude that Appellant was guilty; touted her expertise by instructing the jury on how to conduct its deliberations; encouraged the jury to convict him on behalf of the community at large; and urged jurors to join the State's team. He identifies numerous additional examples of allegedly improper name-calling and argument which, he contends, violated due process. Appellant also asserts that the prosecutor presented jurors with a falsified reconstruction of the offense that was unsupported by the evidence. The record shows that the prosecutor stated that Appellant was holding L.C. as he stood over Jelena in the doorway, and that L.C. cried out, "Mama, Mama, Mama," as Jelena attempted to turn toward her son before Appellant shot her in the back of the head.

this statement was a comment on his non-testimonial demeanor. The prosecutor then asserted, "[T]hat's what you've got right there, sitting right there with a smirk on his face most of the trial. You saw it. That's a killer. That's evil." Appellant objected again that the prosecutor was commenting on his non-testimonial demeanor. The prosecutor responded, "I'm commenting on when he represented himself." The judge overruled the objection.[139]

Typically, a non-testifying defendant's demeanor while in the courtroom is not evidence, so it is not an appropriate subject for the prosecutor in argument.[140] A defendant's non-testimonial demeanor is usually irrelevant to the issue of his guilt.[141] Assuming the prosecutor's arguments, "See him laughing and smirking and shaking his head," and "[T]hat's what you've got right there, sitting right there with a smirk on his face most of the trial," were improper comments on non-testimonial demeanor, any error was harmless.

---

[139] To the extent that Appellant complains that these comments violated his right to self-representation, his current contention does not comport with his trial objections, which were solely on the ground that the comments concerned his non-testimonial demeanor. *See Hallmark v. State,* 541 S.W.3d 167, 171 (Tex. Crim. App. 2017) ("Because the complaint on appeal does not comport with either of the trial objections, nothing is presented for review."). Therefore, we will consider only his arguments regarding non-testimonial demeanor.

[140] *See Wead v. State,* 129 S.W.3d 126, 130 n.8 (Tex. Crim. App. 2004) (prosecutor may not properly comment upon the defendant's demeanor in the courtroom because his demeanor is not evidence of guilt).

[141] *Good v. State,* 723 S.W.2d 734, 737-38 (Tex. Crim. App. 1986) (concluding that a defendant's neutral, orderly courtroom demeanor did not support a reasonable inference of guilt).

We evaluate the harm arising from this improper closing argument under the standard for constitutional error because it is an indirect comment on Appellant's failure to testify.[142] We must reverse the conviction unless we determine beyond a reasonable doubt that the error did not contribute to the conviction or punishment. The context of the prosecutor's statement shows that it could not have tainted the trial process. The argument followed the guilt-innocence portion of trial, where Appellant represented himself until his repeated disobedience caused the trial court to reinstate his attorneys. The jurors did not hear Appellant testify, but they could recall for themselves whether Appellant "smirked" during most of the trial. Moreover, although the record does not itself reflect the "smirks," it does reflect Appellant's flippant attitude and verbal sparring with witnesses, the prosecutor, the courtroom deputies, and the trial court while representing himself. After carefully reviewing the record and performing the required harm analysis under Rule 44.2(a), we hold beyond a reasonable doubt that any error in failing to sustain the Appellant's objection to the prosecutor's argument did not contribute to Appellant's conviction or punishment. Point of error eleven is overruled.

CLOSING ARGUMENT – PUNISHMENT PHASE

---

[142] *Dickinson v. State*, 685 S.W.2d 320, 324 (Tex. Crim. App. 1984); *Snowden v. State*, 353 S.W.3d 815, 826 (Tex. Crim. App. 2011).

In point of error twelve, Appellant asserts that the prosecutors engaged in egregious misconduct during closing argument in the punishment phase of the trial in violation of his Fifth Amendment privilege and Article 38.08. He contends that the prosecutors:

1.  commented on his failure to testify and his non-testimonial demeanor;

2.  worked to inflame the jury's passions by making emotional statements about Jelena's fear during the offense and her final thoughts for L.C.;

3.  described L.C. and his sister E.C. as victims;

4.  encouraged jurors to decide his punishment on an emotional basis;

5.  attacked him personally, repeatedly and at length;

6.  made his in-court demeanor a centerpiece of their argument as to why he deserved the death penalty; and

7.  wrongly argued that his disrespectful courtroom behavior was evidence of his future dangerousness.

Our review of the record reveals that Appellant failed to timely object, and therefore failed to preserve error, to all but one of these complained-of comments.[143] Therefore, we will address the admissibility of that comment, alone, on the merits.

Specifically, Appellant objected to the following statement on the ground that it violated his Fifth Amendment right not to testify:[144]

---

[143] *Cockrell,* 933 S.W.2d at 89 (stating that to complain on appeal about an improper jury argument, a defendant must object at trial and pursue his objection to an adverse ruling).

[144] To the extent that Appellant intends to raise other grounds for objection on appeal, these grounds do not comport with his trial objection and so we will not consider them. *See Hallmark,*

(continued...)

And there's no remorse. He sits over there . . . shaking his head at me. Where's the acceptance of responsibility?

Even Mr. Haas stood up here and told you, "We understand; we get it" was the words he used. Really? Because the last time we were standing here, he was arguing that he was what? Not guilty.

So when did they get it? Where's the responsibility when he's pulling the trigger six times, when he's changing the license plates?

It is improper for the State to accentuate for the jury the defendant's failure to take the stand and claim present remorse.[145] Nevertheless based on the record of this case—which includes Appellant's interview with the police in which he demonstrated a lack of both responsibility and remorse—we have a fair assurance that any error did not influence the jury or had but a slight effect.[146] Point of error twelve is overruled.

## EMOTIONAL EVIDENCE AND COMMENTARY

In point of error thirteen, Appellant contends that the trial judge violated Appellant's due process right to a fair trial by allowing the prosecutor to elicit irrelevant and prejudicial testimony and to make speeches while examining witnesses. He avers that the prosecutor questioned witnesses throughout the trial in a manner that was calculated to inflame the jury.

---

[144] (...continued)
541 S.W.3d at 171.

[145] *Randolph v. State*, 353 S.W.3d 887, 893 (Tex. Crim. App. 2011); *Snowden v. State*, 353 S.W.3d 815, 823-24 (Tex. Crim. App. 2011).

[146] *See Thomas,* 505 S.W.3d at 927.

He identifies four main categories of allegedly irrelevant and unfairly prejudicial testimony and commentary:

1. responding officers' testimony about their feelings toward L.C. and their own children;

2. officers' testimony about a hypothetical gunfight with Appellant, although there was no evidence that Appellant was aggressive or threatening;

3. the prosecutor's prolonged and leading questions on prejudicial topics; and

4. the prosecutor's and judge's argumentative and derogatory comments conveying general disdain for Appellant.

Further, Appellant states, the prosecutor's closing arguments emphasized the erroneously admitted testimony described in categories (1) through (3), which compounded the harmful effects of these alleged errors. We will address each of the four categories in turn, followed by the discussion on cumulative error.

*(1) Officers' Feelings About L.C. and Their Own Children*

Appellant first avers that the prosecutor asked responding officers numerous irrelevant and unfairly prejudicial questions regarding their feelings about L.C. and their own children. Appellant specifically complains that, at the guilt phase, the prosecutor elicited Officer Spoon's testimony about his feelings of sadness upon seeing L.C. in Appellant's car. Spoon also testified that L.C. "was the cutest little kid" and that Spoon was "furious" that Appellant had placed L.C. in danger. When the prosecutor asked Spoon if he kept a picture of L.C. in

his home, Spoon answered affirmatively, explaining that he kept it "[b]ecause [L.C.] was kidnapped, and his mom was murdered in front of him." Similarly, the prosecutor asked Sergeant Downhour, "[A]s you went back there and saw that little boy pulled out of the car, being a father yourself, it did make you mad, didn't it?" Downhour affirmed that it did. And Corporal Knight testified that, when she saw L.C. in the back of the car, she was "very angry" and "upset that a child could be put in harm's way."

Appellant also complains about the prosecutor's questioning of Officer Cummings. As discussed above regarding points of error nine and nineteen, Cummings testified that he spent part of that Halloween evening with his daughter. The prosecutor stated, "And after that, you apprehended this defendant. It's significant because you put your life on the line after being with your little girl." Cummings agreed.

Appellant argues that the officers' testimony was plainly intended to lead the jury to decide the case "on an emotional basis and not on the basis of the other relevant evidence introduced at trial." Although Appellant did not specifically object to all of this questioning, he obtained a running objection under Rules 402, 403, and 404(b) to responding officers' testimony concerning the pursuit and arrest and that conveying their sympathy for L.C.

Under Rule 402, evidence that is not relevant is inadmissible.[147] Further, Rule 403 excludes otherwise relevant evidence when its probative value is substantially outweighed

---

[147] TEX. R. EVID. 402; *Gonzalez*, 544 S.W.3d at 370.

by the danger of unfair prejudice.[148] "The term 'probative value' refers to . . . how strongly [an item of evidence] serves to make more or less probable the existence of a fact of consequence . . . coupled with the proponent's need for that item of evidence."[149] "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[150]

Here, this testimony was inadmissible because it was irrelevant to Appellant's guilt or innocence of the charged offense. Further, this testimony did not concern a fact of consequence, and it suggested a decision on an emotional basis. Accordingly, the trial judge erred in admitting this testimony over Appellant's Rule 402 and 403 objections. Our inquiry, however, does not end there.

Generally, an erroneous evidentiary ruling is non-constitutional error.[151] Non-constitutional error must be disregarded unless it affects the defendant's substantial rights.[152] We will not overturn a criminal conviction for non-constitutional error if, after reviewing the record as a whole, we have fair assurance that the error did not influence the

---

[148] Rule 403; *Davis v. State,* 329 S.W.3d 798, 806 (Tex. Crim. App. 2010); *Gonzalez*, 544 S.W.3d at 371.

[149] *Casey v. State,* 215 S.W.3d 870, 879 (Tex. Crim. App. 2007); *Gonzales*, 544 S.W.3d at 372.

[150] *Davis,* 329 S.W.3d at 806; *Gonzalez*, 544 S.W.3d at 373.

[151] *See Potier v. State,* 68 S.W.3d 657, 663 (Tex. Crim. App. 2002); *Gonzalez, id*.

[152] *See* TEX. R. APP. P. 44.2(b); *Gonzalez, id*.

jury or had but a slight effect.[153]  The presence of overwhelming evidence supporting the judgment can be a factor in evaluating the effect of such an error.[154]

Based on the record of this case, we conclude that the admission of the officers' testimony concerning their feelings about L.C. was harmless.  The evidence of Appellant's guilt was overwhelming, and the testimony at issue "was not so 'emotionally charged' as to prevent the jury from rationally considering the evidence before it."[155]  And, as discussed in points of error nine and nineteen, Appellant himself elicited Cummings's similar testimony that he felt "strongly about how [Appellant had] endangered [L.C.]."[156]  After examining the record as a whole, we have a fair assurance that the error did not influence the jury, or had but a slight effect.  This part of point of error thirteen is overruled.

*(2) Hypothetical Gunfight*

Appellant contends that the prosecutor improperly elicited West Monroe officers' inflammatory testimony about a hypothetical gun fight between Appellant and the officers, although there was no evidence that Appellant had been aggressive or threatening.  He complains that the prosecutor asked multiple protracted questions about the danger the police

---

[153] *Johnson v.  State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

[154] *Motilla,* 78 S.W.3d at 357-60 (concluding that the erroneous admission of testimony concerning the victim's childhood was harmless under Texas Rule of Appellate Procedure 44.2(b)).

[155] *Id.* at 360.

[156] *See Coble,* 330 S.W.3d at 282 (stating that erroneously admitted evidence will not result in reversal when the same evidence was received elsewhere without objection).

officers could have faced if Appellant had drawn the loaded weapons that were in his trunk.[157] The record includes the following exchange between the prosecutor and Williams:

> Q. Let me ask you this scenario: Say that you pulled me over in a car, and I have these weapons in my car loaded with magazines, one in the chamber.
>
> And I get out of my car, and I was like, "Hey how you doing?"
>
> And I pop the trunk. If I open that trunk and grab that gun, you're in trouble.
>
> A. Yes.
>
> * * *
>
> Q. These guns in a firefight with a police officer, you are severely outgunned if I'm approaching you with this weapon over your .40-caliber Springfield, true?
>
> A. Yes. . . .
>
> Q. And how many rounds do you have in your pistol?
>
> A. 16.
>
> Q. 16. I have 61 in this one.
>
> Will those bullets – do you know if – I know that there are bullets made for this gun that will go right through your vest. Do you know if those rounds like that would penetrate your vest?
>
> A. They would be pretty close. I know the 7.62X39 will completely go through a vest.

---

[157] Before the complained-of exchanges, Appellant had obtained a running objection under Rule 403 to any evidence or testimony concerning the firearms found in the trunk of his car.

Thereafter, the prosecutor asked Detective Malmstrom what he would do in a typical vehicle stop. Malmstrom testified that after stopping the vehicle, he would walk up to the "front doorpost to offer coverage," introduce himself, and announce the reason for the stop. He would then walk up to the vehicle. The prosecutor then asked:

> Q. As a patrol officer, if you are attempting to stop an individual and that individual slows down, and as soon as you start to kind of get out of your car, they edge forward, and they have a 40-caliber Springfield XD between their legs, as a patrol officer, is that a frightening situation to you?

Malstrom answered, "Yes, sir." The prosecutor then asked:

> Q. Okay. If I pop the trunk when I stopped and had loaded firearms in there, like that AR, loaded up, say when I was coming to a stop in my car, if I just pop my trunk, pulled my car into stop and got out and said, Hey, how's it going; sorry I was -- and I pulled that trunk up and grabbed ahold of one of those guns, you're dead, aren't you?
>
> A. Yes.
>
> Q. Because that gun is fully loaded. There's one in the chamber. All I have to do, if the safety's on, is just flip that safety down, and you're -- you're done?
>
> A. Yes.
>
> Q. So for somebody riding around with a child that's been kidnapped, heading out of town in a car with loaded -- like these were -- I don't know if you remember seeing those, but they were loaded with one in the chamber.
>
> A. The ones in the car?
>
> Q. The ones in the trunk.
>
> A. Yes, sir. Yes, sir.

Q. So what we had was -- and what we had was eight guns, almost -- I mean, thousands of rounds . . . .

As we discuss later under point of error twenty, the firearms in this case were connected to Appellant and to his preparations for the offense and its aftermath. When police officers stopped Appellant, he had a handgun between his legs, and there was a loaded Sig Sauer was on the floor beneath L.C.'s car seat. On these facts, the probative value of the evidence that Appellant had loaded firearms in the trunk of his car was not substantially outweighed by the danger of unfair prejudice. For the same reasons, the officer's testimony about the dangers posed by the firearms was not unfairly prejudicial. This part of point of error thirteen is overruled.

*(3) Prolonged and Leading Questions*

Appellant asserts that the prosecutor, through his examination of the medical examiner and the forensics expert, made highly prejudicial and argumentative speeches before the jury and asked prolonged, leading questions or questions that were unduly focused on graphic, cumulative, and prejudicial topics. Appellant cites several examples of this conduct. However, he did not consistently object to the complained-of conduct on the bases that he raises on appeal. Nor has he directed us to any potentially applicable running objection.

The record shows that some of Appellant's "leading" objections were sustained and the prosecutor was made to re-frame the questions. But the prosecutor continued to ask leading questions, and Appellant did not always object. Also, Appellant's "asked and

answered" objection—made in response to the prosecutor asking the forensic expert (for the second time) to describe the sequence of the gun shots—led to the trial judge asking the prosecutor if he had something "different." Appellant did not object when the prosecutor stated that he would ask the question differently and then did so. Accordingly, Appellant failed to preserve error as to these claims.[158] This part of point of error thirteen is overruled.

*(4) Argumentative and Derogatory Comments*

Appellant states that the prosecutor unfairly prejudiced the jury against him throughout the trial by making derogatory remarks about him while examining witnesses. He complains that, by criticizing Appellant and commenting on the evidence in the jury's presence, the trial judge exacerbated the negative impression that the prosecutor sought to create. Appellant avers that these comments were clearly calculated to inflame the jury and created the impression that the prosecutor and trial judge were aligned against him.[159]

Specifically, Appellant contends that, in the jury's presence, the prosecutor and trial judge repeatedly commented on Appellant's purported failure to follow proper courtroom etiquette and asserted that Appellant did not care about the rules. For example, after Appellant objected that the prosecutor was re-offering the same evidence under new exhibit numbers, the prosecutor responded that the gun magazines currently offered were different

---

[158] *See* TEX. R. APP. P. 33.1(a)(1)(A); *see Thomas,* 505 S.W.3d at 924; *Darcy v. State,* 488 S.W.3d 325, 330 (Tex. Crim. App. 2016).

[159] Although Appellant alleges that the State and the trial judge engaged in this conduct "throughout the trial," all of the specified conduct took place during the guilt phase.

from the magazines previously admitted. The prosecutor stated, "And if [Appellant] can give me a specific number he thinks that we offered that under yesterday, I'll go pull it out and show him."

The prosecutor continued, "And also, be cognizant of the difference between TPD Number 190 and the State's Exhibit Number 190-L, which was the Springfield firearm you killed your wife—ex-wife with." Appellant objected, stating, "I would object to that improper comment on the ex-wife, Your Honor." The judge responded, "That's the allegation in the indictment."

Regarding the prosecutor's "ex-wife" comment, assuming it was improper, we find that it was not reversible error.[160] This comment did not inject new facts into the record because the jury was aware that the State's theory was that Appellant had murdered his ex-wife with the Springfield firearm.[161] Further, the jury could evaluate the truthfulness of the prosecutor's comment.[162] No curative action was taken, but given the strength of the State's case, we conclude that any error was harmless.

---

[160] *Cf. Martinez,* 17 S.W.3d at 692 ("[M]ost comments that fall outside the areas of permissible argument will be considered to be error of the nonconstitutional variety.").

[161] *Cf. Mosley v. State,* 983 S.W.2d 249, 260 (Tex. Crim. App. 1998) (considering, as a factor in assessing harm, whether an improper comment injected new facts into the record).

[162] *Cf. id.* (stating, in finding the error harmless, that "the jury [wa]s in a position to evaluate the truthfulness of the prosecutor's assertion").

Regarding the complained-of statement by the judge, it was not a comment on the evidence. Instead, it was a simple statement of fact: the indictment alleged that Appellant killed his ex-wife.[163] Therefore, we overrule this complaint.

Next, Appellant directs us to an instance in which he asked an investigator whether he had photographed a safe that was inside Appellant's mother's house. The prosecutor objected to Appellant's question:

> [PROSECUTOR]: Judge, we're going to—we're going to object only in that the defendant, because he doesn't care what the Court says or what the rules are, continues to try to get into stuff that he has filed a suppression on and that we have honored.
>
> He tries to go back into -- that was not seized at this location. It's the same one that he objected to, he filed the suppression on, the search of his mother's home.
>
> THE COURT: Objection's sustained. I know what you're talking about.
>
> [PROSECUTOR]: We'd ask the jury to be instructed to disregard because we have operated in good faith based on what he had filed, and he continues to try to subvert the rules. He doesn't care what they are, what the Court says. He's always trying to backdoor and do something with the --
>
> THE COURT: The last -- the jury will disregard the last question, last response of the witness.

---

[163] *See Dockstader v. State,* 233 S.W.3d 98, 108 (Tex. App.—Houston [14th Dist.] 2007, pet. ref'd) ("To reverse a judgment on the ground of improper conduct or comments of the judge, we must find (1) that judicial impropriety was in fact committed, and (2) probable prejudice to the complaining party.").

Appellant did not object to the prosecutor's comments that Appellant refused to follow the rules. Therefore, he failed to preserve error regarding that comment.[164] Additionally, as discussed under point of error 10, Appellant had filed a pretrial motion to suppress any evidence seized during the search of his mother's house, and the prosecutor had agreed not to present any such evidence. And prior to the complained-of comment, the trial judge had already repeatedly admonished Appellant that he could not discuss this evidence. The trial judge's comment, "I know what you're talking about," in context, meant "you [prosecutor] don't have to keep explaining."[165] Therefore, we overrule this complaint.

Appellant also contends that the prosecutor used an improper strategy of making derogatory comments in front of the jury and then withdrawing them. For example:

[Prosecutor]: And could you tell in this photograph if the killer had, in an act of cowardice, shot her in the back?

[Appellant]: Your Honor, I'm just going to object to the comment "act of cowardice shot her in the back." Highly prejudicial.

[Prosecutor]: I think anyone who would shoot a woman in the back is an act of cowardice [sic], but I'll withdraw my statement, Judge.

---

[164] *See* TEX. R. APP. P. 33.1(a)(1)(A); *Darcy,* 488 S.W.3d at 330.

[165] *See Liteky,* 510 U.S. at 555-56 ("A judge's ordinary efforts at courtroom administration—even a stern and short-tempered judge's ordinary efforts at courtroom administration—remain immune.").

Assuming that the prosecutor's "act of cowardice" comment was improper, we conclude that it was not harmful.[166] The evidence of Appellant's guilt was overwhelming. After examining the record as a whole, we have a fair assurance that the error, if any, did not influence the jury, or had but a slight effect.[167]

Next, Appellant contends that the trial judge repeatedly described to the jury what the "evidence shows" regarding Appellant driving the vehicle in the "chase," and police officers breaking the windows, "trying to get the defendant out of the car," as he was "fleeing." The record shows that the judge made these comments in response to Appellant's objection to the admissibility of State's Exhibit 158, a photograph of his vehicle in the Tyler impound lot.

Exhibit 158 was initially admitted into evidence during Spoon's testimony before the jury, after he confirmed that he was familiar with the content of State's Exhibits 153 through 161. Spoon testified that these photos "fairly and accurately depict[ed] what they purported to show." Appellant received the trial judge's assurance that his running objection was still in effect. He also objected under Rules 901, 1001, 1002, 1003, 403, 404(b), hearsay, lack of predicate, lack of foundation, and relevance. Without commenting on the content of the exhibits, the trial judge overruled all of Appellant's objections to State's Exhibits 153 through 161.

---

[166] *See* TEX. R. APP. P. 44.2(b).

[167] *See Motilla,* 78 S.W.3d at 355.

Later, during Spoon's testimony, Appellant objected to Exhibit 158. Appellant also stated, "I will reurge, obviously, and continue to reurge the motion [to suppress] that was talked about outside the hearing of the jury."[168] The judge responded, "[T]he officer has already identified [that car as] the one that he seized that you were driving in the chase, [and so that motion is] denied and overruled."

Appellant then stated that he needed to present his previously filed motion "SSS," which the trial judge seems to have mistakenly assumed pertained to the admissibility of Exhibit 158.[169] The judge responded, "What you have got up right there is a photograph of the vehicle, according to . . . the officer -- that you were fleeing in." The judge added, "State's Exhibit 158 has been identified as the vehicle the defendant was driving during the chase," and the prosecutor affirmed that it was. The judge later asked Spoon, "So [Exhibit] 158 shows the vehicle that you've already testified [that] the defendant was fleeing in, and it shows the . . . windows that were obviously taped up as a result of your officers having to bust them up to get the weapons, is that correct, and to get the defendant out." Spoon confirmed that this was correct.

---

[168] After the judge admitted State's Exhibits 153-161, Appellant stated that he had a motion to suppress those exhibits and other evidence. The judge held a hearing outside the presence of the jury. In that hearing, the judge denied the motion, explaining to Appellant that the motion was untimely because he did not raise it until after the exhibits had been admitted.

[169] In fact, Motion SSS sought to bar ex parte communications between the prosecutors and the judge. Appellant did not explain the nature of this motion to the judge until after this discussion of the admissibility of Exhibit 158.

The prosecutor then noted that State's Exhibit 158 had already been admitted. On that basis, the judge overruled Appellant's objections. When Appellant sought confirmation of the judge's ruling, the judge stated, "[T]he evidence shows you were driving [that vehicle] in the chase and the evidence shows this Officer Spoon taped up the . . . windows before it was moved to Tyler because [they] had been broken out to get you out of [the vehicle] . . . in the course of your apprehension. So, yes, it's denied."

We conclude that the judge's comments were responsive to Appellant's objections and questions, and they were based on evidence disclosed during the proceedings.[170] The judge did not state that the evidence was true, only that it established a predicate for the exhibit.[171]

Appellant next complains about the trial judge's comments on State's Exhibit 162. An investigator testified at trial that State's Exhibit 162 was a photograph of "the defendant's car with the piece of evidence tape as it was sealed so [we] could protect the integrity of what was in it." Appellant objected to the admission of Exhibit 162 "under [Rules] 901, 1002, 1003, 403, 404(b), lack of predicate, lack of personal knowledge, and the hearsay value of

---

[170] *Cf. Rodriguez v. State,* 470 S.W.3d 823, 830 (Tex. Crim. App. 2015) ("'[O]pinions formed by the judge on the basis of facts introduced or events occurring in the course of the current proceedings, or of prior proceedings, do not constitute a basis for a bias or partiality motion unless they display a deep-seated favoritism or antagonism that would make fair judgment impossible.'") (quoting *Liteky*, 510 U.S. at 555).

[171] *See* TEX. R. EVID. 104(a) (stating that the trial judge determines preliminary questions about the admissibility of evidence).

what this photograph is actually supposed to represent, as far as relevance at this point." On appeal, he now complains of the ensuing exchange:

> THE COURT: All right. [State's Exhibit] 162 depicts . . . a photograph of the vehicle that the defendant was fleeing in with the . . . left front and left side window . . . and the rear window, they are taped up so they just won't be opened from the results of them trying to get the defendant out of the car.
>
> So, I mean, those objections are -- all of them, [Appellant], are overruled.
>
> [APPELLANT]: Your Honor, in addition to that, I'm going to have to object to the Court's comment itself on the evidence.
>
> THE COURT: Well, you're always worried about whether or not I have looked at the photograph. So I want you to know I have looked at it by indicating what it was, which the officer just testified to.
>
> So your objections are overruled. I have carefully reviewed it. 162 is admitted into evidence.

The trial judge's statement accurately described the contents of State's Exhibit 162. But even assuming that the statement was an improper comment on the evidence, it does not constitute reversible error because it was not reasonably calculated to benefit the State or prejudice Appellant.[172] Further, several officers testified that Appellant fled in his car, and,

---

[172] *See Moody v. State,* 827 S.W.2d 875, 879 (Tex. Crim. App. 1992) (concluding that the trial court's statements that "[t]hat's the lady that was murdered" and "this man is accused of committing her murder" were harmless because they were "not in any way reasonably calculated to benefit the State or prejudice [the] appellant"); *see also Marks v. State,* 617 S.W.2d 250, 252 (Tex. Crim. App. 1981) (panel op.).

after they stopped him, they broke his window and pulled him out.[173]  Thus, we overrule this complaint.

Appellant also complains about the following discussion concerning the license plates on his car:

> [APPELLANT]:  Okay.  Then objection [to State's Exhibit 164] under 403, 404(b), lack of personal knowledge, lack of predicate, lack of foundation, 1002, 1003.  There's no predicate to this whatsoever.
>
> THE COURT:  All those objections are overruled.  The officer [has] testified, after looking at the photograph, that that plate is the one that was on the vehicle you were fleeing in and taken out of, so—and obviously the objection is overruled, and that exhibit -- what's the number?
>
> [APPELLANT]:  I would object to the Court's comments.
>
> THE COURT:  I'm summing up the evidence, which is the predicate for my ruling, based on your objections.
>
> * * *
>
> THE COURT:  The Court's ruling is there's plenty of predicate for State's Exhibit 164, based on the officer's testimony.  It'll be admitted.  It's admitted into evidence.  All the objections are overruled.

The judge made these comments in response to Appellant's objections to an exhibit. The trial judge stated that the officer's testimony established the predicate for admitting the exhibit.  He did not opine that the officer's testimony was true.  Further, even if the comment

---

[173] *Cf. Marks,* 617 S.W.2d at 252 (indicating that, even if a trial judge's conduct had been a comment on an eyewitness's credibility, the fact that two other eyewitnesses identified the appellant as the perpetrator offset any potential harm).

was improper, it was not reasonably calculated to benefit the State or prejudice Appellant.[174]

Thus, we overrule this complaint.

Additionally, Appellant argues, the judge's comments compounded the impression that the judge was aligned with the State. He contends that the judge violated his obligation to remain neutral and objective before the jury. Appellant concludes that the judge committed reversible error by refusing to sustain his objections to the prosecutor's inflammatory comments and by expressing approval of some of those comments.

As discussed above, the judge's comments were responsive to Appellant's objections and were based on evidence presented during the proceedings. In light of our review of the entire record and the overwhelming evidence of Appellant's guilt, we conclude that none of these comments prejudiced Appellant.

*Cumulative Harmful Effect*

Appellant argues that the prosecutor's conduct was clearly calculated to inflame the jury. He states that, by allowing this conduct, and often even joining in, the trial judge abused his discretion and deprived Appellant of a fair trial. He contends that a "consistent stream of errors," including, "the mountain of irrelevant and prejudicial evidence admitted in this case, the prosecutorial misconduct, and judicial commentary" harmed him. He asserts that, in cases such as this one where the prosecutor devotes significant parts of his closing

---

[174] *See Moody*, 827 S.W.2d at 879.

argument to erroneously admitted evidence, reviewing courts have found reversible error.

A number of errors may be found harmful in their cumulative effect.[175] However, having concluded that Appellant has not preserved most of the complaints that he now raises, and that the preserved claims either lack merit or are harmless, we cannot conclude in this case that the cumulative effect of trial court's purported errors has deprived Appellant of his rights of due process and a fair trial. Point of error thirteen is overruled.

## L.C.'S COUNSELING

In points of error fourteen, fifteen, and sixteen, Appellant challenges the testimony of Judith Lester, a therapist who held counseling sessions with L.C. We will address points of error fourteen and fifteen together, and then address point of error sixteen.

*Points Fourteen and Fifteen: L.C.'s Statements to Lester*

In point of error fourteen, Appellant asserts that the judge erroneously admitted Lester's testimony and treatment records under the hearsay exception for statements made for medical diagnosis or treatment, Rule 803(4) and the decisions in *Taylor v. State* and *Munoz v. State*.[176] He argues that the State failed to establish the predicate for admission of therapy testimony under Rule 803(4). He also argues that this case is distinguishable from

---

[175] *Chamberlain v. State*, 998 S.W.2d 230, 238 (Tex. Crim. App. 1999).

[176] *Taylor v. State,* 268 S.W.3d 571 (Tex. Crim. App. 2008); *Munoz v. State*, 288 S.W.3d 55 (Tex. App.—Houston [1st Dist.] 2009, no pet.) (each holding a child-declarant statements to a mental-health professional admissible under Rule 803(4)).

*Taylor* and *Munoz* because, unlike the child-declarants in those cases, (1) L.C. was not a victim of, but was instead an eyewitness to, the charged offense, and (2) L.C. did not testify. Appellant further alleges that the introduction of hearsay statements when the declarant does not testify violates the Confrontation Clause.

The trial judge determines preliminary questions of the admissibility of evidence.[177] We review a trial judge's decision to admit or exclude evidence under an abuse of discretion standard.[178] A trial judge abuses his discretion only when his ruling is so clearly wrong as to lie outside the zone of reasonable disagreement.[179]

In general, the proponent of hearsay testimony has the burden of proving to the trial judge by a preponderance of the evidence that the testimony is admissible under a hearsay exception.[180] Rule 803(4) provides a hearsay exception for statements made for medical diagnosis or treatment, regardless of whether the declarant is available to testify. Statements fall under that exception if they are made for, and are reasonably pertinent to, medical diagnosis or treatment, and if they describe medical history, past or present symptoms, their inception, or their general cause. In the context of long-term, after-the-fact, mental-health

---

[177] *See* TEX. R. EVID. 104(a); *Vinson v. State,* 252 S.W.3d 336, 340 n.14 (Tex. Crim. App. 2008).

[178] *Taylor,* 268 S.W.3d at 579; *Zuliani v. State,* 97 S.W.3d 589, 595 (Tex. Crim. App. 2003).

[179] *Taylor,* 268 S.W.3d at 579.

[180] *See Vinson,* 252 S.W.3d at 340 n.14; *see, e.g., White v. State,* 549 S.W.3d 146, 152 (Tex. Crim. App. 2018); *Alvarado v. State,* 912 S.W.2d 199, 215 (Tex. Crim. App. 1995).

treatment for a child, the proponent should make it readily apparent on the record that: (1) it was important to the efficacy of the treatment for the child-declarant to be truthful and to disclose the perpetrator's true identity, and (2) the child, before the disclosure, understood that importance.[181] The perpetrator's identity may be pertinent to treatment when it helps the therapist fully discover the extent of the child's emotional and psychological injuries.[182]

"To determine whether a child understands the importance of truthfulness when speaking to medical personnel, the reviewing court looks to the entire record."[183] "If a child-declarant can and does believe that his statement to a mental-health professional will facilitate his diagnosis or treatment, . . . his out-of-court statement should be admissible under Rule 803(4) . . . ."[184]

In this case, Lester initially explained before the jury that she would testify about information she had acquired as L.C.'s therapist. On Appellant's motion, the trial judge excused the jury and conducted a Rule 705/*Daubert* hearing at which the State presented evidence to meet the two-part predicate.[185] Lester testified that she had provided counseling

---

[181] *See Taylor,* 268 S.W.3d at 588-91.

[182] *Cf. Taylor,* 268 S.W.3d at 591.

[183] *Franklin v. State,* 459 S.W.3d 670, 676-77 (Tex. App.—Texarkana 2015, pet. ref'd) (citing *Green v. State,* 191 S.W.3d 888, 896 (Tex. App.—Houston [14th Dist.] 2006, pet. ref'd)).

[184] *Taylor,* 268 S.W.3d at 588.

[185] TEX. R. EVID. 705 (concerning a party's ability to examine an expert about the facts or data underlying the expert's opinion); *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 589-92 (1993) (discussing the admissibility requirements for expert scientific testimony).

services for L.C. and was prepared to answer questions about their counseling sessions. She acknowledged that she had no personal knowledge of the offense. She stated that, in addition to counseling L.C., she had counseled his guardians and his sister. Lester had met with L.C. about sixteen times, starting in November 2014, and she continued to meet with him twice a month. She confirmed that she would testify to statements that L.C. had made to her in the course of treatment, and she would discuss pictures L.C. had drawn as part of his treatment. Additionally, the prosecutor expressed his intent to introduce Lester's records of L.C.'s treatment. The prosecutor further questioned Lester:

> Q. Was truth-telling -- within your counseling sessions with [L.C.], was truth-telling a vital component in the course of treatment?
>
> A. Yes, sir, it is.
>
> Q. Okay. Is it your opinion that it was important to the efficacy of the treatment that [L.C.] disclose the true identity of the perpetrator?
>
> A. Yes, it's very important.
>
> Q. Prior to the disclosure, was it readily apparent[] to [L.C.] that this was the case?
>
> A. Absolutely.
>
> Q. Were these statements made to you by [L.C.] pertinent to his treatment?
>
> A. Yes.
>
> Q. Were the statements identifying the perpetrator likewise pertinent to the treatment?
>
> A. Yes.

Q. Was it important to the efficacy of the treatment that you know the identity of the perpetrator?

A. Yes. It tends to be more traumatic, especially for children, when we're talking about trauma that happens within the attachment of significant caregivers.

The trial judge found that Lester was treating and counseling L.C., the alleged perpetrator was L.C.'s father, and there was no requirement that Lester expressly state that L.C. recognized the need to be truthful. Accordingly, the judge ruled that Lester's testimony conveying L.C.'s statements concerning the alleged offense was admissible under Rule 803(4).

Before the jury, the prosecutor elicited the same predicate testimony from Lester. Lester then elaborated on the counseling process and vouched for L.C.'s truthfulness:

Q. Is there anything that you think is relevant, as far as -- that I haven't asked you about, things [L.C.] has said to you regarding his father?

* * *

A. I think the thing I would say is that [L.C. has] been consistent over time. He's told me the same series of events.

The way that I treat children using these trauma interventions is that I am very open-ended, and I give very open instructions. Draw me a picture that you can tell me the story of what happens. I review with him regularly why he comes to see me.

And part of that is that I know that it's extremely effective for children, and for adults, for that matter, to heal from trauma by being able to tell their story.

His story has been consistent over time. He has -- he clearly draws the same thing again, again, again, and [states] that he wants his voice to be heard that [his father] killed [his mother].

During Appellant's cross-examination of Lester, she further explained her counseling procedures:

Q.  In the course of your treatment or in talking with [L.C.], how did you impress on him the fact that what he needs to say needs to be the truth?

\* \* \*

A.  He and I have actually had conversations about the difference between truth and story telling so that I could have a sense of making sure that, at 7, he understands what's the truth and what's a lie or what's a story.  So he and I have actually talked about that in session.

Q.  What is the purpose, in general, if you know, of the counseling session for a child to engage in therapy with a person?  Not necessarily your -- in your actual interactions, but in general terms, what is -- what is the end result?

A.  Each individual family and client gets to determine what their goals are for therapy.  In his particular instance, his overall -- the overarching goal is for him to be able to adjust to the life experiences that he's had and adjust to the placement in a new family, all these big changes that have happened.

Within that, trauma treatment gets -- gets indicated so that he can tell the story of what's happened to him and then examine the feelings surrounding that story and examine any particular kind of long-lasting trauma, like trauma triggers, sensory triggers that might come up for him that might make it very difficult for him to live a very full and rich life.

Q.  Obviously that would be not something that you would tell him in those terms, correct?

A.  I actually use just about this language with kids.

On redirect, Lester affirmed that she had no concerns that L.C. had been "manipulated in any way" when he recounted his experience.  She perceived that L.C. reported what he actually saw.

On these facts, the trial judge properly admitted Lester's testimony and records[186] conveying L.C.'s statements that were pertinent to his treatment under Rule 803(4).[187] Lester testified that L.C. was aware that it was important for his treatment that he disclose the perpetrator's true identity during their counseling sessions. She also testified that they discussed the difference between truth and story-telling and that L.C. understood "what's the truth and what's a lie or what's a story." Further, they talked about their treatment goals, which were to help L.C. adjust to his life experiences and his new family situation. Appellant's allegation that Lester's testimony and the records conveying L.C.'s statements were inadmissible hearsay is without merit.

Further, Appellant's other arguments also fail. He asserts that the statements made, even if important to the efficacy of the treatment, were nevertheless inadmissible because (1) L.C. was a witness-declarant rather than a victim-declarant, and (2) L.C. did not testify. Rule 803(4) is not limited to victim-declarants in the first place. And the Rule 803 hearsay exceptions apply regardless of whether the declarant is available as a witness.

Appellant also argues that the admission of Lester's testimony and treatment records violated the Confrontation Clause. Under the Confrontation Clause, a "testimonial" statement is inadmissible at trial unless the declarant either takes the stand and is subject to

---

[186] The State introduced the treatment records as business records, with Lester being both the author and the records custodian. Lester testified that she recorded information from each counseling session within 24 hours of the session and that she kept the records in the regular course of business.

[187] *See Taylor,* 268 S.W.3d at 580 (noting that the rationale behind Rule 803(4) relies upon the declarant's motive to tell the truth, which guarantees sufficient trustworthiness).

cross-examination, or is unavailable and the defendant had a prior opportunity for cross-examination.[188] Testimonial statements are those "made under circumstances which would lead an objective witness reasonably to believe that the statement would be available for use at a later trial."[189]

In determining whether a hearsay statement is "testimonial," the primary focus is upon the objective purpose of the interview or interrogation, not upon the declarant's expectations.[190] Generally speaking, a hearsay statement is "testimonial" when the circumstances objectively indicate that the primary purpose of the interview or interrogation is to establish or prove past events potentially relevant to later criminal prosecution.[191]

In this case, the primary purpose of L.C.'s treatment sessions was to help him cope with his memories of the offense and the loss of his parents, and to help him adjust to his new life and family.[192] Accordingly, L.C.'s statements to Lester were non-testimonial. Therefore,

---

[188] *Burch v. State,* 401 S.W.3d 634, 636 (Tex. Crim. App. 2013).

[189] *Id.* (quoting *Crawford v. Washington,* 541 U.S. 36, 52 (2004)).

[190] *Davis v. Washington,* 547 U.S. 813, 822-23 (2006).

[191] *De La Paz v. State,* 273 S.W.3d 671, 680 (Tex. Crim. App. 2008).

[192] *See, e.g., Lollis v. State,* 232 S.W.3d 803, 809-10 (Tex. App.—Texarkana 2007, pet. ref'd) (holding that a child-declarant's statements to a licensed professional counselor who was providing therapy to assist him in recovering from the trauma of abuse were non-testimonial and admission did not violate the defendant's right to confrontation); *see also Melendez-Diaz v. Massachusetts,* 557 U.S. 305, 312 n.2 (2009) (noting that medical records created for purposes of treatment are not testimonial within the meaning of *Crawford*).

Lester's testimony relating L.C.'s statements did not violate the Confrontation Clause. Points of error fourteen and fifteen are overruled.

*Point of Error Sixteen: Lester's Opinion Testimony*

In point of error sixteen, Appellant contends that the trial judge erred in allowing Lester's testimony about L.C.'s feelings at the time of trial and her concern, and the concerns of other family members, over whether L.C. would have to testify. Appellant asserts that this testimony went "far beyond the scope" of Rule 803(4) and was improper under Rules 701 and 702.

Both lay and expert witnesses can offer opinion testimony.[193] Rule 701 applies to the testimony of a witness who personally witnessed or participated in the events about which the witness is testifying, while Rule 702 pertains to the testimony of a witness who was brought in to testify as an expert.[194] To be admissible under Rule 701, a witness's opinion testimony must be rationally based on her perception and helpful to the jury in clearly understanding her testimony or determining a fact in issue.[195] "An opinion is rationally based on perception if it is an opinion that a reasonable person could draw under the circumstances."[196]

---

[193] *See* TEX. R. EVID. 701, 702; *see also Osbourn v. State,* 92 S.W.3d 531, 535 (Tex. Crim. App. 2002).

[194] *Osbourn,* 92 S.W.3d at 535.

[195] TEX. R. EVID. 701.

[196] *Fairow,* 943 S.W.2d at 900.

"When a witness who is capable of being qualified as an expert testifies regarding events which he or she personally perceived, the evidence may be admissible as both Rule 701 opinion testimony and Rule 702 expert testimony."[197] As a general rule, opinions that are based on observations that do not require significant expertise to interpret and that are not based on a scientific theory are admissible as lay opinions if the requirements of Rule 701 are met.[198] "It is only when the fact-finder may not fully understand the evidence or be able to determine the fact in issue without the assistance of someone with specialized knowledge that a witness must be qualified as an expert."[199]

Lester possessed specialized knowledge, but L.C.'s demeanor, his statements, and the expressions on the faces of the figures in his drawings, did not require significant expertise to interpret. Lester's opinions that L.C. was "sad" and "misse[d] his mother very much," and that his account of the offense had been consistent over time, at least , were opinions that a reasonable person, even without significant expertise, could draw under the circumstances. Her opinions were rationally based on her personal perceptions and helped the jury clearly understand L.C.'s emotional state and his recollection of the offense. Accordingly, Lester's opinion testimony was admissible under Rule 701, regardless of whether it was beyond the scope of Rule 803. Point of error sixteen is overruled.

---

[197] *Osbourn,* 92 S.W.3d at 536.

[198] *Id.* at 537.

[199] *Id.*

ADAMS'S, WHISENHUNT'S, AND CAMPBELL'S TESTIMONY

In point of error seventeen, Appellant asserts that the trial judge committed reversible error by admitting the testimony of three of Jelena's friends—Adams, Whisenhunt, and Campbell—conveying her statements concerning her fear of Appellant. He contends that this testimony was hearsay, was unfairly prejudicial, and violated the Confrontation Clause. On the same grounds, he also challenges his sister Campbell's testimony conveying his ex-wife Adams's statements concerning Appellant's abuse during their marriage.

Appellant asserts that Jelena's hearsay statements were not reflective of her state of mind but instead were her memories of specific events. Therefore, he argues, they were not admissible under Rule 803(3)'s hearsay exception[200] and the trial judge abused his discretion by admitting them. Appellant further argues that, although there was considerable evidence that he was the person who shot and killed Jelena, there was "a substantial and legitimate issue" as to whether the State could prove the additional elements necessary to convict him of capital murder. He contends that the complained-of testimony distracted and inflamed the jury. He states that, given the voluminous and highly prejudicial nature of this testimony, its admission was harmful and he is entitled to a new trial. We will address Adams's, Whisenhunt's, and Campbell's testimony separately.

---

[200] In relevant part, Rule 803(3) provides that the hearsay rule does not exclude: "A statement of the declarant's then-existing state of mind (such as motive, intent, or plan) or emotional, sensory, or physical condition (such as mental feeling, pain, or bodily health), but not including a statement of memory or belief to prove the fact remembered or believed . . . ." TEX. R. EVID. 803(3).

*Adams*

At trial, Adams testified that on the morning of the offense, Jelena had called her to talk about Appellant. The prosecutor asked Adams about the conversation. When Adams began to answer, Appellant interrupted her, objecting to "lack of personal knowledge" and "no foundation." His objections were overruled. Adams testified that Jelena told her that Appellant wanted to pick up the children at Jelena's house instead of keeping their original arrangement to meet in the deli parking lot and that she was terrified of him being in her house.

The prosecutor asked Adams if she and Jelena had previously talked about Jelena's fear of Appellant. Appellant interrupted Adams's response with a hearsay objection, which was overruled. Adams testified that Jelena "was very afraid of him" and had related that Appellant had, on many occasions, threatened to kill Jelena and take the children. Jelena and the children even lived with Adams for a while out of concern for their safety. They had an agreement that if anything happened to either one of them, the survivor would make sure that justice was done because they knew that Appellant would "be behind it[.]" Adams further testified, "[H]e's threatened me many times in the past, as well as my family." Appellant's objection to hearsay and "to lack of personal knowledge, as far as family," was overruled.

Appellant objected on grounds of unfair prejudice after Adams testified that she feared for Jelena because of what she, herself, had endured while married to Appellant. This untimely objection did not preserve error, and so we will not consider this ground on

appeal.[201] Further, we will not consider Appellant's Confrontation Clause allegation because he did not object to Adams's testimony on this ground.[202] The only ground that Appellant preserved for appeal that comports with his current challenges to Adams's testimony is hearsay.[203] We limit our review accordingly.

Adams's testimony concerning her own feelings and experiences, including her history with Appellant, was not hearsay because it did not convey a third party's out-of-court statements.[204] And Adams's testimony conveying Jelena's expressions of fear were admissible as statements of Jelena's then-existing mental and emotional condition.[205]

We next turn to Adams's testimony concerning her agreement with Jelena to seek justice against Appellant if anything happened to one of them. This testimony was admissible to the extent that it expressed Adams's and Jelena's fear of Appellant and belief

---

[201] *See* TEX. R. APP. P. 33.1(a); *Luna v. State,* 268 S.W.3d 594, 604 (Tex. Crim. App. 2008) (holding that an untimely objection, made after the question was asked and answered, did not preserve error).

[202] *See Holland v. State,* 802 S.W.2d 696, 700 (Tex. Crim. App. 1991) (concluding that a hearsay objection does not preserve a claim of constitutional error because evidentiary and constitutional errors "are neither synonymous nor necessarily coextensive").

[203] *See Clark v. State,* 365 S.W.3d 333, 339 (Tex. Crim. App. 2012) ("The point of error on appeal must comport with the objection made at trial.").

[204] *See* TEX. R. EVID. 801(d) (defining hearsay as a statement, other than one made by the declarant while testifying at the trial or hearing, offered to prove the truth of the matter asserted).

[205] *See* TEX. R. EVID. 803(3) (excluding from the hearsay rule a witness's testimony relating the declarant's statements of her then-existing state of mind and emotional condition); *Martinez,* 17 S.W.3d at 688 (finding that a witness's testimony relating the victim's statement that she was afraid of the appellant was admissible under Rule 803(3)).

that he posed a threat, but not to show that the two women had a specific agreement or that Adams acted in accordance with that agreement.[206] "As long as the trial court's ruling is within the 'zone of reasonable disagreement,' there is no abuse of discretion, and the trial court's ruling will be upheld."[207] In light of the permissible purpose of this testimony—illustrating the two women's intense fear of Appellant—the trial judge did not abuse his discretion by admitting it. Accordingly, any arguable error in admitting this part of Adams's testimony was not reversible.

However, Adams's testimony conveying Jelena's previous statements that Appellant had threatened to kill her and take the children was not admissible under Rule 803(3). Hearsay testimony regarding the declarant's emotion or "mental feeling" is admissible, but

---

[206] *See, e.g., Martinez,* 17 S.W.3d at 688 (stating that testimony conveying the capital murder victim's plea for the witness to call the sheriff if anyone saw the appellant was not hearsay under Rule 801(d) because it was admitted to show the victim's fear of the appellant, not to show that the sheriff's office was called); *McDonald v. State,* 911 S.W.2d 798, 806 (Tex. App.—San Antonio 1995, no pet.) (finding that a witness's testimony that the victim had told her she had changed the locks to protect herself from the defendant was admissible to show the victim's state of mind under Rule 803(3)).

[207] *See De La Paz,* 279 S.W.3d at 343-44.

hearsay evidence describing why the declarant was afraid is not.[208] Thus, the trial court erred in admitting this testimony. Our inquiry, however, does not end there.

Error in admitting testimony is reversible only if it affected the Appellant's substantial rights.[209] A substantial right is affected when the error had a substantial and injurious effect or influence in determining the jury's verdict.[210] But if the improperly admitted evidence did not influence the jury or had but a slight effect upon its deliberations, such non-constitutional error is harmless.[211] Appellant argues that any error was harmful because there was a substantial doubt that he had committed the acts that elevated the offense from murder to capital murder, and that the improperly admitted hearsay evidence harmed him by distracting and inflaming the jury. We disagree. Adams's objected-to inadmissible hearsay concerning Appellant's past threats to Jelena was no more inflammatory than the unobjected-to evidence

---

[208] *See, e.g., Glover v. State,* 102 S.W.3d 754, 762-63 (Tex. App.—Texarkana 2002, pet. ref'd) (stating that a witness's testimony conveying the declarant's statements that the defendant had sex with her, offered to prove the defendant's conduct toward the declarant, were "specifically excluded from the state of mind exception."); *Skeen v. State,* 96 S.W.3d 567, 576 (Tex. App.—Texarkana 2002, pet. ref'd) (finding that the victim's statements that the defendant had been partying, tearing things up, and smoking marihuana were beyond the mental or emotional condition exception); *Buhl v. State,* 960 S.W.2d 927, 933 (Tex. App.—Waco 1998, pet. ref'd) (distinguishing between admissible hearsay statements conveying the declarant's fear of the victim and inadmissible statements explaining that this fear was caused by the victim's having pulled guns on the declarant).

[209] Tex. R. App. P. 44.2(b).

[210] *See Coble,* 330 S.W.3d at 280.

[211] *Id.*

of these threats.[212] And there was ample admissible evidence showing that Appellant went to Jelena's house intending to kill Jelena and abduct L.C.

This evidence consisted of Appellant's communications with Jelena in the days before the offense, which established that he was unwilling to accept the geographical amendment that allowed her to move with the children to Houston. He was particularly unhappy about the amendment's terms for exchanging the children, and he focused this anger on Jelena. Further, shortly before Appellant committed the instant offense, Jelena had refused to alter the location of their planned exchange of the children after Appellant stated that he wanted to pick them up from her house. Appellant canceled the exchange, but less than three hours later, eyewitnesses heard shots, observed a man resembling Appellant carrying L.C. from Jelena's carport, saw him drive away with the boy in a car, and then discovered Jelena's body bearing numerous gunshot wounds. Other evidence, including a splintered door frame, showed that Appellant forced his way into Jelena's home before killing her and abducting L.C. Based on this sequence of events, there was no "substantial doubt" that Appellant killed Jelena in the course of committing kidnapping. In any event, as discussed under point of error twenty-one, the properly admitted evidence clearly established that Appellant intentionally killed Jelena while in the course of committing or attempting to commit

---

[212] *See Brooks v. State,* 990 S.W.2d 278, 287 (Tex. Crim. App. 1999) (stating that the improper admission of evidence is not reversible error when substantially the same facts are proven by unobjected-to testimony).

burglary.[213]  We have fair assurance that the error in admitting Adams's testimony about Appellant's threats to kill Jelena and take the children did not influence the jury or had but a slight effect.

*Whisenhunt*

Stephanie Whisenhunt testified that she and Jelena were friends. Whisenhunt testified in part to statements made by Jelena prior to her death and to Appellant's own behavior that Whisenhunt herself had observed.  Appellant complains about specific statements made by Whisenhunt at trial, only some of which he properly objected to.  We first turn to Appellant's complaints based on Rule 403.  Appellant preserved a Rule 403 challenge to only one topic in Whisenhunt's testimony.  Specifically, Whisenhunt testified that she would sometimes accompany Jelena to exchange the children with Appellant, and Appellant would do things that made them uncomfortable.  Appellant objected to this testimony based on "unfairly prejudicial" and "no foundation," which were overruled.  Whisenhunt explained that Appellant "would videotape us with his phone or iPad.  There was one instance where he watched us from the JCPenny's parking lot and sent his mother to get the kids instead."  She further testified that, after one exchange, Appellant followed them back to Jelena's house, and then he followed Whisenhunt when she left Jelena's house.  We need not conduct a Rule

---

[213] *See Balderas,* 517 S.W.3d at 766 (holding that an unlawful entry into a home with the intent to commit murder satisfies the burglary element of capital murder); *Sorto,* 173 S.W.3d at 471 (stating that, where the jury charge authorized a conviction on alternative theories, a guilty verdict would be upheld if the evidence was sufficient on any one of them).

403 error analysis because we are persuaded that, in light of the properly admitted evidence of Appellant's guilt, this testimony did not cause the rendition of an improper judgment.[214]

We next address complaints based on hearsay. Some of the complained-of testimony was admissible under Rule 801(e)(2)(A), which "plainly and unequivocally states that a criminal defendant's own statements, when being offered against him, are not hearsay."[215] Specifically, Whisenhunt testified that she was with Jelena days before her murder when Appellant called Jelena. Jelena turned on the speaker phone so that Whisenhunt could hear Appellant. Whisenhunt described Appellant's tone during this phone call as "very condescending." She could hear Appellant cursing at Jelena under his breath. The trial court did not err in admitting this evidence because it was Appellant's own statements.

Appellant failed to preserve his hearsay complaints as to some of Whisenhunt's testimony conveying Jelena's statements. Significantly, Whisenhunt testified twice that Jelena had told her that if anything happened to her, Whisenhunt should go to the police and tell them that Appellant had something to do with it. Appellant objected the second time, but failed to object the first time. Thus, he did not preserve error as to this testimony.[216]

---

[214] *See Thomas,* 505 S.W.3d at 926-29.

[215] *Trevino v. State,* 991 S.W.2d 849, 853 (Tex. Crim. App. 1999); TEX. R. EVID. 801(e)(2)(A).

[216] *See* TEX. R. APP. P. 33.1(a).

Appellant preserved error based on hearsay objections as to some parts of Whisenhunt's testimony relating Jelena's comments. Specifically, he objected to Whisenhunt's testimony that Jelena stated that:

- Appellant would criticize her parenting skills and generally insult her when Jelena met Appellant to exchange the children;

- she was afraid of Appellant;

- Appellant had followed Jelena many times, she was "pretty sure that he had tapped her phone calls," and he had been watching Jelena's house;

- Appellant had a "very strange" and unhealthy obsession with guns;

- if he killed Jelena it would probably be with a gun;

- she was an only child to her parents; and

- on the morning of the offense, Appellant had called Jelena, "cussed her out," and canceled his visit with the children.

Appellant now asserts that these statements were inadmissible as hearsay that showed the truth of past events remembered.[217]

---

[217] *See* Rule 803(3); *Dorsey v. State,* 24 S.W.3d 921, 928-29 (Tex. App.—Beaumont 2000, no pet.) (stating that hearsay testimony relating the declarant's statements that were memories of specific events were not admissible under Rule 803(3)).

Even assuming that the admission of these statements was error, that admission did not influence the jury or had but a slight effect.[218] The record includes considerable admissible evidence of Jelena's longstanding fear of Appellant and of Appellant's hostile communications with her in the days and hours leading up to the offense. Appellant admitted in his statement to police that Jelena had told him that she was afraid of him. Further, given the very close timing between Whisenhunt's departure from Jelena's house and the commission of the offense, and evidence of the clear view of Jelena's house from the parking lot across the street, the jury could reasonably conclude that, on the day of the offense, Appellant had been watching Jelena's house.[219] Additionally, Whisenhunt had personally witnessed Appellant's disturbing behaviors. Whisenhunt had also listened to Appellant's hostile communications with Jelena.

Further, the State presented substantial admissible evidence that, when West Monroe police officers arrested Appellant, his vehicle contained a variety of loaded firearms, magazines, and loose ammunition. In his recorded statement, Appellant told investigators

---

[218] *See Johnson v. State,* 967 S.W.2d 410, 417 (Tex. Crim. App. 1998).

[219] Whisenhunt left Jelena's house at 11:57 a.m. She knew the precise time she left because she texted her mother to let her know that she was driving home. The prosecutor showed Whisenhunt L.C.'s drawing of the offense in which L.C. was sitting on the couch while his father shot his mother. Whisenhunt stated that the drawing was consistent with where she last saw L.C. When Jelena walked Whisenhunt to her car, Whisenhunt told her to go back inside and lock her door. As she was leaving, Whisenhunt looked around for Appellant's silver Buick. She did not see it, but she knew that someone in the parking lot across the street could watch Jelena's house without being seen. Whisenhunt received a news alert about the shooting just as she reached her own house. She "knew instantly" what had happened.

that he would have shot the police officers who arrested him if his son had not been with him. The State also presented admissible evidence that Appellant killed Jelena with five fatal shots to her head and torso.[220]

This admissible evidence was similar to Whisenhunt's objected-to hearsay testimony. Thus, the parts of her hearsay testimony that were inadmissible did not influence the jury or had but a slight effect.

*Campbell*

Campbell, Appellant's sister, also testified at trial. Appellant complains about Campbell's testimony conveying Adams's and Jelena's statements. The record shows that Appellant preserved his hearsay challenges to most of those statements. He preserved a Rule 403 challenge to only some parts of Campbell's testimony. He did not object on grounds of a Confrontation Clause violation, and, therefore, we will not consider that claim on appeal.[221]

Some of Campbell's objected-to testimony was admissible under Rule 803(3), which provides a hearsay exception for a "statement of the declarant's then-existing state of mind

---

[220] *See Brooks,* 990 S.W.2d at 287 (concluding that any error in admitting the hearsay testimony was harmless in light of other unobjected-to evidence proving the same fact); *see also Livingston v. State,* 739 S.W.2d 311, 333 (Tex. Crim. App. 1987) ("[I]f a fact to which objected-to hearsay relates is sufficiently proven by other competent and unobjected to evidence, the admission of the hearsay is properly deemed harmless and does not constitute reversible error.").

[221] *See Clark,* 365 S.W.3d at 339 ("The point of error on appeal must comport with the objection made at trial.").

(such as motive, intent, or plan) or emotional, sensory, or physical condition."[222] Specifically, Campbell testified that Jelena contacted her several times on the day of the offense. Jelena told Campbell about her conversation with Appellant regarding the exchange of the kids. Jelena stated to Campbell that she was concerned for both her own and Campbell's safety. Campbell testified that Jelena's tone of voice was consistent with her being genuinely concerned for their safety. This testimony goes to Jelena's state of mind on the day of the offense, and therefore, the trial judge did not err in admitting this part of Campbell's testimony.

Some of Campbell's objected-to testimony where Appellant preserved error was inadmissible. This includes Campbell's testimony about Appellant's prior abuse of Adams. On cross-examination, Appellant asked Campbell if Jelena and Adams had "said bad things about me to you." Campbell responded that they had told her about the bad things that Appellant had done to them. Appellant asked Campbell, "So you believe . . . when Jelena told you something or when [Adams] tells you something, correct?" Campbell affirmed that she did. Campbell acknowledged that she had not personally seen the abuse that Jelena and Adams had described:

> Q. Anything bad that they ever told you about if they were scared, you know, that wasn't ever something that you had viewed personally, correct?
>
> A. I did not view the physical abuse that you put towards both of them.

---

[222] TEX. R. EVID. 803(3).

Q. So you have no idea if there ever was any kind of abuse whatsoever, as far as personal experience, personal knowledge?

A. I was never there when physical abuse occurred.

Q. Okay.

A. I was there after.

Q. So – but you have no personal experience whatsoever seeing that what they said was actually true?

A. I was never there at the time of the physical abuse.

On re-direct, the prosecutor asked Campbell if she had ever viewed the aftermath of Appellant's abuse. Campbell affirmed that she had. When she began to describe an occasion on which she had seen this aftermath, Appellant objected to lack of personal knowledge. The prosecutor responded that Appellant had opened the door by eliciting Campbell's testimony that she had not viewed any physical abuse and creating the impression that Campbell simply disliked Appellant and believed what Jelena and Adams had told her. Appellant objected under Rule 404(b) and asserted that his questioning "never opened the door to anything." The trial judge overruled the objection. When Campbell again began to testify about seeing the aftermath of Appellant's abuse, Appellant objected to hearsay, to lack of personal knowledge, and under Rules 403 and 404(b). These objections were overruled.

Campbell described an incident in 1999, when Appellant called and asked her to go to his house. He told her that he and Adams "had got into it" and there was an emergency. Campbell testified that she went to the house and saw Appellant in handcuffs being placed

in a police car and Adams lying on the back patio. Adams could not move. The deputy told Campbell that Appellant was going to jail and Adams was going to the hospital. Campbell accompanied Adams to the hospital.

While in the emergency room, Campbell learned that Adams had a "very bad" bone bruise and was otherwise bruised and scraped from being pulled through the dining room, over a couch, and across the runners of a sliding glass door to the patio. Appellant's objection to lack of personal knowledge was overruled. Campbell testified that she learned from Adams that, after Appellant had pulled her onto the patio, Adams had tried several times to get up and go back inside. Appellant repeatedly pushed her down until she was unable to get up. Appellant's objections, citing lack of personal knowledge, speculation, hearsay, and Rules 403 and 404(b), were overruled. Campbell stated that Adams had persuaded Appellant that she was "really hurt." Although "it took a while," Appellant eventually called Campbell and 911.

A victim's out-of-court statements recounting her memory of events, rather than her state of mind, are inadmissible.[223] The hearsay statements in this part of Campbell's testimony fall within that category. The State failed to establish that any of this hearsay evidence was admissible under Rule 803(3) or any other hearsay exception.[224] Further, the

---

[223] *See, e.g., Dorsey,* 24 S.W.3d at 928-29.

[224] *See Cofield v. State,* 891 S.W.2d 952, 954 (Tex. Crim. App. 1994) (stating that, when a
(continued...)

testimony was not admissible under the rule of optional completeness because Appellant did not challenge the fact that Campbell saw the aftermath of the abuse. Moreover, this testimony did not establish an elemental or evidentiary fact, rebut a defensive theory, or serve to clarify other hearsay.[225] Rather, this testimony tended to show that Appellant was a bad person with a propensity for abusing his wives.[226] Therefore, the trial court erred in admitting this testimony.

Other parts of Campbell's testimony regarding Jelena where Appellant preserved error were likewise inadmissible. Specifically, Campbell testified to instances where Jelena expressed fear of Appellant. Campbell relayed that the first time Jelena expressed fear of Appellant was when she was pregnant with her first child. Jelena commented, "What have I gotten myself into? Now I'm going to be stuck with him for the next 18 years." Campbell further testified that in the last months of Jelena's life, Jelena's fear of Appellant intensified. When asked how she knew this, Campbell testified that Jelena stated that Appellant had threatened to kill her multiple times and that if Jelena ever died in an accident, to ensure that her death was investigated.

---

[224] (...continued)
defendant properly objected to hearsay, the State then had the burden to show that the proffered evidence was admissible pursuant to a hearsay exception).

[225] *See Montgomery v. State,* 810 S.W.2d 372, 387 (Tex. Crim. App. 1991) (stating that "if extraneous offense evidence is not 'relevant' apart from supporting an inference of 'character conformity,' it is absolutely inadmissible under Rule 404(b)").

[226] *See Montgomery,* 810 S.W.2d at 387.

The State failed to establish that Campbell's testimony conveying Jelena's hearsay statements describing specific instances of Appellant's threats and abuse were admissible under Rule 803(3) or any other hearsay exception.[227]   For the same reasons the testimony regarding Adams was inadmissible, this testimony regarding Jelena was inadmissible.

Further, Article 38.36[228] permits a party to offer evidence of the defendant's and victim's previous relationship, but such evidence must meet the requirements of the Rules of Evidence.[229]   Therefore, although this testimony showed Appellant's relationship with Jelena at the time of the offense, it was inadmissible hearsay.

However, the improperly admitted testimony  did not influence the jury or had but slight effect because, as discussed previously, the State presented considerable admissible

---

[227] *See* TEX. R. EVID. 802 (stating that hearsay is inadmissible unless a statute or rule provides otherwise).

[228] Article 38.36(a) provides:

In all prosecutions for murder, the state or the defendant shall be permitted to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense.

[229] *See Garcia,* 201 S.W.3d at 702; *Smith v. State,* 5 S.W.3d 673, 692 (Tex. Crim. App. 1999) (Keller, J., concurring and dissenting) (stating, concerning a prior version of Article 38.36, "[T]he rules against hearsay, and other rules relating to the proper form in which evidence must be admitted, are not affected by Article 38.36.  The statute was intended only to address the admissibility of evidence by its subject matter.").

evidence of Jelena's fear of Appellant and Appellant's guilt.[230]  In these circumstances, admitting Campbell's extraneous-offense hearsay testimony concerning Appellant's past abuse of Adams and Jelena did not constitute reversible error.  Point of error seventeen is overruled.

## WHETHER APPELLANT "OPENED THE DOOR"

In point of error eighteen, Appellant contends that the trial judge erroneously ruled that he had "opened the door" to Campbell's extensive prejudicial testimony.  He states that he merely elicited Campbell's acknowledgment that she was not present when the abuse she described took place.  He argues that this did not open the door to the State asking Campbell about additional hearsay statements concerning his extraneous bad conduct, including prior instances of abuse and violation of related protective orders.  Appellant states that all of Campbell's hearsay testimony was inadmissible under Rule 803(3), violated his confrontation rights, and was prejudicial.

We concluded in point of error seventeen that , although Appellant's questioning did not open the door to Campbell's extraneous-offense hearsay testimony, Appellant was not harmed by its admission.

Appellant also complains about a comment the prosecutor made after asking Campbell whether Jelena had told her that Appellant had threatened to slit her throat.  The trial court

---

[230] *See Thomas,* 505 S.W.3d at 926 (concluding that, if a non-constitutional error did not influence the jury, or had but very slight effect, the judgment should be affirmed).

overruled Appellant's Rule 403, Rule 404(b), and hearsay objections to that question. Campbell responded that she did not recall that threat. The prosecutor then commented, "Sometimes I get confused on who the statements were said to. 'Slit the throat' must have been to another person." Appellant did not object to this comment. Therefore, he did not preserve error, and we need not consider his complaint on the merits.[231] Point of error eighteen is overruled.

## FIREARMS EVIDENCE

In point of error twenty, Appellant asserts that the trial judge abused his discretion during the guilt phase when he admitted irrelevant and prejudicial evidence of the firearms that investigators found in the trunk of Appellant's vehicle. Appellant argues that this evidence was inadmissible because the prosecutor did not allege that any of the firearms found in the trunk of Appellant's vehicle were involved in the offense or that Appellant's possession of them was unlawful.

Appellant further states that the firearms evidence should have been excluded under Rule 403 because its probative value was substantially outweighed by the danger of unfair prejudice. He avers that the contents of the trunk did not serve to make a fact of consequence more or less probable. He also argues that the weapons should have been excluded due to their potential to impress the jury in an irrational and indelible way.

---

[231] *See* TEX. R. APP. P. 33.1(a); *see Coble,* 330 S.W.3d at 282.

Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice.[232] This rule carries a presumption that relevant evidence will be more probative than prejudicial.[233] We review a trial judge's ruling under Rule 403 for an abuse of discretion.[234]

Here, the firearms evidence was relevant and had a high probative value. Appellant packed the trunk of his car with loaded firearms and ammunition before he left his mother's house on the morning of the charged offense. A receipt on the floorboard showed that he purchased additional ammunition that morning. This conduct demonstrated advance planning in anticipation of murdering Jelena and the drastic measures that Appellant was prepared to take to avoid capture. Therefore, the firearms evidence was probative of Appellant's plan to murder Jelena and evade arrest.

Further, Appellant was arrested while fleeing from the crime scene to avoid capture. In his statement to police, Appellant said that he would have shot the arresting officers if he had not had L.C. in the car with him. Later, he asserted that he would have shot the officers if he needed to defend L.C. He also stated that, during the chase, he considered committing

---

[232] TEX. R. EVID. 403; *see Davis,* 329 S.W.3d at 806.

[233] *Santellan,* 939 S.W.2d at 169.

[234] *Pawlak v. State,* 420 S.W.3d 807, 810 (Tex. Crim. App. 2013); *Gonzalez*, 544 S.W.3d at 370.

"suicide by cop." The firearms in Appellant's trunk were relevant to assessing the credibility of Appellant's statement.

Appellant contends that the facts of this case are similar to those in *Alexander v. State*[235] in which the appellate court concluded that a revolver found in the residence where the defendant was arrested was irrelevant and unfairly prejudicial. In *Alexander,* the victim died from a rifle shot, and the suspect left the rifle at the crime scene. Three weeks later, the defendant was arrested in a residence in another town. Investigators seized a .357 Magnum from inside the residence.[236] There was no showing that the residence was the defendant's or that the Magnum had any connection to the defendant or to the offense. On these facts, the appellate court found that the Magnum was not relevant, and even if it was relevant, it did not "compellingly serve to make a fact of consequence more or less probable."[237] The seizure of the Magnum had no probative value, and it had the potential to impress the jury in an irrational but indelible way.[238] And the State did not prove that the defendant committed

---

[235] *Alexander v. State*, 88 S.W.3d 772 (Tex. App.—Corpus Christi-Edinburg 2002, pet. ref'd).

[236] *Id.* at 774, 777.

[237] *Id.* at 778.

[238] *Id.*

an extraneous offense.[239] Considering these factors, the appellate court held that the trial court abused its discretion by admitting the Magnum into evidence.[240]

Here, Appellant's reliance on *Alexander* is misplaced. Unlike the handgun in *Alexander,* the firearms in this case were clearly connected to Appellant and to his preparations for the offense and its aftermath. When police officers stopped Appellant, they observed a handgun between his legs. A loaded Sig Sauer was on the floor beneath L.C.'s car seat. On these facts, the evidence of loaded firearms in the trunk of Appellant's car was not unfairly prejudicial.

The trial judge did not abuse his discretion in determining that the probative value of the firearms evidence was not substantially outweighed by the danger of unfair prejudice. Point of error twenty is overruled.

## AFFIRMATIVE DEFENSE INSTRUCTION

In point of error twenty-two, Appellant asserts that the trial judge erred in refusing to instruct the jury regarding the affirmative defense to kidnapping. Section 20.03(a) provides that a person commits the offense of kidnapping if he intentionally or knowingly abducts another person. Section 20.01(2) defines the term, "abduct," as restraining a person "with intent to prevent his liberation by: (A) secreting or holding him in a place where he is not

---

[239] *Id.*

[240] *Id.*

likely to be found; or (B) using or threatening to use deadly force." Section 20.03(b)—the section relevant to Appellant's complaint—provides an affirmative defense to prosecution when:

(1) the abduction was not coupled with intent to use or to threaten to use deadly force;
(2) the actor was a relative of the person abducted; and
(3) the actor's sole intent was to assume lawful control of the victim.

Sections 20.03(b)(2) and (3) constitute a confession-and-avoidance defense because they do not negate any element of the offense of kidnapping but rather excuse what would otherwise constitute criminal conduct. A defendant's failure to testify, stipulate, or offer evidence admitting to the offense prevents him from benefitting from a confession-and-avoidance defense.[241]

Defense counsel requested a Section 20.03(b) instruction because "There's no showing that the death of [Jelena] was facilitating the possession of [L.C.]" and there was evidence from which the jury could have found that Appellant took L.C. with him "as an afterthought" so that L.C. would not be left alone in Jelena's home. The trial judge denied the requested instruction stating:

---

[241] *See Cornet v. State,* 417 S.W.3d 446, 451 (Tex. Crim. App. 2013) (instruction on a confession-and-avoidance defense is appropriate only when defendant essentially admits to every element of the offense but interposes a justification to excuse it ); *Gomez v. State,* 380 S.W.3d 830, 834 (Tex. App.—Houston [14th Dist.] 2012, pet. ref'd) (concluding that a defendant did not establish a confession-and-avoidance defense when his conflicting accounts of the incident did not show that he admitted to the offense).

I don't see where the evidence supports a submission of affirmative defense under the facts of this case.

The affirmative defense, the abduction was not coupled with intent to use or threaten to use deadly force. The door is kicked in. She's shot six times. The child is taken.

I'm going to deny that request. I just don't think the evidence is there to submit that affirmative defense to prosecution under this section.

Upon a timely request, the trial judge must instruct the jury on any defensive issue raised by the evidence, even if the evidence is contradicted or weak.[242]

A defense is raised by the evidence if there is some evidence on each element of the defense that, if believed by the jury, would support a rational inference that the element is true.[243] Therefore, for a defendant to be entitled to a jury instruction under Section 20.03(b), there must be admitted evidence that, if believed, would support all three elements of the affirmative defense.[244]

---

[242] Art. 36.14; *Rogers v. State,* 550 S.W.3d 190, 193 (Tex. Crim. App. 2018); *see also Rue v. State,* 288 S.W.3d 107, 110 (Tex. App.—Houston [1st Dist.] 2009, pet. ref'd).

[243] *See* TEX. PENAL CODE § 2.04(c) ("The issue of the existence of an affirmative defense is not submitted to the jury unless evidence is admitted supporting the defense.").

[244] *See Rue,* 288 S.W.3d at 110; *Green v. State,* 881 S.W.2d 27, 28-29 (Tex. App.—San Antonio 1994, pet. ref'd).

When reviewing the trial judge's decision not to instruct on a defensive issue, we consider the evidence in the light most favorable to the defendant's requested submission.[245] We review the judge's decision for an abuse of discretion.[246]

Assuming, without deciding, the trial court's failure to give the Section 20.03(b) instruction was error, we examine whether the error was harmless or requires reversal. Appellant made a timely request for the charge. Therefore, reversal is required if the error is calculated to injure an appellant's rights, which means no more than that there must be some harm to Appellant from the error.[247] In other words, an error that has been properly preserved by objection will call for reversal as long as the error is not harmless. The degree of harm must be assayed in light of the entire jury charge, the state of the evidence, including the contested issues and weight of probative evidence, the argument of counsel and any other relevant information revealed by the record of the trial as a whole.

Appellant's theory, as summarized at closing, was that the evidence may have supported murder ("If the State has proved beyond a reasonable doubt that Mr. Calvert committed the offense of murder, so be it. But like Mr. Cassel says, you know, that's not enough. . . . There has to be something more."). But here, there was not "something more." The evidence did not support a kidnapping (Appellant did not "abduct" L.C.), or a burglary

---

[245] *Bufkin v. State,* 207 S.W.3d 779, 782 (Tex. Crim. App. 2006).

[246] *Id.*

[247] *Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1984).

(Appellant was "just mad and upset and went over there to talk about it, knocked at the door, and whatever happened after that point happened"). So, to the extent that the jury could have found the "abduction"of L.C. (as opposed to the killing of Jelena) was not "coupled" with the intent to use deadly force, the jury had an out: it could have convicted Appellant of murder. Moreover, when a jury returns a general guilty verdict on an indictment charging alternate methods of committing the same offense, the verdict stands if the evidence is sufficient to support a finding under any of the theories submitted. The presence of overwhelming evidence of guilt plays a determinative role in resolving the issue and may be considered when assessing jury-charge error.[248] Here, as discussed in the response to point of error twenty-two, the evidence of murder in the course of burglary was overwhelming. Under these circumstances, the failure of the court to give the Section 20.03(b) did not cause "some harm."

Point of error twenty-two is overruled.

## JURY UNANIMITY

In point of error twenty-three, Appellant asserts that he was denied his right to a unanimous verdict when the trial judge refused to provide the jury with a special verdict form and thereby allowed jurors to convict Appellant even if they failed to agree unanimously on the underlying offense needed to establish capital murder. Appellant argues that there were substantial grounds to question whether he was guilty of kidnapping when he took L.C. from

---

[248] *Sanchez v. State*, 376 S.W.3d 767, 775 (Tex. Crim. App. 2012).

Jelena's home. Moreover, Appellant states, there was a significant question whether he was guilty of burglary, in light of L.C.'s statement to Lester that he heard a knock on the door before Appellant entered the house and shot Jelena. Appellant avers that his request for a special verdict form should have been granted, "given the unique set of facts in this situation." He further contends that the United States Constitution's due process clause requires that the same underlying offense, as an element of the offense of capital murder, be found unanimously and beyond a reasonable doubt.

We have repeatedly held that a jury's general verdict of "guilty of capital murder as charged in the indictment" does not violate the unanimity requirement when capital murder was charged in separate paragraphs, each alleging an alternative manner or means of committing capital murder.[249] This holding applies "equally to all alternate theories of capital murder" contained in Texas Penal Code Section 19.03, "whether they are found in the same or different subsections, so long as the same victim is alleged for the predicate murder[.]"[250] Therefore, the jury's general verdict in response to instructions providing alternative manners or means of committing capital murder did not violate the unanimity requirement. Point of error twenty-three is overruled.

PUNISHMENT-PHASE EVIDENCE: OFFICER LOGAN

---

[249] *See Luna,* 268 S.W.3d at 600-01; *see also Martinez v. State,* 129 S.W.3d 101, 103 (Tex. Crim. App. 2004).

[250] *Gamboa v. State,* 296 S.W.3d 574, 584 (Tex. Crim. App. 2009).

In point of error twenty-four, Appellant asserts that the trial judge committed reversible error at the punishment phase by admitting 1) former TDCJ corrections officer David Logan's graphic testimony about an incident in which an inmate in administrative segregation stabbed him in the eye with a pencil, leaving him blind in one eye and 2) State's Exhibit 368, a brain scan that showed the pencil still embedded. Appellant maintains that his timely objections under Rules 401, 402, and 403 should have been sustained. Additionally, he contends that the admission of this evidence violated his Eighth Amendment right to individualized sentencing. Appellant further argues that the admission of this evidence was not harmless because there was minimal evidence that he presented a threat of future dangerousness; his history of violence was limited to domestic incidents, and he had no record of assaultive or violent conduct while in jail.

Appellant acknowledges that evidence of the violent nature of Texas prisons is generally relevant to the question of a defendant's future dangerousness, but he avers that Logan's testimony, describing another inmate's violent attack in graphic detail, was not even "marginally relevant" to the question of whether Appellant should receive the death penalty. Alternatively, any marginal relevance was outweighed by this evidence's graphic and highly prejudicial nature. We agree with this latter proposition, but we find the error harmless.

Logan testified that he had served in the Navy "[f]our years during Desert Storm" before becoming a corrections officer, and worked for over ten years in that capacity until an unprovoked attack by an inmate left him disabled and unable to work. He testified that he was injured after he and another officer prepared to escort an inmate to the recreation

yard. That inmate was in the most restrictive custody classification within administrative segregation. Following standard procedure, Logan visually searched the inmate and then handcuffed him through the slot in the cell door. In the few seconds between handcuffing the inmate and opening the cell door, the inmate freed one hand. When Logan opened the cell door, the inmate hit him and stabbed him in the eye with a pencil that he had been given to work on his legal case. Logan struggled with the inmate and eventually forced him back into his cell. Logan was then life-flighted to a hospital.

A brain scan showed that the pencil had gone through his eye and four inches into his brain, coming to rest against the artery of his brain. He was left completely blind in his left eye. He did not know why the inmate attacked him but he surmised that the inmate, who was serving consecutive sentences totaling 115 years, "probably wanted to die" and therefore attempted to kill a guard. Logan said that if an inmate "has it on his mind to hurt you, there's nothing you can do."

With a few exceptions that do not apply here, Article 37.071, section (2)(a)(1) provides that, at the punishment phase of a capital case, the parties may present evidence "as to any matter the court deems relevant to sentence." In this case, Logan's testimony about the attack he suffered and the brain scan exhibit were marginally relevant to the jury's assessment of Appellant's future dangerousness because they illustrated the ease with which an inmate—even in very secure prison conditions —could seriously injure another person.[251]

---

[251] *See, e.g., Canales v. State,* 98 S.W.3d 690, 699 (Tex. Crim. App. 2003) (concluding that the trial court did not abuse its discretion in admitting, over relevance and unfair prejudice

(continued...)

However, Rule 403 allows for the exclusion of otherwise relevant evidence when its probative value is substantially outweighed by the danger of unfair prejudice. "The term 'probative value' refers to the inherent probative force of an item of evidence—that is, how strongly it serves to make more or less probable the existence of a fact of consequence to the litigation—coupled with the proponent's need for that item of evidence."[252] "'Unfair prejudice' refers to a tendency to suggest decision on an improper basis, commonly, though not necessarily, an emotional one."[253]

We afford particular respect to the trial judge's exercise of discretion in applying Rule 403.[254] Here, the probative value of Logan's testimony about being stabbed and the brain scan of Logan's injury was substantially outweighed by the danger of unfair prejudice.[255] Although there was evidence of 1) Appellant's possession of dangerous contraband in his cell (a handcuff key, nail clippers, and a razor blade), and 2) Appellant's hostile,

---

[251] (...continued)
objections, an expert's accounts of inmates defeating the locking mechanisms on their cell doors; testimony was responsive to the defense's position that a life-sentenced inmate housed in administrative segregation would not be dangerous); *Jenkins v. State,* 912 S.W.2d 793, 817-18 (Tex. Crim. App. 1993) (op. on reh'g) (record contained evidence that the appellant was a drug user and that he was particularly dangerous when under the influence, an expert's testimony about the availability of drugs in prison was relevant to future dangerousness and was not "fundamentally unfair").

[252] *Casey,* 215 S.W.3d at 879; *Gonzalez,* 544 S.W.3d at 372.

[253] *Davis*, 329 S.W.3d at 806; *Gonzalez,* 544 S.W.3d at 373.

[254] *Moreno v. State,* 22 S.W.3d 482, 487-88 (Tex. Crim. App. 1999); *Gonzalez,* 544 S.W.3d at 370.

[255] *Cf. Reese,* 33 S.W.3d at 243 ("[T]he facts that the photograph depict[s] are not facts of consequence that were in dispute.").

disrespectful, and dishonest conduct in jail and in the courtroom, there was no evidence that he had attempted to attack or physically injure anyone. Therefore, the State's evidence, focusing on a horrific injury inflicted by an inmate who had no connection to Appellant, was likely to impress the jury in some irrational, yet indelible, way. Further, in light of the ample admissible evidence of the significant potential for and actual violence in prison, the State did not need this exhibit.

But, given the record as a whole, we hold that its admission was harmless. The evidence did not have a substantial and injurious effect on the punishment decision because the State presented considerable admissible evidence of Appellant's future dangerousness and the prison conditions in which he would be confined.[256] The presentation of Logan's testimony about the stabbing and State's Exhibit 368 was a small part of the State's lengthy case at the punishment phase. The State's "overwhelming focus" was on Appellant's behavior and prison conditions.[257] Therefore, we reject Appellant's argument that the error was not harmless.

---

[256] *Cf. Garcia,* 126 S.W.3d at 927 (holding that the erroneous admission of evidence was harmless because (1) "there was a considerable amount of other evidence from which the jury could have concluded that [the] appellant had been abusive toward his wife"; and (2) "there was more than ample evidence to support the jury's affirmative answer to the special issue concerning [the] appellant's future dangerousness").

[257] *Cf. Cantu v. State,* 939 S.W.2d 627, 637-38 (Tex. Crim. App. 1997) (concluding that the erroneous admission of victim impact evidence was harmless given its sparsity, the fact that the State did not mention it during arguments, and the overwhelming focus on the appellant's behavior and the circumstances of the offense).

Appellant's assertion that Logan's testimony violated the Eighth Amendment's requirement of individualized sentencing is without merit. The Supreme Court has not applied the individualized sentencing requirement in assaying the admissibility of future dangerousness evidence. Rather, the Supreme Court has held that a jury must be allowed to consider all relevant evidence as to why a death sentence should or should not be imposed.[258] The Supreme Court has also stated that it is unconvinced "that the adversary process cannot be trusted to sort out the reliable from the unreliable evidence and opinion about future dangerousness, particularly when the convicted felon has the opportunity to present his own side of the case."[259]

The individualized sentencing requirement is satisfied when the jury is able to consider and give full effect to a defendant's mitigating evidence.[260] Appellant does not aver that he was prevented from presenting relevant mitigating evidence. Accordingly, we conclude that the admission of Logan's testimony did not violate the Eighth Amendment's individualized sentencing requirement. Point of error twenty-four is overruled.

PUNISHMENT-PHASE EVIDENCE: OPINION TESTIMONY AND

---

[258] *Jurek v. Texas,* 428 U.S. 262, 271 (1976).

[259] *Barefoot v. Estelle,* 463 U.S. 880, 901 (1983).

[260] *See, e.g., Kansas v. Marsh,* 548 U.S. 163, 171 (2006) ("[A]s a requirement of individualized sentencing, a jury must have the opportunity to consider all evidence relevant to mitigation . . . ."); *Jones v. United States,* 527 U.S. 373, 381 (1999) ("[I]n order to satisfy the requirement that capital sentencing decisions rest upon an individualized inquiry, a scheme must allow a 'broad inquiry' into all 'constitutionally relevant mitigating evidence.'"); *Blystone v. Pennsylvania,* 494 U.S. 299, 307 (1990) ("The requirement of individualized sentencing in capital cases is satisfied by allowing the jury to consider all relevant mitigating evidence.").

VICTIM IMPACT EVIDENCE

In point of error twenty-five, Appellant asserts that the trial judge erred in allowing three categories of improper testimony at the punishment phase: (1) a guard's opinion of Appellant's future dangerousness based on Appellant's jail and courtroom conduct while representing himself; (2) victim impact evidence; and (3) opinions of mental health experts.

Appellant cites no authority for his position that a guard's opinion based on his observations of Appellant's conduct was inadmissible, which was, in any event admissible under Rule 701.[261] Appellant also provides no argument and cites no legal authority in support of his assertion that the State elicited improper victim impact testimony. Therefore, these parts of his complaint are inadequately briefed.[262]

Regarding the third part of Appellant's complaint, he argues in part that the State's first expert witness at the punishment phase, Dr. Edward Gripon, invaded the province of the jury when he testified over objection that Appellant's diagnosis of major depression was unrelated to his commission of the offense. The record reflects that the prosecutor began a question: "I mean, as far as when the jury is looking at these diagnoses and does that mitigate the defendant's actions in shooting his wife or—." Defense counsel interrupted to object that this question was "outside the doctor's area of expertise." The trial judge

---

[261] *See Fierro v. State,* 706 S.W.2d 310, 317 (Tex. Crim. App. 1986) (finding that a probation officer and a jail administrator, who both knew the defendant, could testify that the defendant would be violent in the future); *see also Fairow,* 943 S.W.2d at 899 (concluding that a lay opinion regarding another person's mental state is admissible under Rule 701 as long as the proponent establishes personal knowledge of the facts from which the opinion may be drawn).

[262] *See* TEX. R. APP. P. 38.1(h), (i).

overruled the objection, but Gripon did not answer the question. Instead, the prosecutor asked: "I mean, just what I'm saying is, is it relevant to these things at all, as far as his culpability?" Gripon responded, "I don't think in forensic psychiatry we have ever noted a correlation between major depressive disorder and homicide."

Appellant's objection at trial ("outside the doctor's area of expertise") does not comport with his complaint on appeal ("invaded the province of the jury"). Therefore, he failed to preserve error.[263] Moreover, opinion testimony is not objectionable solely on the basis that it "embraces an ultimate issue to be decided by the trier of fact."[264]

Appellant further complains that the State's second expert witness, Dr. Michael Arambula, invaded the province of the jury when he testified that, because of "how [Appellant] interacts, . . . when a woman, in particular, per his records, doesn't do what he wants, then she's going to be at risk of being assaulted, threatened, restrained, . . . or else he could control the situation by . . . , choking, hitting, any of those things[.]" Appellant did not object to this testimony. Therefore, he failed to preserve error.[265] Point of error twenty-five is overruled.

---

[263] *See* TEX. R. APP. P. 33.1; *Gardner,* 733 S.W.2d at 201.

[264] TEX. R. EVID. 704; *see Ramirez v. State,* 815 S.W.2d 636, 650-51 (Tex. Crim. App. 1991) (concluding that psychiatric expert opinion testimony concerning a defendant's future dangerousness that was based upon sufficient relevant facts was admissible, provided that those facts were within the expert's personal knowledge, assumed from common or judicial knowledge, or established by the evidence).

[265] TEX. R. APP. P. 33.1; *Yazdchi,* 428 S.W.3d at 844.

DEFINING "MITIGATING EVIDENCE"

Appellant's points of error twenty-six and twenty-seven concern the definition of "mitigating evidence" in Article 37.071, section 3(f)(3). In point of error twenty-six, Appellant asserts that the definition of mitigating evidence is facially unconstitutional because it limits the Eighth Amendment concept of mitigation to factors that render a defendant less "morally blameworthy" for the commission of capital murder.

Appellant does not assert that he objected to Article 37.071's definition of mitigation at trial. Nor does he direct us to any place in the record where he objected. "A facial challenge to the constitutionality of a statute" can be forfeited by a failure to object at trial.[266] Accordingly, Appellant forfeited this claim of error, and we will not address it on the merits.[267] Point of error twenty-six is overruled.

In point of error twenty-seven, Appellant argues that Article 37.071's definition of mitigating evidence is unconstitutional as applied to him because, during jury voir dire, the prosecutor effectively instructed the jurors who served on this case that the mitigation special issue required a "nexus" between the proffered mitigating evidence and the defendant's culpability for the offense. The record shows that Appellant did not timely object or otherwise challenge the prosecutor's explanations of mitigating evidence and moral

---

[266] *Karenev v. State,* 281 S.W.3d 428, 434 (Tex. Crim. App. 2009).

[267] *See* TEX. R. APP. P. 33.1; *see also Fuller v. State,* 253 S.W.3d 220, 232 (Tex. Crim. App. 2008) ("We have consistently held that the failure to object in a timely and specific manner during trial forfeits complaints about the admissibility of evidence. This is true even though the error may concern a constitutional right of the defendant.").

blameworthiness. Accordingly, he forfeited this claim of error on appeal.[268] Point of error twenty-seven is overruled.

## CHALLENGES FOR CAUSE

In point of error twenty-eight, Appellant alleges that the trial judge erroneously refused to grant his challenges for cause to venire members Bressman, Malone, and Welch. He contends that their statements during individual voir dire showed that they were biased against him, they strongly favored the death penalty, and they affirmatively wanted to serve on the jury. Further, he avers that the prosecutors committed misconduct during voir dire by describing the facts of other death penalty cases and expressing their opinions concerning the death penalty and the insanity defense.

A prospective juror is challengeable for cause if (among other reasons) the prospective juror has a bias or prejudice against the defendant or against the law upon which either the State or the defense is entitled to rely.[269] The test is whether the prospective juror's bias or prejudice will substantially impair his ability to carry out his duties in accordance with his instructions and his oath.[270] A party wishing to exclude a juror because of bias must demonstrate, through questioning, that the potential juror lacks impartiality.[271] Before a

---

[268] *See* TEX. R. APP. P. 33.1; *cf. Threadgill v. State,* 146 S.W.3d 654, 667 (Tex. Crim. App. 2004).

[269] TEX. CODE CRIM. PROC. art. 35.16(a)(9), (c)(2); *Gardner,* 306 S.W.3d at 295.

[270] *Gardner,* 306 S.W.3d at 295.

[271] *Wainwright v. Witt,* 469 U.S. 412, 423 (1985).

prospective juror may be excused for cause on this basis, the law must be explained to him, and he must be asked whether he can follow it, regardless of his personal views.[272] The challenging party must show that the prospective juror understands the requirements of the law but cannot overcome his prejudice well enough to follow the law.[273]

The standard of review on appeal is whether the trial court abused its discretion.[274] We examine the voir dire of the prospective juror as a whole[275] and afford great deference to the trial court's decision because the trial judge was present to observe the prospective juror's demeanor and listen to his tone of voice.[276] Particular deference is due when the prospective juror's answers are vacillating, unclear, or contradictory.[277]

But even if a trial judge erroneously denied a challenge for cause against a venire member, the appellant must show harm. To do so, the appellant must show that he was forced to use a peremptory strike to remove that venire member and that he suffered a

---

[272] *Gardner,* 306 S.W.3d at 295.

[273] *Id.*

[274] *Id.* at 296.

[275] *Curry v. State,* 910 S.W.2d 490, 493 (Tex. Crim. App. 1995).

[276] *Gardner,* 306 S.W.3d at 295-96.

[277] *Smith v. State*, 297 S.W.3d 260, 268 (Tex. Crim. App. 2009).

detriment from the loss of that peremptory strike because he would have used that strike on another objectionable juror.[278]

*Bressman*

At trial, Appellant's sole challenge to Bressman was that her personal beliefs in favor of the death penalty substantially impaired her ability to consider a sentence of life without parole.[279] On her written questionnaire, Bressman stated that she generally favored the death penalty and believed it was appropriate in some cases. At the beginning of voir dire, the prosecutor asked: "Anything about your religious views that you think conflict or support the death penalty?" Bressman responded: "I support the death penalty. I believe that, you know, if you take a life and [you're] —vicious enough to do that, then you really shouldn't have the right to live; but that's just how I feel about that. . . . I'm a very eye-for-an-eye-type person." Later, Appellant asked Bressman to elaborate on that answer, and she responded: "I do feel like if someone has taken the life of someone very brutally and for no good, apparent reason, I definitely—and the evidence is there—I do think the death penalty is an appropriate penalty

---

[278] *Chambers v. State,* 866 S.W.2d 9, 22 (Tex. Crim. App. 1993); *Comeaux v. State,* 445 S.W.3d 745, 750 (Tex. Crim. App. 2014).

[279] In his brief, Appellant also complains that Bressman was prejudiced because both of her parents worked for the Texas Department of Corrections, she had seen information about the case on television, and she affirmatively wanted to join the jury. But we will not consider Appellant's challenges on appeal that differ from his challenge during voir dire. *See Chambers v. State,* 903 S.W.2d 21, 32 (Tex. Crim. App. 1995) ("We have repeatedly held that an objection at trial that does not comport with the complaint on appeal presents nothing for review.").

for that person." Toward the end of voir dire, Appellant asked: "Isn't it true that your core beliefs, though, lean towards the death penalty?" Bressman responded: "Absolutely. Yes."

But the record of Bressman's voir dire as a whole does not show that her beliefs would interfere with her ability to serve as a juror and abide by the oath. Bressman indicated during voir dire that she would not automatically decide that a defendant deserved a death sentence after she had found him guilty and concluded that he would be a future danger. Rather, she affirmed that she could consider whether any of the evidence was sufficiently mitigating to merit a life sentence. Bressman stated that jurors "should hear everything before . . . mak[ing] a major decision because there is a life in the balance." She also testified that she could listen to all of the evidence and follow the law even if she did not personally agree with it.

When questioned by Appellant, Bressman acknowledged that she "lean[ed] towards the death penalty," but she stated that this belief would not substantially impair her ability to consider mitigating evidence. She also testified that she would be open to considering mental health evidence. She stated that she would hold the State to its burden of proof because, if she were in the defendant's situation, that was what she would want the jurors to do. Further, she affirmed that she would not always answer the future dangerousness question affirmatively. She added that her parents, who had worked in the criminal justice system, knew "people who entered the penitentiary who were model inmates and who never would have done anything else to another person." She said that some people who

committed a serious offense would not be a threat "to the society in which they've been placed."

Bressman's responses during voir dire indicated that she could set aside any biases she might have, follow the law, and listen to all of the evidence.[280] We defer to the decision of the trial judge, who observed her demeanor and listened to the tone of her voice, and who therefore was in the best position to ascertain whether her opinions would interfere with her ability to serve as a juror. Appellant has not shown that the trial judge erred by denying his challenge for cause to Bressman.

*Malone*

During voir dire, Appellant challenged Malone for cause solely on the ground that her friendly interactions with Jelena might cause her to be biased, particularly in light of her expressed desire to be on the jury.[281] During voir dire, Malone stated that she knew Jelena because Jelena was a customer at the bank where Malone worked. When asked how many times she interacted with Jelena, Malone responded: "At least five times. It was enough to know her by her first name." Malone liked Jelena and believed Jelena was a nice person.

---

[280] *Cf. Buntion v. State,* 482 S.W.3d 58, 104 (Tex. Crim. App. 2016) (holding that the trial judge did not erroneously deny a challenge for cause against a prospective juror when the prospective juror "did not express an inability to set aside her personal opinions and follow the law"; "consistently stated that she would need to know all of the evidence before she could answer the special issues"; and "did not think that the death penalty was always appropriate for the capital murder of a police officer.").

[281] In his brief, Appellant also complains that Malone had seen news reports about the case and Appellant's behavior in court. But we will not consider Appellant's challenges on appeal that differ from his challenge during voir dire. *See Chambers,* 903 S.W.2d at 32.

But "'the mere fact that a juror knows, or is a neighbor, or an intimate acquaintance of, and on friendly relations with, one of the parties to a suit, is not sufficient basis for disqualification.'"[282] For example, a trial court acted within its discretion in denying a challenge for cause to a prospective juror who testified that she knew the victim and several witnesses but stated that she could set this knowledge aside and evaluate the case strictly from the evidence she heard at trial and from the jury charge.[283] In another case, a prospective juror testified that he had known the victim all his life and that "there is a possibility" of bias, but also testified that, if selected for the jury, he would not be biased and would "come in here with an open mind." In that case, the defendant did not meet his burden of showing that the prospective juror was challengeable for cause.[284]

The record of Malone's voir dire as a whole does not show that her familiarity with Jelena would interfere with her ability to serve as a juror and abide by the oath. The prosecutor asked Malone several times if her interactions with Jelena at the bank would prevent her from being impartial or cause her to believe that Appellant was "a little bit guilty of anything." Malone repeatedly answered that it would not. Malone stated that she did not have a relationship with Jelena outside of the customer relationship through the bank. Malone also confirmed that she would afford Appellant the presumption of innocence and

---

[282] *Anderson v. State,* 633 S.W.2d 851, 853 (Tex. Crim. App. 1982) (panel op.) (quoting *Allbright v. Smith,* 5 S.W.2d 970, 971 (Tex. Comm. App. 1928)).

[283] *See id.* at 854.

[284] *Jernigan v. State,* 661 S.W.2d 936, 939-40 (Tex. Crim. App. 1983).

that she could find Appellant not guilty if the prosecutor did not prove guilt beyond a reasonable doubt. She affirmed that she would be able to hold the State to its burden of proving the offense beyond a reasonable doubt.

Malone also stated that she would be able to listen to the evidence and answer the special issues in such a way that Appellant would be sentenced to life without parole. She stated that she would be open to the possibilities, "[d]epending on the evidence." Even if she found that a defendant was guilty and that he would be a future danger, she could still be open to finding sufficient mitigating evidence meriting a life sentence.

When asked about her affirmative written answer to the question of whether she wanted to be on the jury, Malone stated that she had always been curious about criminal law. She wanted to perform her civic duty. She believed that honest, intelligent people needed to serve on juries in order for the criminal justice system to function properly. She explained that her questionnaire answer was not motivated by a desire to serve on this particular case, but instead was motivated by her general interest in serving on a jury in a criminal case.

The trial judge was in the best position to determine whether Malone was challengeable for cause. Malone affirmed several times that she would afford Appellant the presumption of innocence and consider the evidence in making her decisions. On this record, no "clear abuse of discretion is evident."[285]

---

[285] *See Colburn v. State,* 966 S.W.2d 511, 517 (Tex. Crim. App. 1998) ("In reviewing the trial court's action, we ask whether the totality of the voir dire testimony supports the court's finding that the prospective juror is unable to follow the law as instructed, and reverse only if a clear abuse of
(continued...)

*Welch*

Appellant does not identify any reason or provide any argument for why venire member Welch should have been excluded. Instead, he states, "Similar error occurred with regard to Venireperson Welch," and he provides bare citations to the record. This part of Appellant's claim is inadequately briefed.[286] We decline to make his arguments for him.[287] Appellant has not shown that the trial judge erred in denying his challenge for cause to Welch.

Finding no error in the trial judge's denials of Appellant's challenges for cause to these three venire members, we overrule point of error twenty-eight.

## RIGHT TO BE PRESENT

In point of error twenty-nine, Appellant contends that the trial judge deprived him of his Article 33.03 right to be present at all essential proceedings in his case when, outside of Appellant's presence, the judge excused four prospective jurors. Appellant argues that the assignment of the entire panel to a specific court and case triggered the commencement of formal voir dire proceedings, including the duty to record all voir dire proceedings with the defendant present.

---

[285] (...continued)
discretion is evident.").

[286] *See* TEX. R. APP. P. 38.1(h), (i).

[287] *See, e.g., Wyatt,* 23 S.W.3d at 23 n.5.

Article 33.03 requires the personal presence of the defendant "at the trial" in all felony prosecutions unless he voluntarily absents himself after pleading to the indictment or after the jury has been selected.[288] The point at which "the trial" begins—triggering the defendant's right to be present—depends on whether a general assembly or special venire is summoned. Prospective jurors who are summoned to a general assembly have not been assigned to any particular case;[289] prospective jurors who are summoned to a special venire have been.[290] Trial begins for the former group *after* the jurors who are not disqualified, exempt or excused are divided into trial panels and sent to the individual courts trying the cases; trial begins for the latter group at the time of the exemptions, excuses and qualifications.[291] So, when a special venire is summoned, a trial court errs by proceeding with the excuses and qualifications in the defendant's absence.[292]

---

[288] TEX. CODE CRIM. PROC. art. 33.03; *Moore,* 999 S.W.2d at 399.

[289] *Jasper v. State*, 61 S.W.3d 413, 423 (Tex. Crim. App. 2001) (noting that prospective jurors who are summoned to a general assembly have not been assigned to any particular case; the judge presiding over the general assembly is assigned for that purpose only at that time and has no given case in mind).

[290] TEX. CODE CRIM. PROC. art. 34.01 ("A 'special venire' is a writ issued in a capital case by order of the district court, commanding the sheriff to summon either verbally or by mail such a number of persons, not less than 50, as the court may order, to appear before the court on a day named in the writ from whom the jury for the trial of such case is to be selected.").

[291] *Jasper*, 61 S.W.3d at 423.

[292] *See Jasper,* 61 S.W.3d at 423 (holding that "it was statutory and constitutional error for the trial court to proceed with the excuses and qualifications in [the] appellant's absence" because the prospective jurors were "*already assigned to [the] appellant's specific case.*").

Here, a special venire was summoned. The record in this case reflects that the trial judge stated several times that the panel summoned for Appellant's case was not a special venire. But the record also reflects that the panel was summoned specifically for the purpose of selecting a jury for the trial of this case. Accordingly, Appellant had the right to be personally present when the trial court proceeded with excuses and qualifications.

In preparation for this trial, the trial judge summoned 1000 prospective jurors. Of the 1000 people summoned, 240 people arrived at the appointed time and place. In the courtroom, the trial judge informed the parties that the panel was waiting in the central jury room. He stated that the judge and parties would move to that room so that the judge could conduct general qualifications. The remaining prospective jurors would then fill out the written questionnaires.

However, Appellant filed and presented a motion for continuance, asserting that he had not received the jury pool report a full two days before voir dire as required by Article 34.04.[293] He requested that the trial judge dismiss the waiting venire panel and summon a new panel. The prosecutor suggested that the judge could meet with the venire members outside the parties' presence, distribute the questionnaires, and then release them until the following day. Appellant did not object when the judge assented to this suggestion.

---

[293] In relevant part, Article 34.04 provides: "No defendant in a capital case in which the state seeks the death penalty shall be brought to trial until he shall have had at least two days (including holidays) a copy of the names of the persons summoned as veniremen, for the week for which his case is set for trial except where he waives the right or is on bail."

The following day, April 24, the trial judge informed the parties that, while distributing the questionnaires, he had excused four prospective jurors from the panel. The judge explained that three venire members who had been available on April 23 could not be available on April 24. One had a long-standing appointment with the Veterans Administration and two would be out of town. The judge postponed their jury service to another date.[294] The fourth prospective juror had a "disability that it was clear to the Court that, if they had appeared this morning, I was going to excuse them." He explained that this prospective juror was not competent mentally and was also physically disabled. The juror's spouse had waited for her just outside the central jury room because she needed his assistance. Accordingly, the judge released her. Appellant objected that he had not had an opportunity to object to these excuses or to see and qualify the excused venire members. The trial judge overruled these objections.

In the presence of the parties, the trial judge swore in the venire. He heard qualifications, exemptions, and hardships, and he excused prospective jurors who indicated that they had already decided, through exposure to media coverage, that Appellant was guilty. Appellant filed a written motion titled, "Defendant's Objections to Court's Procession to Qualify and Obtain Questionnaire Information from the Summoned Venire Panel on April 23rd, 2015, Without the Presence of the Pro Se Defendant and Motion to Quash the Venire."

---

[294] *See* TEX. CODE CRIM. PROC. art. 35.03, § 1 (providing, in relevant part, that the trial court shall hear and determine excuses, including any claim of an exemption or a lack of qualification, and if the court considers the excuse sufficient, the court shall discharge the prospective juror or postpone service to another date, as appropriate).

Prior to individual jury voir dire, the trial judge heard this motion and overruled it. The trial judge erred by proceeding with the prospective jurors' excuses in Appellant's absence.[295] Appellant impliedly agreed to allow the judge to distribute questionnaires in his absence. But he did not voluntarily absent himself from a proceeding in which the judge would excuse jurors. Accordingly, any error in excusing them outside Appellant's presence was of constitutional dimension.[296] Therefore, we will apply the harm standard for constitutional error.

Under the constitutional-error standard, we will not reverse a conviction if we determine that the error was harmless beyond a reasonable doubt.[297] If a reasonable likelihood exists that the error materially affected the jury's deliberations, then the error was not harmless beyond a reasonable doubt.[298]

Article 35.03 gives a trial judge broad discretion to excuse prospective jurors for good reason.[299] The postponement or cancellation of jury service because of a pre-existing

---

[295] *See Jasper,* 61. S.W.3d at 423.

[296] *See id.*; *see also Miller v. State,* 692 S.W.2d 88, 90 (Tex. Crim. App. 1985) (stating that the right of confrontation includes the absolute requirement that a criminal defendant who is threatened with loss of liberty be physically present at all phases of the proceedings against him, absent a waiver through his own conduct); *see also Allen,* 397 U.S. at 338 (stating that the Confrontation Clause guarantees an accused's right to be present in the courtroom at every stage of his trial).

[297] *See* TEX. R. APP. P. 44.2(a); *Jasper,* 61 S.W.3d at 423.

[298] *Jasper,* 61 S.W.3d at 423.

[299] *Crutsinger v. State,* 206 S.W.3d 607, 608 (Tex. Crim. App. 2006).

scheduling conflict is a legitimate exercise of this discretion.[300] Further, the trial judge has the discretion to excuse a prospective juror who has a disability and has requested an excusal.[301]

Accordingly, even if Appellant had been present and had objected to the judge's excusing these four prospective jurors, the trial judge would have been well within his discretion in overruling his objections.[302] Further, the judge's explanations indicated that he would have excused these prospective jurors even if Appellant had objected.[303] Thus, we conclude that Appellant's absence when the judge excused these prospective jurors was harmless beyond a reasonable doubt. Point of error twenty-nine is overruled.

We affirm the judgment of the trial court.

Delivered: October 9, 2019

Do Not Publish

---

[300] *Id.* at 608-09.

[301] *See Black v. State,* 26 S.W.3d 895, 899 (Tex. Crim. App. 2000).

[302] *See Jasper,* 61 S.W.3d at 424 (finding it significant to the harm analysis that, even if the appellant had been present and objected to the excuses, the trial court would have been well within its discretion in overruling the objections).

[303] *See id.* (finding that a defendant's absence, when a judge excused one prospective juror because she was a "caretaker" and another because she was pregnant and within six weeks of her due date, was harmless beyond a reasonable doubt).